**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
)
SPECTRONIC DENMARK A/S, *et al.*,　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Plaintiffs,　　　　)　　　No. 1:08-CV-00590 (PLF)
　　　　　　　　　　　　　　　　　　)
　　　　　　v.　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
JIMMI M. HANSEN, *et al.*,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Defendants.　　　　)
_____)

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Steven K. Davidson (D.D.C. Bar No. 407137)
John F. O'Connor (D.D.C. Bar No. 460688)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
sdavidson@steptoe.com
joconnor@steptoe.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

## Table of Contents

Page

I.    INTRODUCTION ..................................................................................1

II.   BACKGROUND ...................................................................................4

    A.    The Relationship of Defendants and Spectronic ...................................4

    B.    The First-Filed Danish Suit .................................................................4

    C.    Plaintiffs File the Present Action and Selectively Advise the Court of
       the Danish Proceedings .......................................................................7

    D.    Defendants Have Not Misappropriated Plaintiffs' Trade Secrets ...................8

    E.    Defendants Did Not Misappropriate Plaintiffs' Computerized
       Information ........................................................................................10

    F.    Plaintiffs DTC Communications and Domo, Ltd. Have Nothing To Do
       With the Issues in this Case ...............................................................10

    G.    Defendants Have Participated in Multiple Trade Shows Since the
       Individual Defendants Resigned From Spectronic, Including Three
       Trade Shows After the Danish Court Issued Its Limited Preliminary
       Injunction .........................................................................................11

III.  ANALYSIS ...........................................................................................11

    A.    The Standard for a Temporary Restraining Order/Preliminary
       Injunction .........................................................................................11

    B.    Plaintiffs Are Estopped From Obtaining a Preliminary Injunction or
       Temporary Restraining Order in this Court .........................................13

    C.    The Parties' Respective Rights Have Been, Are Being, and Should Be
       Resolved in the Denmark Proceeding ..................................................16

    D.    Plaintiffs Cannot Meet Their Burden of Establishing a Likelihood of
       Success on the Merits of Their Claims .................................................19

          1.    Plaintiffs Are Unlikely To Prevail On The Merits Of Their
             Claims Because the Court Lacks Subject-Matter Jurisdiction ..........20

          2.    Plaintiffs Are Not Likely to Prevail on Their CFAA Claim .............23

          3.    Plaintiffs Have No Reasonable Likelihood of Prevailing on
             their Lanham Act Claim ................................................................29

          4.    Plaintiffs Have No Reasonable Likelihood of Prevailing on
             their District of Columbia Trade Secrets Act Claim .........................32

       E.     **Plaintiffs Have Not Met Their Burden of Demonstrating They Would Suffer Irreparable Harm in the Absence of a Preliminary Injunction or Temporary Restraining Order**......................................................................36

       F.      **Covidence Would Suffer Irreparable Harm If a Preliminary Injunction Were Issued** ...................................................................38

       G.    **The Public Interest Would Be Disserved By Issuance of a Preliminary Injunction or Temporary Restraining Order**....................................39

**IV.**    **THE COURT SHOULD SANCTION PLAINTIFFS BY REQUIRING THEM TO REIMBURSE DEFENDANTS THEIR ATTORNEY'S FEES AND COSTS** ...................................................................................................40

**V.**     **CONCLUSION** ............................................................................................43

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alexander v. FBI,*
    192 F.R.D. 25 (D.D.C. 2000)................................................................40

*Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.,*
    10 F.3d 425 (7th Cir. 1993) ................................................................21

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,*
    421 U.S. 240 (1975)................................................................40

*Ambach v. Bell,*
    686 F.2d 974 (D.C. Cir. 1982)................................................................11

*Assassination Archives & Research Ctr. v. CIA,*
    48 F. Supp. 2d 1 (D.D.C. 1999)................................................................40

*BCCI Holdings (Luxembourg) v. Mahfouz,*
    828 F. Supp. 92 (D.D.C. 1993)................................................................18

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991)................................................................40

*CityFed Fin. Corp. v. Office of Thrift Supervision,*
    58 F.3d 738 (D.C. Cir. 1995)................................................................12

*Colo. River Water Conservation Dist. v. United States,*
    424 U.S. 800 (1976)................................................................16

*Columbia Hosp. for Women Found. v. Bank of Tokyo-Mitsubishi, Ltd.,*
    15 F. Supp. 2d 1 (D.D.C. 1997)................................................................12

*Conley v. Gibson,*
    355 U.S. 41 (1957)................................................................25

*Dairymen, Inc. v. FTC,*
    No. 81-0169, 1981 WL 2140 (W.D. Ky. Aug. 5, 1981)................................................................15

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
    539 U.S. 23 (2003)................................................................30, 31

*Davenport v. Int'l Bhd. of Teamsters,*
    166 F.3d 356 (D.C. Cir. 1999)................................................................12

*Decatur Liquors, Inc. v. District of Columbia,*
    478 F.3d 360 (D.C. Cir. 2007) ................................................................22

*Diamond Power Int'l, Inc. v. Davidson,*
    ___ F. Supp. 2d ___, 2007 WL 2904119 (N.D. Ga. 2007) ..........................27

*Dresser Indus., Inc. v. Underwriters at Lloyd's of London,*
    106 F.3d 494 (3d Cir. 1997) ..................................................................21

*Drs. Groover, Christie & Merritt, P.C. v. Burke,*
    917 A.2d 1110 (D.C. 2007) ...................................................................33

*Dye v. United States,*
    ___ F. Supp. 2d ___, 2007 WL 2800376 (D.D.C. 2007) ...........................25

*Ellipso, Inc. v. Draim,*
    No. 06-1373, 2007 WL 1866799 (D.D.C. June 28, 2007) ..........................25

*Gen. Universal Sys., Inc. v. Lee,*
    379 F.3d 131 (5th Cir. 2004) .................................................................31

*Gilson v. Republic of Ireland,*
    606 F. Supp. 38 (D.D.C. 1984) ...........................................................33, 34

*Hagans v. Lavine,*
    415 U.S. 528 (1974) ............................................................................21

*Handy v. Shaw, Bransford, Veilleux & Roth,*
    325 F.3d 346 (D.C. Cir. 2003) ...............................................................16

*Hayes v. Ridge,*
    946 F. Supp. 354 (E.D. Pa. 1996) .......................................................14, 15

*Hutto v. Finney,*
    437 U.S. 678 (1978) ............................................................................40

*Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,*
    335 F.3d 357 (5th Cir. 2003) .................................................................17

*Keystone Driller Co. v. Gen. Excavator Co.,*
    290 U.S. 240 (1933) ............................................................................12

*Klaxon Co. v. Stentor Elec. Mfg. Co.,*
    313 U.S. 487 (1941) ............................................................................33

*Law Offices of Jerris Leonard, P.C. v. Mideast Sys., Ltd.,*
    111 F.R.D. 359 (D.D.C. 1986) ...............................................................16

*Long v. Dep't of Homeland Security*,
    436 F. Supp. 2d 38 (D.D.C. 2006) ........................................................................36

*Lyon Ford, Inc. v. Ford Mktg. Corp.*,
    337 F. Supp. 691 (E.D.N.Y. 1971) .....................................................................15

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ...........................................................................................11

*Monument Realty LLC v. WMATA*,
    ___ F. Supp. 2d ___, 2008 WL 555967 (D.D.C. Feb. 28, 2008) ......................36

*Morgan Stanley DW, Inc. v. Rothe*,
    150 F. Supp. 2d 67 (D.D.C. 2001) .................................................................12, 37

*Mova Pharm. Corp. v. Shalala*,
    140 F.3d 1060 (D.C. Cir. 1998) .........................................................................11

*Newburyport Water Co. v. Newburyport*,
    193 U.S. 561 (1904) ...........................................................................................21

*Pain v. United Techs. Corp.*,
    637 F.2d 775 (D.C. Cir. 1980) ...............................................................17, 18, 19

*Peacock v. Thomas*,
    516 U.S. 349 (1996) ...........................................................................................23

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
    392 U.S. 134 (1968) ...........................................................................................39

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ...........................................................................................34

*Piper Aircraft Cp. v. Reyno*,
    454 U.S. 235 (1981) ...........................................................................................18

*Roadway Express, Inc. v. Piper*,
    447 U.S. 752 (1980) ...........................................................................................40

*Salve Regina College v. Russell*,
    499 U.S. 225 (1991) ...........................................................................................39

*Salyer v. Salyer Am. Fresh Foods*,
    No. 05-3562 ........................................................................................................26

*Schroer v. Billington*,
    ___ F. Supp. 2d ___, 2007 WL 4225667 (D.D.C. 2007) ..................................25

*Secureinfo Corp. v. Telos Corp.*,
  387 F. Supp. 2d 593 (E.D. Va. 2005) ...................................................................27

*Serono Labs., Inc. v. Shalala*,
  158 F.3d 1313 (D.C. Cir. 1998) ..........................................................................36

*Shepherd v. Am. Broadcasting Co.*,
  62 F.3d 1469 (D.C. Cir. 1995) ............................................................................40

*Southwest Airlines Co. v. BoardFirst, LLC*,
  No. 06-CV-0891, 2007 WL 4823761 (N.D. Tex. Sept. 12, 2007) .........................29

*Stewart v. Capitol Area Permanente Med. Group*,
  720 F. Supp. 3 (D.D.C. 1989) .............................................................................19

*Syngenta Crop Protection, Inc. v. Henson*,
  537 U.S. 28 (2002) ..............................................................................................23

*U.S. Motors v. Gen. Motors Europe*,
  519 F. Supp. 2d 671 (E.D. Mich. 2007) ...............................................................21

*Universal Licensing Corp. v. Paola del Lungo S.p.A.*,
  293 F.3d 579 (2d Cir. 2002) ...............................................................................21

*Universal Oil Prods. Co. v. Root Refining Co.*,
  328 U.S. 575 (1946) ............................................................................................40

*Westech Gear Corp. v. Dep't of Navy*,
  No. 87-2609, 1988 WL 170558 (D.D.C. May 9, 1988) .........................................33

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ............................................................................36

## STATUTES

18 U.S.C. § 1030 .....................................................................................19, 23, 25, 26, 27

28 U.S.C. § 1332 .....................................................................................................20, 21

District of Columbia Trade Secrets Act, D.C. Code § 36-401 ...............................32, 33

5 U.S.C. § 1125(a)(1) ...................................................................................................19

**RULES**

Federal Rule of Civil Procedure 44.1 ........................................................................34

Federal Rule of Civil Procedure 11 ....................................................................40, 43

Federal Rule of Civil Procedure 12(b)(6) ................................................................25

**BOOKS AND ARTICLES**

Charles A. Wright, et al., *Federal Practice & Procedure* ................................13, 21, 40

## I.    INTRODUCTION

Candor and full disclosure are particularly important from parties seeking temporary restraining orders.  The proceedings on temporary restraining orders typically are so expedited that the Court and opposing parties often have little to no time to investigate the movant's claims, and discovery is essentially impossible to obtain.  These exigencies are heightened even more when the party to be enjoined is a foreigner.  In the time since Plaintiffs filed their temporary restraining order motion, Defendants, who have sold no products in the United States and had no relationships with American lawyers, had to find and retain counsel, and counsel had to get up to speed on the facts of the parties' dispute.  This task is complicated where, as here, virtually every important document is in Danish.

Plaintiffs have failed to meet their obligation to be candid and fully disclose the facts to the Court.  Perhaps worst, Plaintiffs advised the Court that a Danish court had preliminarily enjoined Defendants from doing business with certain potential customers.  Compl. ¶¶ 129-30. Plaintiffs, however, provided the Court and Defendants with a translation of only part of the Danish court's decision.  Of particular importance, the Danish court described the "primary" relief sought by Plaintiffs as follows:

> [That Defendants be] prohibited as individuals and as a whole or partial group for a period of 5 years starting April 1, 2007 . . . to direct[ly] or indirectly provide, sell, rent, lease, or supply sound and video recording products as well as wireless sound and video surveillance products to police, military or governmental intelligence agencies in Denmark or abroad.

O'Connor Decl., Ex. A at 2.  In short, Plaintiffs sought in Denmark a preliminary injunction that would have prohibited Defendants from competing generally, from doing things such as marketing and selling their products at trade shows, and the Danish court specifically refused to grant that relief.  Instead, the Danish court permitted Defendants to compete with vigor so long

as they did not sell products to a defined list of product distributors.  *Id.*, Ex. A at 3.[1]  This Court would never know that fact from Plaintiffs' papers, and Defendants had to obtain a translation of the second half of Plaintiffs' own exhibit to expose Plaintiffs' dishonesty.

In keeping with their fast and loose treatment of the facts, Plaintiffs assert in their Complaint that Defendants' "Oculus" video recording device is a "knock off" of a Spectronic video recorder, but fail to disclose that Plaintiff Spectronic *does not even have a video recording device on the market, and will not have one on the market for several months*.  Moreover, Plaintiffs fail to disclose that Spectronic's own Chief Executive Officer testified in the Danish proceedings that Spectronic did not even begin developing a video recording device until *after* all three individual Defendants had left Spectronic.

Tactics aside, there is no basis for the injunctive relief sought by Plaintiffs.  The Danish court's rejection of Plaintiffs' request for relief that would have enjoined Defendants' attendance at the upcoming Washington, D.C. trade show, estops Plaintiffs from seeking the same relief from a second court.  Moreover, even if Plaintiffs were not estopped, notions of comity and the judicial policy against forum shopping are sufficient to defeat Plaintiffs' motion, and the same is true of the doctrine of *forum non conveniens*.

If the Court were to reach the typical four-part test for preliminary injunctions and temporary restraining orders, it is clear that Plaintiffs are not likely to succeed on the merits of their claims.  Plaintiffs' federal claims are so lacking in substance that they cannot form the basis of federal question jurisdiction, and there is no diversity jurisdiction in this case.  Plaintiffs' claim under the Computer Fraud and Abuse Act fails for a lack of evidence as well as Plaintiffs'

---

[1] The list of "customers" with which Defendants were preliminarily enjoined from doing business is limited to Plaintiffs' distributors.  The Danish court did not preliminarily enjoin Defendants from selling products to any end-users.

inability to satisfy several required elements for such a claim. Plaintiffs' claim under § 43(a) of the Lanham Act is defeated by the plain language of the statute, a fact reinforced by a recent unanimous Supreme Court decision. Plaintiffs' claim under the District of Columbia Trade Secrets Act fails because of a lack of evidence and also because it is most unlikely that a District of Columbia trade secrets statute would supply the governing law for a claim that three Danes supposedly stole trade secrets from one Danish company, in Denmark, and supposedly have used those trade secrets to the benefit of a new Danish company they have formed.

Plaintiffs also cannot show any likelihood that they would suffer irreparable harm in the absence of a preliminary injunction. Defendants have attended many trade shows in the past several months, fatally undermining Plaintiffs' claim that Defendants' attendance at a trade show equates with the irretrievable loss of Plaintiffs' trade secrets. By contrast, issuance of a preliminary injunction would cause irreparable harm to Defendants, both in terms of the loss of unidentifiable clients as well as reputational injury. Issuance of interim relief here is also contrary to public policy.

The final question is whether Plaintiffs should be allowed to profit from their conduct in misleading the Court and filing claims entirely duplicative of the first-filed Danish suit. A mere denial of Plaintiffs' motion leaves Plaintiffs with half of what they have sought, as they have imposed tens of thousands of dollars in legal fees and costs on a smaller competitor that is forced to litigate (once again) the propriety of an injunction prohibiting Defendants from competing in the marketplace, when Defendants have already litigated (and won) that issue in Denmark. This Court's inherent power to sanction litigants allows the Court to prevent the injustice perpetrated by Defendants, and can deter Defendants and others from offering incomplete and misleading descriptions of foreign litigation. Therefore, in addition to denying Plaintiffs' motion, the Court

should make Defendants whole by ordering Plaintiffs to reimburse Defendants the attorney's
fees and costs they have incurred in defending against the present motion.

## II.    BACKGROUND

### A.    The Relationship of Defendants and Spectronic

Defendants Hansen, Messerschmidt, and Klebaek are Danish citizens resident in
Denmark. Together, they formed Covidence A/S ("Covidence") in April 2007. Covidence, a
Danish company with its principal place of business in Ronde, Denmark, develops, markets, and
sells high quality miniature video surveillance equipment to police forces, intelligence agencies,
military organizations and other law enforcement agencies worldwide. Prior to the founding of
Covidence, the individual Defendants were employed by Plaintiff Spectronic Denmark A/S
("Spectronic"). The three individual Defendants resigned from Spectronic on February 26, 2007.
Hansen Decl. ¶¶ 1-2.[2]

The three individual Defendants had employment contracts with Spectronic. These
contracts were the same types of contracts entered into by Spectronic's approximately 80 other
employees. As the plain language in Paragraphs 63-64, 75-76, and 85-86 of the Verified
Complaint makes clear, the provisions in Defendants' employment contracts did not impose
post-employment restrictions on Defendants in terms of covenants not to compete or a customer
limitation provision. Hansen Decl. ¶ 12.

### B.    The First-Filed Danish Suit

Shortly after the individual Defendants formed Covidence, the same three Plaintiffs in
this action filed suit against the same four Defendants in this action in Denmark. In that first-
filed lawsuit, Plaintiffs alleged that Defendants stole trade secrets from Spectronic and that

---

[2] The Hansen Declaration is attached as an exhibit to the Declaration of John F.
O'Connor.

4

Defendants were using those trade secrets to compete against Plaintiffs. In that lawsuit, Plaintiffs sought monetary damages and injunctive relief. Hansen Decl. ¶¶ 14-16. Plaintiffs' claims in Denmark are essentially the same as their claims in this action. Sorenson Decl. ¶ 3.[3]

In the Denmark action, Plaintiffs filed a motion seeking a preliminary injunction against Defendants. Plaintiffs' motion papers in Denmark identify the primary injunctive relief requested by Plaintiffs as follows:

> [That Defendants be] separately, together or partially together, in a period of five years starting April 1, 2007 . . . prohibited from directly or indirectly supplying, selling, renting out or delivering sound- and video-recording equipment as well as wireless sound- and video-recording products to police-, military-, or intelligence-authorities domestically and abroad.

O'Connor Decl., Ex. B at 2; Sorenson Decl. ¶ 3. Only as subsidiary and alternative relief did Plaintiffs seek a preliminary injunction that would have preliminarily barred Defendants from doing business with certain specified distributors. O'Connor Decl., Ex. B at 3.

The Danish court similarly understood Plaintiffs' principal request for interim relief to be an injunction that would have barred Defendants from competing generally in the audio and video recording device market. In its preliminary injunction decision, the Danish court described Plaintiffs' main request for relief as follows:

> [That Defendants be] prohibited as individuals and as a whole or partial group for a period of 5 years starting April 1, 2007 . . . to direct[ly] or indirectly provide, sell, rent, lease, or supply sound and video recording products as well as wireless sound and video surveillance products to police, military or governmental intelligence agencies in Denmark or abroad.

O'Connor Decl., Ex. A at 2.

_____

[3] Peter Sorenson is the lawyer who represents Defendants in the Danish action. His Declaration is attached as an exhibit to the O'Connor Declaration. Plaintiffs not only provided an incomplete and misleading description of the Danish proceedings, but offered no evidence from Danish counsel concerning these proceedings.

After a four-day contested hearing with live witnesses cross-examined by the parties and the court, the Danish court refused to grant Plaintiffs the principal relief they sought, requested relief that would have precluded Defendants from competing altogether and, for example, would have barred Defendants from attending trade shows to market and sell their goods. Instead, the Danish court issued a far narrower preliminary injunction that permitted Defendants to compete worldwide so long as they refrained from doing business with a specified list of distributors and suppliers. The list of distributors with which Defendants were preliminarily enjoined from doing business included only two United States companies: Brimtek Inc. and Ganz & Pugh. Hansen Decl. ¶ 14; Sorenson Decl. ¶ 4; O'Connor Decl., Ex. A at 3.

The Danish court did not find that Defendants had breached their employment contracts in any way during the proceedings on the Danish temporary restraining order, and Defendants have not done anything in forming and operating Covidence that is a breach of their employment contracts. Hansen Decl. ¶ 12.

Plaintiffs did not appeal the Danish court's refusal to grant the broader relief Plaintiffs sought. Sorenson Decl. ¶ 7. Because Defendants determined that they could live with the narrower preliminary injunction issued by the Danish court, Defendants did not appeal that decision either. Hansen Decl. ¶ 14. Under Danish law, either party could have appealed from the preliminary injunction decision. Sorenson Decl. ¶ 7. The Danish case remains active. Ultimately, the Danish court will decide Plaintiffs' claims that Defendants misappropriated trade secrets and will either award damages and confirm the preliminary injunction in favor of Plaintiffs, or discharge the preliminary injunction and enter judgment for Defendants. Hansen Decl. ¶ 14; Sorenson Decl. ¶ 6. Defendants intend to comply with the Danish preliminary injunction until it either expires or is discharged. Hansen Decl. ¶ 15.

6

C.    **Plaintiffs File the Present Action and Selectively Advise the Court of the Danish Proceedings**

In an effort to develop their business, Defendants purchased a booth at the "GovSec, U.S. Law and Ready 2008" trade show taking place in the District of Columbia on April 23-24, 2008, and made plans to attend the trade show. Defendants' attendance at the trade show is not prohibited by the Danish preliminary injunction, though Defendants' participation would have been prohibited if the Danish court had issued the much broader preliminary injunction that Plaintiffs sought in Denmark. Sorenson Decl. ¶¶ 5, 8. Defendants do not believe that the two United States companies identified in the Danish preliminary injunction motion – Brimtek Inc. and Ganz & Pugh – will be at the Washington, D.C. trade show. Hansen Decl. ¶ 14.

In response to Defendants' decision to attend the trade show, Plaintiffs filed the present action, asserting misappropriation of trade secret claims similar to those being litigated in the first-filed Denmark action. Plaintiffs' Verified Complaint in the present action references the preliminary injunction issued in the Denmark case at Paragraphs 129-30, but does not disclose that the case remains active and that Plaintiffs are asserting claims for money damages and injunctive relief in that action for alleged misappropriation of trade secrets by Defendants.

With respect to the preliminary injunction issued by the Danish court, Plaintiffs attach three pages from the forty-five page decision, which is in Danish, as Exhibit 32 to their Verified Complaint. Along with the Danish version of these three pages, Plaintiffs attach to Exhibit 32 an English translation of less than one page of the decision, the part that sets forth the relief granted. Plaintiffs did not provide the Court or Defendants with an English translation of the rest of the Danish court's preliminary injunction decision, or even a translation of all three pages of the

7

decision Plaintiffs submitted as an exhibit.[4]  The part of the preliminary injunction decision that Plaintiffs did not translate makes clear that Plaintiffs sought a preliminary injunction barring Defendants from competing in the audio and video recording device market for five years and that the Danish court had refused to issue this requested relief.  *See* O'Connor Decl., Ex. A at 3.

In addition to filing their Verified Complaint in this action, Plaintiffs filed a motion for a temporary restraining order or preliminary injunction.  That pleading seeks an order enjoining Defendants from participating in any way in the April 23-24, 2008 trade show in Washington, D.C.  As with their Verified Complaint, Plaintiffs' preliminary injunction papers do not disclose that Plaintiffs had already asked the Danish court to issue a preliminary injunction that would have barred Defendants from competing with Plaintiffs generally (as opposed to precluding Defendants from doing business with specified distributors) and that the Danish court had refused to grant that relief.

### D.    Defendants Have Not Misappropriated Plaintiffs' Trade Secrets

Plaintiffs' Verified Complaint in this action accuses the Defendants of stealing Plaintiffs' trade secrets.  Defendants have not taken anything from Plaintiffs nor have they used knowledge of trade secrets from their prior employment at Spectronic to develop, market, or sell Covidence products.  In fact, in the Denmark lawsuit discussed above, Spectronic's Chief Executive Officer, Kim Lehmann, testified under oath that he did not have any knowledge of anything that had been stolen from Spectronic by the Defendants.  Hansen Decl. ¶ 3.  Neither Plaintiffs' Verified Complaint nor the accompanying Affidavit of Christian Moestrup provides any specific

---

[4] Upon having the entirety of the Danish version of Plaintiffs' Exhibit 32 translated, Defendants' counsel learned on April 21, 2008 the Danish version of the Danish court's preliminary injunction decision submitted by Plaintiffs is only three pages of a forty-five page document.  As discussed in this opposition, the untranslated portion of just these three pages demonstrates that Plaintiffs have misled the Court as to the scope of the relief sought by Plaintiffs in Denmark.

statement of what trade secrets Defendants supposedly misappropriated, or how those trade secrets supposedly were used in the production of Defendants' products.

Paragraph 92 of Plaintiffs' Verified Complaint alleges that "[o]ne of the knock-off and/or stolen products unlawfully marketed in this jurisdiction by the defendants is the so-called 'Oculus' video recorder." This allegation is false and unsupported by the record. The Oculus product developed by Covidence is a miniature video recorder (8x52x27 millimeters) for body-worn applications. At the time Defendants left Spectronic, none of the Plaintiffs had a product on the market similar to Oculus, or even such a product in development. Indeed, it had been Spectronic's strategic business decision to limit its product range to audio products. The Oculus recorder is the first Covidence product ready for worldwide distribution. Therefore, Covidence has, to date, not sold any video recorders in the United States. Hansen Decl. ¶¶ 4-5.

Plaintiffs' Verified Complaint alleges at Paragraph 33 that Spectronic had a strategic plan, prior to Defendants' departure from Spectronic, to develop video recording equipment. This is not true and is not supported by the record. The document relied on by Spectronic for this contention is a proposed strategy plan that represented the wishes of Spectronic's engineering department, and was not approved by Spectronic's board of directors. No actions toward developing video recording products were initiated by Spectronic until after Defendants left Spectronic's employ. Hansen Decl. ¶ 6.

In the Danish lawsuit discussed above, Spectronic's Chief Executive Officer, Kim Lehmann, testified under oath that Spectronic launched its first video recorder development program in July/August 2007, several months after Defendants left Spectronic, and that Spectronic expected to begin selling its new product in the first quarter of 2008. The best available commercial information is that Spectronic's development of a video recorder is delayed

9

and that Spectronic will not be ready to sell its own video recorder product until December 2008. Hansen Decl. ¶ 7.

In addition to using none of Plaintiffs' trade secrets in developing the Oculus device, Defendants also have not used any trade secrets Plaintiffs might have in developing any of Covidence's other products. Hansen Decl. ¶ 9.

### E.    Defendants Did Not Misappropriate Plaintiffs' Computerized Information

Plaintiffs' Verified Complaint alleges, solely on information and belief, that Defendants misappropriated information from Spectronic's computer systems. This allegation is false and not supported by the record. Plaintiffs identify two computer systems to which they allege Defendants were granted access by Spectronic: the Axapta system and the SuperOffice system. Defendants Klebaek and Messerschmidt did not have access to SuperOffice, and their access to Axapta was the same access enjoyed by Spectronic's other employees. Hansen Decl. ¶ 10. Defendants have not used customer information or any other information obtained through the authorized use of Spectronic's computer systems at Covidence, nor did Defendants engage take any information from Spectronic's computer systems without authority. *Id.*

### F.    Plaintiffs DTC Communications and Domo, Ltd. Have Nothing To Do With the Issues in this Case

None of the Defendants ever worked for Plaintiffs DTC Communications, Inc., and Domo, Ltd. None of the Defendants had access to either company's computer systems. None of the Defendants have used or disclosed any information relating to either of these companies. The business of these two companies is to develop and sell wireless video products, and Covidence does not develop or sell wireless video products, a fact to which Defendants testified under oath in the Danish proceeding. Plaintiffs have presented the Court with an outdated page from Covidence's website to suggest that Covidence is in the business of developing and selling

10

wireless video solutions.  The statement on Covidence's website has been amended to make

clear that Covidence does not develop and sell wireless video solutions.  Hansen Decl. ¶ 11.

> **G.    Defendants Have Participated in Multiple Trade Shows Since the Individual Defendants Resigned From Spectronic, Including Three Trade Shows After the Danish Court Issued Its Limited Preliminary Injunction**

Covidence has participated in four major trade shows in Europe during the last six

months, three of which were held after the Danish case issued its limited preliminary injunction,

and Spectronic did not attempt to enjoin Covidence from appearing at any of these trade shows.

These trade shows include the Milipol show in Paris in October 2007, the SICUR show in

Madrid in February 2008, the HMGCC show in London in February 2008, and the HOSDB

show in London in March 2008.  The preliminary injunction issued by the Danish court does not

prohibit Covidence from attending trade shows anywhere in the world, so long as Covidence

complies with the terms of that injunction in terms of the entities with which it does business.

Hansen Decl. ¶ 17.

## III.    ANALYSIS

### A.    The Standard for a Temporary Restraining Order/Preliminary Injunction

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be

granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v.*

*Armstrong*, 520 U.S. 968, 972 (1997).  Whether a temporary restraining order or a preliminary

injunction shall be awarded rests in the sound discretion of the trial court.  *Ambach v. Bell*, 686

F.2d 974, 979 (D.C. Cir. 1982).  A movant seeking a temporary restraining order or preliminary

injunction bears the burden of establishing that: (1) there is a substantial likelihood plaintiff will

succeed on the merits; (2) plaintiff will be irreparably harmed if an injunction is not granted; (3)

an injunction will not substantially injure the non-moving party; and (4) the public interest will

be furthered by an injunction.  *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir.

1998).[5]  These factors are not considered in isolation, and no one factor is necessarily dispositive as to whether a preliminary injunction is appropriate.  *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995).  Instead, the four factors "interrelate on a sliding scale and must be balanced against each other."  *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999).

However, when a party seeks to change the status quo, "the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction."  *Columbia Hosp. for Women Found. v. Bank of Tokyo-Mitsubishi, Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (internal citation omitted), *aff'd*, 159 F.3d 636 (D.C. Cir. 1998); *see also Morgan Stanley DW, Inc.*, 150 F. Supp. 2d at 72 n.2.  Therefore, Plaintiffs bear a heightened burden in seeking injunctive relief because they seek to disturb the status quo by prohibiting Defendants from attending a trade show they are free to attend at present.

In this case, however, the Court should deny Plaintiffs' motion before even reaching the usual four-part test for interim relief.  As an initial matter, Plaintiffs' request for a preliminary injunction or temporary restraining order is barred by the Danish court decision denying Plaintiffs injunctive relief that would have precluded Defendants' attendance at the upcoming trade show.  Moreover, even if the doctrine of collateral estoppel did not apply, the decision to award interim relief remains a matter of discretion, and the Court should exercise its discretion to deny Plaintiffs' motion.  *See Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933).  Plaintiffs have already sought a preliminary injunction in Denmark that would have

_____

[5] The Court considers the same factors in evaluating a motion for a temporary restraining order as for as motion for preliminary injunction.  *Morgan Stanley DW, Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001).

barred Defendants from competing in the audio and video surveillance marketplace, and the

Danish court denied that relief.  Remarkably, Plaintiffs now have come to this Court and sought

once again to bar Defendants from competing with Plaintiffs, offering this Court an incomplete

and misleading description of the Danish proceedings in order to conceal that the Danish court

had already rejected the notion of restraining Defendants from competing in the audio and video

recording market.  This is forum shopping at its worst, and Plaintiffs have acted inequitably in

telling only half the story about the Danish preliminary injunction proceedings.

Therefore, the Court may deny Plaintiffs' motion without even reaching the four-part test

that must be satisfied before interim relief may be awarded.  *See* 11A Charles A. Wright, et al.,

*Federal Practice & Procedure*, § 2946, at 106 (2d ed. 1995) (collecting cases) ("As a matter of

public policy, equitable relief typically will not be granted to an individual who has acted in bad

faith with respect to the transaction that has been brought before the court.").  In any event,

however, it could not be clearer that Plaintiffs cannot meet their burden under the applicable

four-part test, so their motion would lack merit even if Plaintiffs came to this Court with clean

hands.

**B.      Plaintiffs Are Estopped From Obtaining a Preliminary Injunction or Temporary Restraining Order in this Court**

By translating a small portion of the Danish court's preliminary injunction decision, and

not disclosing the nature of the relief requested from that court, Plaintiffs failed to advise this

Court that they had already sought from the Danish court a preliminary injunction that would

have barred Defendants from attending the Washington, D.C. trade show.  Specifically, Plaintiffs

asked the Danish court presiding over the first-filed action to preliminarily enjoin Defendants

from competing in the audio and video recording device market for five years.  Hansen Decl. ¶

14; Sorenson Decl. ¶ 3; *see also* O'Connor Decl., Ex. A at 2; Ex. B at 2.  After a four-day

13

contested hearing that involved live testimony from a number of witnesses, the Danish court refused to grant that requested preliminary injunction, and instead issued an injunction that solely prohibited Defendants, on an interim basis, from doing business with a specific list of distributors and suppliers. O'Connor Decl., Ex. A at 3; Sorenson Decl. ¶ 5. Notably, only two of the distributors listed in the Danish preliminary injunction are United States companies, and Defendants do not expect either of those entities to attend the upcoming trade show. Hansen Decl. ¶ 14.

Thus, by attending the trade show in Washington, D.C., Defendants are doing exactly what they are permitted to do under the Danish preliminary injunction, competing generally in the audio and video recording device market subject to the narrow prohibitions contained in the Danish order regarding distributors with which Defendants may not do business. Nevertheless, without disclosing the full nature of the Danish preliminary injunction proceedings, Plaintiffs have come to this Court and sought a second preliminary injunction, one that would give Plaintiffs injunctive relief that the Danish court specifically declined to grant. However, having unsuccessfully sought a preliminary injunction that would do more than impose modest limitations on Defendants' right to use certain distributors, after a lengthy hearing in Denmark, Plaintiffs are estopped from seeking a broader preliminary injunction from this Court.

In *Hayes v. Ridge*, 946 F. Supp. 354 (E.D. Pa. 1996), the court faced a similar situation, where the plaintiffs sought preliminary injunctive relief that had been denied in a preliminary injunction motion the plaintiffs had previously sought in state court. *Id.* at 363. The court rejected the plaintiffs' attempt to relitigate the preliminary injunction they lost in state court, finding that the plaintiffs were estopped from doing so. The plaintiffs argued that the state court's prior denial of the preliminary injunction had no preclusive effect because it was not a

14

final judgment on the merits. *Id.* at 366. The court noted, however, that virtually all of the cases

standing for the proposition that a prior preliminary judgment ruling does not have preclusive

effect "involve[d] an attempt to use a prior preliminary injunction ruling to determine a final

substantive point in either the same case or in another case." *Id.* at 364.

The *Hayes* court observed, however, that the defendants before it were not seeking to use

the prior preliminary injunction decision in that way, but were merely seeking to use it to

preclude the plaintiff from seeking the same injunctive relief it had been denied in one case

through a second preliminary injunction motion filed in a different court. *Id.* In that situation,

the court held that a litigant *was* estopped from taking a second bite at the apple:

> The second issue is whether the state court denial of the injunction
> is a "final judgment on the merits." Like the discussion above, this
> does not present a significant obstacle. This is so because a
> preliminary injunction *is* a final judgment on the merits (when
> appealed and affirmed or when not appealed) *of the limited issue
> presented by the preliminary injunction – i.e.*, whether the
> plaintiffs can show likelihood of success on the merits, irreparable
> harm, and the other necessary factors.

*Id.* at 366. Other courts have come to the same conclusion. *See Dairymen, Inc. v. FTC*, No. 81-

0169, 1981 WL 2140, at *1-2 (W.D. Ky. Aug. 5, 1981) (denying preliminary injunction where

another court in the same district had already denied a preliminary injunction brought by the

plaintiff because "it appears that considerations of collateral estoppel are applicable"); *Lyon*

*Ford, Inc. v. Ford Mktg. Corp.*, 337 F. Supp. 691, 695 (E.D.N.Y. 1971) (holding that a plaintiff

was barred from seeking preliminary injunctive relief when such relief had been denied in a

companion case because the plaintiff's "contention disregards the present New York rule of

collateral estoppel").

The same analysis applies here. While Plaintiffs did not disclose it, the indisputable fact

is that Plaintiffs had asked the Danish court to issue a preliminary injunction that would have

barred the same conduct Plaintiffs seek to preliminarily enjoin in this Court: Defendants'

competition in the audio and video surveillance market.  Plaintiffs did not get that relief, but got

much narrower interim relief that only precludes Defendants from doing business with the

distributors and suppliers specified in the preliminary injunction decision.  That decision came

after a four-day hearing at which Plaintiffs had a full opportunity to present their case.  Sorenson

Decl. ¶ 4.  The Danish preliminary injunction hearing involved live witnesses, and those

witnesses were cross-examined by both the parties and the Danish court.  *Id.*  Plaintiffs chose not

to appeal the Danish preliminary injunction decision, although they could have under Danish

law.  *Id.* ¶ 7.  Defendants are complying fully with the Danish preliminary injunction decision,

but Plaintiffs have come to this Court seeking relief that the Danish court declined to grant,

through an incomplete and misleading characterization of the Danish proceedings.  Under these

circumstances, the doctrine of collateral estoppel defeats Plaintiffs' motion right out of the box,

and the Court should deny the motion accordingly.

### C.    The Parties' Respective Rights Have Been, Are Being, and Should Be Resolved in the Denmark Proceeding

Even if Plaintiffs were not collaterally estopped by virtue of the Denmark preliminary

injunction proceeding, the existence of that first-filed case would be a strong equitable basis for

denying Plaintiffs a second opportunity to seek a preliminary injunction against Defendants.  In

this Circuit, the "general principle is to avoid duplicative litigation."  *Handy v. Shaw, Bransford,*

*Veilleux & Roth*, 325 F.3d 346, 349-50 (D.C. Cir. 2003) (quoting *Colo. River Water*

*Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)); *see also Law Offices of Jerris*

*Leonard, P.C. v. Mideast Sys., Ltd.*, 111 F.R.D. 359, 361 (D.D.C. 1986) ("Where the factual

claims in two actions indicate that evidence offered in both claims is likely to be substantially

identical, the claim should be adjudicated in a single forum.").  Plaintiffs are already litigating

16

their trade secrets claims in the Denmark case.  That court has already held a comprehensive preliminary injunction proceeding, and has balanced the parties' interim rights pending final resolution of the case on the merits.

Under these circumstances, it would show a lack of respect to the Danish court for this Court to upset the Danish court's delicate balancing of the parties' pretrial rights through a preliminary injunction/temporary restraining order issued under immense time pressure given the imminence of the trade show.  This is particularly true given that Plaintiffs' claims on the merits are essentially the same as their claims in the Denmark case.  *See Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 372 (5th Cir. 2003) (injunction inappropriate where it would be likely to have the practical effect of showing a lack of respect for the judicial proceedings of other sovereign nations).

But even if the first-filed Danish action did not exist, this would not be the appropriate forum to consider Plaintiffs' claims, as the courts of Denmark are a much more convenient forum.  The standards for a *forum non conveniens* analysis in this Circuit are as follows:

> [A] district judge's *forum non conveniens* inquiry should proceed in four steps.  As a prerequisite, the court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case.  Next, the trial judge must consider all relevant actors of *private* interest, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice.  If the trial judge finds this balance of private interests to be in equipoise or near equipoise, he must then determine whether or not factors of *public* interest tip the balance in favor of a trial in a foreign forum.  If he decides that the balance favors such a foreign forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice.

*Pain v. United Techs. Corp.*, 637 F.2d 775, 784-85 (D.C. Cir. 1980).  Here, the factors strongly point toward dismissal of this case in favor of the Danish forum.

In determining whether an adequate alternative forum exists, the Court ordinarily must consider whether all of the parties are amenable to process in the proposed alternative forum. *Piper Aircraft Cp. v. Reyno*, 454 U.S. 235, 254 n.22 (1981). Here, the parties are not merely amenable to process in Denmark, but every single party before this Court is already litigating the same issues in a Denmark suit filed nearly a year before Plaintiffs filed this action.

The private interest factors similarly point strongly toward the Danish forum. Private factors include "ease of access to sources of proof, the availability of compulsory process for attendance of unwilling witnesses, the cost of obtaining attendance of willing witnesses, and other problems that interfere with an expeditious and inexpensive trial." *BCCI Holdings (Luxembourg) v. Mahfouz*, 828 F. Supp. 92, 96 (D.D.C. 1993) (citing *Reyno*, 454 U.S. at 241 n.6). These factors all demonstrate the superiority of the Danish forum for the parties' disputes. Plaintiffs' claims, here and in the first-filed Danish case, involve allegations that three Danish employees of a Danish company (Spectronic) left that company and formed a competing Danish company (Covidence) and that Defendants are using trade secrets to help their new Danish company compete with their old Danish employer. All of the relevant witnesses are located in Denmark, and all of the relevant documents are likely in Danish. Indeed, the present motion demonstrates the significance of the relevant documents being in Danish, as Defendants were required to obtain rush translations of documents from the Danish court proceedings in order to demonstrate to the Court that Plaintiffs were telling an incomplete and misleading story about the Danish preliminary injunction. All of these factors demonstrate that Denmark is a far superior forum for considering Plaintiffs' claims.

As the D.C. Circuit noted in *Pain*, one private factor often weighing against dismissal on *forum non conveniens* grounds is the typical deference given plaintiffs' initial forum choice.

18

*Pain*, 637 F.2d at 784-85.  Even that consideration would not support maintaining an action in this Court.  Plaintiffs' forum choice is accorded little weight where, as here, Plaintiffs are not from this district and can point to no facts suggesting that this district is a particularly convenient forum for Plaintiffs.  *See Stewart v. Capitol Area Permanente Med. Group*, 720 F. Supp. 3, 5 (D.D.C. 1989).  Moreover, unlike the typical case, Plaintiffs' initial choice of forum is not even this Court, as Plaintiffs first filed suit in Denmark and turned to this Court only after the Danish court denied Plaintiffs the preliminary injunctive relief that would have barred Defendants' participation at a trade show in Washington, D.C.

Because there is  not a single private interest factor that supports maintaining a suit in this Court, this Court is not a convenient forum and dismissal is appropriate so long as Plaintiffs are not barred from proceeding in the Danish forum.  *Pain*, 637 F.2d at 784-85.  Here, of course, Plaintiffs *are* proceeding in Denmark already, so Plaintiffs' ability to do so is not a matter of conjecture.  For these reasons, Plaintiffs' claims should not be permitted to proceed in this Court, and should be dismissed in favor of the Danish forum Plaintiffs originally selected.  Without any claims that should proceed in this Court, there is no basis for issuing a preliminary injunction or temporary restraining order, and the parties' respective interim rights should continue to be governed by the preliminary injunction decision issued by the Danish court.

### D.      Plaintiffs Cannot Meet Their Burden of Establishing a Likelihood of Success on the Merits of Their Claims

Plaintiffs' preliminary injunction motion seeks to show a reasonable likelihood of success on the merits of three of Plaintiffs' claims: Plaintiffs' claim under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 (Pl. Mem. at 7-8), Plaintiffs' claim under the Lanham Act, 15 U.S.C. § 1125(a)(1) (Pl. Mem. at 10), and Plaintiffs' claim under the District of Columbia Trade Secrets Act (Pl. Mem. at 8-9).  Plaintiffs have no reasonable likelihood of

prevailing on these claims.  As an initial matter, this Court lacks subject-matter jurisdiction

because, contrary to Plaintiffs' assertion, there is no diversity jurisdiction here, and Plaintiffs'

two claims under federal statutes are so clearly lacking in legal merit that they cannot form the

basis for invoking federal question jurisdiction.  Even if the Court had jurisdiction, however,

Plaintiffs' claims are fundamentally flawed on their merits, both legally and factually, such that

there is no reasonable probability that Plaintiffs would succeed on their claims.

### 1.    Plaintiffs Are Unlikely To Prevail On The Merits Of Their Claims Because the Court Lacks Subject-Matter Jurisdiction

Plaintiffs' Complaint alleges two bases for subject-matter jurisdiction: diversity

jurisdiction and federal question jurisdiction.  Plaintiffs' assertion that the Court has diversity

jurisdiction is incorrect.  Congress has conferred diversity jurisdiction on federal courts where

the amount in controversy exceeds $75,000 and the dispute is between:

> (1)    citizens of different States;
>
> (2)    citizens of a State and citizens or subjects of a foreign State;
>
> (3)    citizens of different States and in which citizens or subjects of a foreign state are additional parties; and
>
> (4)    a foreign state . . . as plaintiff and citizens of a State or different States.

28 U.S.C. § 1332(a).

Subsection (1) does not apply because there are no United States citizens as Defendants.

Subsection (2) applies only when one set of parties is exclusively United States citizens and their

adversaries are exclusively foreign citizens.  Subjection (3) does not apply because there are no

United States citizens as Defendants, and Subsection (4) does not apply because no foreign state

is involved in this case.  Indeed, courts have regularly confronted this issue and uniformly hold

that there is no diversity jurisdiction where, as here, "the only parties are foreign entities, or

where on one side there are citizens and aliens and on the opposite side there are only aliens." *Universal Licensing Corp. v. Paola del Lungo S.p.A.*, 293 F.3d 579, 580 (2d Cir. 2002); *see also Dresser Indus., Inc. v. Underwriters at Lloyd's of London*, 106 F.3d 494, 499 (3d Cir. 1997) ("Cases between aliens on one side and aliens and citizens on the other . . . do not fit the jurisdictional pigeonhole."); *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 428 (7th Cir. 1993) ("[28 U.S.C. § 1332] does not permit a suit between foreigners and a mixture of citizens and foreigners."); *U.S. Motors v. Gen. Motors Europe*, 519 F. Supp. 2d 671, 673-74 (E.D. Mich. 2007) (collecting cases) ("So far as this Court's research has revealed, the case law uniformly holds that subject matter jurisdiction is lacking under these circumstances."). The Plaintiffs are a mixture of United States citizens and foreign citizens, while Defendants are all foreign citizens. Therefore, diversity jurisdiction does not exist and this Court may exercise subject-matter jurisdiction only if the Court properly has federal question jurisdiction.

But federal question jurisdiction is not satisfied whenever a plaintiff sets out a claim under a United States statute. Rather, the federal claim asserted by the plaintiff must be a "substantial" one. As a leading commentator has explained: "The requirement for substantiality does not refer to the value of the interests that are at stake, but to whether there is any legal substance to the position the plaintiff is presenting." 13B Charles A. Wright, et al., *Federal Practice & Procedure* § 3564, at 66-67 (2d ed. 1984). The Supreme Court has acknowledged that claims asserted under federal law do not trigger federal question jurisdiction where the claims are "so attenuated and unsubstantial as to be absolutely devoid of merit." *Hagans v. Lavine*, 415 U.S. 528, 536-37 (1974) (quoting *Newburyport Water Co. v. Newburyport*, 193 U.S. 561, 579 (1904)). The D.C. Circuit recently held that a claim by liquor license holders that an amendment to the District of Columbia liquor code violated the Home Rule Act and various

constitutional provisions was so insubstantial as to fail to trigger federal question jurisdiction. *Decatur Liquors, Inc. v. District of Columbia*, 478 F.3d 360, 362-63 (D.C. Cir. 2007).

Here, the two federal claims asserted by Plaintiffs are on their face self-defeating, and have been included solely for the purpose of attempting to secure a federal forum for Plaintiffs. Plaintiffs' CFAA claim lacks legal merit and does not fit the facts as alleged by Plaintiffs. As discussed in greater detail in Section III.D.2, *infra*, Plaintiffs have offered no facts to support even an inference that Defendants misappropriated computerized information. Moreover, Plaintiffs offer no facts or explanation as to how a Spectronic computer situated in Denmark can qualify as a "protected computer" under CFAA. *See* Section III.D.2.b, *infra*. Plaintiffs themselves admit that Defendants' use of Spectronic's computer systems was authorized, and Plaintiffs have alleged no facts showing that they suffered $5,000 in "losses" that are covered by the statute. *See* Sections III.D.2.c-d, *infra*. Because the CFAA is so plainly inapplicable to the facts alleged by Plaintiffs, this claim is not a "substantial" federal claim sufficient to confer federal question jurisdiction on this Court.

Similarly, Plaintiffs' Lanham Act claim is facially deficient because § 43(a) of the Lanham Act applies only where a party is misleading the marketplace as to the manufacturer of the physical product sold by the defendant. Binding Supreme Court precedent makes clear, consistent with the plain language of the statute, that § 43(a) does not create a federal trade secrets cause of action, as claims, such as that asserted by Plaintiffs here, that a competitor has incorporated stolen ideas or concepts into its own product is not within § 43(a)'s reach. *See* Section III.D.3, *infra*. Thus, as with Plaintiffs' CFAA claim, their Lanham Act appears to serve merely as a placeholder designed to secure a federal forum for Plaintiffs' preliminary injunction motion, as Plaintiffs' theory simply does not fit within § 43(a)'s framework. However,

placeholder claims cannot create federal question jurisdiction when Plaintiffs' theory is so

clearly not actionable under the federal statute. Therefore, this Court lacks both federal question

jurisdiction and diversity jurisdiction and therefore could not issue a preliminary injunction or

temporary restraining order even if Plaintiffs could make a showing under the applicable test for

interim relief.[6]

### 2.    Plaintiffs Are Not Likely to Prevail on Their CFAA Claim

Even if Plaintiffs' CFAA claim were substantial enough to confer subject-matter

jurisdiction on this Court, Plaintiffs have not shown a reasonable likelihood that they could

prevail on it. Plaintiffs' CFAA claim alleges that Defendants somehow violated § 1030(a)(4) of

the CFAA. Pl. Mem. at 7. Section 1030(a)(4) of the CFAA criminalizes conduct whereby a

person: (1) knowingly and with intent to defraud; (2) accesses a protected computer without

authorization, or exceeds authorized access; and (3) by means of such conduct furthers the

intended fraud and obtains anything of value. 18 U.S.C. § 1030(a)(4). In addition, § 1030(g)

permits a private cause of action for a CFAA violation only where one of the five factors

identified in § 1030(a)(5)(B) exists. 28 U.S.C. § 1030(g). Plaintiffs rely solely on §

1030(a)(5)(B)(i), which requires a showing that one or more persons suffered a loss of at least

$5,000 from the defendant's conduct within a one-year period. Compl. ¶ 153. Plaintiffs have

not shown any probability that they can satisfy most of the elements of their CFAA claim.

---

[6] The Court also lacks ancillary jurisdiction over the remainder of Plaintiffs' claims. As the Supreme Court has held, a "court must have jurisdiction over a case or controversy before it may assert jurisdiction over ancillary claims." *Syngenta Crop Protection, Inc. v. Henson*, 537 U.S. 28, 34 (2002) (quoting *Peacock v. Thomas*, 516 U.S. 349, 355 (1996)). The absence of diversity jurisdiction or a "substantial" federal claim means that this Court lacked subject-matter jurisdiction *ab initio* and ancillary jurisdiction cannot create jurisdiction where none existed.

### a.    Plaintiffs Have Provided No Evidence to Support a Conclusion That Defendants Misappropriated Computerized Information

Plaintiffs have presented the Court with no evidence from which the Court could conclude that it is likely that Defendants misappropriated information from Plaintiffs' computer systems.  Rather than relying on Plaintiffs' inability to meet their burden, Defendants have addressed the issue head on, and strenuously denied (under oath) having misappropriated anything from Plaintiffs' computer systems.  Hansen Decl. ¶ 10.  Indeed, Defendants have presented the Court with sworn testimony that Defendants' access to Spectronic's computer systems was not even as broad as Plaintiffs' contend.  *Id.*

By contrast, the only "evidence" provided by Plaintiffs regarding a supposed misappropriation of computerized information is Plaintiffs' allegation "upon information and belief" that Defendants engaged in such conduct.  Compl. ¶¶ 148-49, 151-52.  Plaintiffs provide neither allegations nor evidence of particular computerized information supposedly purloined by Defendants, or any facts from which the Court could conclude that the basis for Plaintiffs' "information and belief" is anything more than Plaintiffs' imagination and willingness to plead to the statute.  The only "facts" alleged by Plaintiffs are that Defendants had access to two Spectronic computer systems in the regular course of their work at Spectronic, and that these systems contained proprietary data.  Compl. ¶¶ 146-47; Moestrup Aff. ¶¶ 11-12.  But the fact that Defendants had authorized access to Spectronic's computer systems, without allegations supporting an inference of misappropriation, would not even withstand a motion to dismiss, to say nothing of having the factual heft required to support the imposition of interim relief.

The sole basis for Plaintiffs' CFAA claim is that Defendants were permitted access to Spectronic systems, and therefore might have stolen information from it.  Not only is there no plausible likelihood of success on the CFAA claim, this is precisely the type of speculative claim

24

that is subject to dismissal under the *Twombly* standard.[7]   Indeed, if the rule were otherwise, any

departing employee with access to an employer's computer system could be sued for a CFAA

violation, and held in the case past a motion to dismiss, based on the false syllogism that "if the

employee had access to computerized data, it's reasonable to assume that he or she stole it."

> **b.    Plaintiffs Have Offered No Evidence to Support a Conclusion that Spectronic's Computers Are "Protected Computers" Under CFAA**

Apart from Plaintiffs' abject lack of evidence, or even allegations for that matter,

sufficient to support their CFAA claim, several other required elements of a CFAA claim are

notably absent here.  For example, Plaintiffs' CFAA claim required a showing that the computers

from which the misappropriation allegedly occurred are "protected computers."  18 U.S.C. §

1030(a)(4).  Plaintiffs rely on a pre-2002 version of CFAA for their conclusory allegation that

Defendants accessed a "protected computer."  Compl. ¶ 145 ("Plaintiffs maintain one or more

computers and/or computer systems that are 'protected computers' pursuant to 18 U.S.C. §

1030(e)(2)(B) because they are used both in international and in interstate commerce and

communications.").  Congress amended CFAA in 2002, however, to make clear the narrow

situations in which a computer located overseas could qualify as a "protected computer."  The

---

[7] As this Court has observed, the permissive "no set of facts" standard of *Conley v. Gibson*, 355 U.S. 41 (1957), was "very recently undercut, if not obliterated by the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, [127 S. Ct. 1955, 1965 (2007)]."  *Ellipso, Inc. v. Draim*, No. 06-1373, 2007 WL 1866799, at *1 (D.D.C. June 28, 2007).  "In order to survive a Rule 12(b)(6) motion to dismiss, a complaint must make sufficient factual allegations to suggest 'plausible grounds' for the suit."  *Schroer v. Billington*, ___ F. Supp. 2d ___, 2007 WL 4225667, at *3 (D.D.C. 2007).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions. . . .  Factual allegations must be enough to raise a right to relief above the speculative level."  *Bush*, 2007 WL 3357144, at *1 (omissions and alterations in original) (quoting *Twombly*, 127 S. Ct. at 1276).  For that reason, "'rote accusations' of 'unlawful' and 'unauthorized' behavior, without more, are simply too conclusory to support [a cause of action]."  *Dye v. United States*, ___ F. Supp. 2d ___, 2007 WL 2800376, at *10 (D.D.C. 2007).

amended version of CFAA defines "protected computers," other than computers belonging to

financial institutions and the United States government, as follows:

> [T]he term "protected computer" means a computer . . . which is
> used in interstate or foreign commerce or communication,
> including a computer located outside the United States that is used
> in a manner that affects interstate or foreign commerce or
> communication of the United States.

18 U.S.C. § 1030(e)(2)(B).  Plaintiffs have provided the Court with no facts, much less alleged

facts, that would demonstrate that the Spectronic computers to which Defendants had access in

Denmark somehow were used "in a manner that affects interstate or foreign commerce or

communication of the United States."  *Id.*  Plaintiffs having presented no evidence on this issue,

the only reasonable conclusion is that Plaintiffs are unlikely to be able to demonstrate that the

Spectronic computers used by a Danish company in Denmark are the types of computers

Congress sought to reach through the CFAA.

c.    <strong>Plaintiffs' Own Allegations Refute Any Possibility That<br>Defendants Accessed Plaintiffs' Computers Without Authority<br>or Exceeded Authorized Access</strong>

CFAA requires that a plaintiff demonstrate that the defendant either "access[ed] a

protected computer without authorization," or "exceed[ed] authorized access."  18 U.S.C. §

1030(a)(4).  Plaintiffs have provided the Court with no evidence to support such a conclusion,

and Plaintiffs' own allegations refute it.  Plaintiffs' own Verified Complaint and affiant

acknowledge that Defendants were *authorized* to access Spectronic's computer systems while

employed by Spectronic; therefore, no claim under that prong of CFAA will lie.  Compl. ¶ 147;

Moestrup Aff. ¶¶ 11-12; *see also Salyer v. Salyer Am. Fresh Foods*, No. 05-3562, at *4 (N.D.

Cal. Mar. 16, 2006) ("As stated previously, it is beyond dispute that all individual Defendants are

authorized users of SAFF's computers because they are officers of SAFF.  Therefore, the claim

for violation of the Computer Fraud and Abuse Act is dismissed with prejudice.").  Presumably

26

for that reason, Plaintiffs' Complaint relies on a contention that Defendants somehow exceeded their authorized access to Plaintiffs' computers.  Compl. ¶ 152 (alleging Defendants obtained information from Spectronic's computers "in excess of their authority"); *id.* ¶ 153 ("By exceeding authorized access to Spectronic's protected computers . . . .").  But even a claim based on that theory fails as a matter of law.

CFAA defines "exceeds authorized access" as follows: "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled so to obtain or alter."  18 U.S.C. § 1030(e)(6).  Thus, "a violation for 'exceeding authorized access' occurs where initial access is permitted but the access of certain information is not permitted.  Stated differently, a violation does not depend upon the defendant's unauthorized use of *information*, but rather upon the defendant's unauthorized use of *access*."  *Diamond Power Int'l, Inc. v. Davidson*, ___ F. Supp. 2d ___, 2007 WL 2904119, at *14 (N.D. Ga. 2007) (internal citation omitted).  Just as in *Diamond Power* Plaintiffs' claim here is that Defendants accessed materials that they were authorized to access, but that they then used this information, once accessed, in an unauthorized way.  Moestrup Aff. ¶¶ 11-12.  Even if that "on information and belief" allegation were true, and Defendants have strenuously denied it under oath, it would not violate CFAA because the statute covers situations where a defendant accessed information he was not authorized to access, not where a defendant supposedly misuses information he or she had permission to retrieve.  *Diamond Power Int'l*, ___ F. Supp. 2d ___, 2007 WL 2904119, at *14; *see also Secureinfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 609 (E.D. Va. 2005).  Of course, all of this discussion of CFAA's technical requirements misses the biggest issue, that, CFAA notwithstanding, Defendants deny under oath that they

27

misappropriated any computerized data from Plaintiffs and Plaintiffs have presented zero

evidence to support a contrary conclusion.

> **d.    Plaintiffs Have Not Provided Evidence of a "Loss" Sufficient to Allow a Private Right of Action Under CFAA**

Plaintiffs have not shown any likelihood of satisfying the requirement of showing a loss

of $5,000 as required by the CFAA for a private cause of action.  Plaintiffs' Complaint simply

attempts to plead to the statute, alleging that Plaintiffs have suffered at least $5,000 in losses in a

one-year period "as reflected in the costs and expenses that the plaintiffs have incurred and

continue to incur in investigating and addressing the defendants' misappropriation of the

plaintiffs' proprietary information."  Compl. ¶ 153.  But Plaintiffs' description of the damages

they supposedly have suffered does not qualify as "loss" under CFAA, and cannot support a

private cause of action under that statute.  As the court observed in *Nexans Wires S.A. v. Sark-*

*USA, Inc.*, 319, F. Supp. 2d 468, 474 (S.D.N.Y. 2004), the term "loss" as used in CFAA "means

any remedial costs of investigating the computer for damage, remedying the damage and any

costs incurred because the computer cannot function while or until repairs are made.  However,

there is nothing to suggest that the 'loss' or costs alleged can be unrelated to the computer."  *Id.*;

*see id.* at 475 ("Therefore, the meaning of 'loss,' both before and after the term was defined by

statute, has consistently meant a cost of investigating or remedying damage to a computer, or a

cost incurred because the computer's service was interrupted.").

Indeed, *Nexans Wires* is directly on point.  That case, like the present case, involved

supposed misappropriation of computerized data by former employees of the plaintiff who

defected to a competitor.  The court granted summary judgment to the defendant because, among

other reasons, the plaintiff had not suffered $5,000 in "loss" as contemplated by CFAA.  The

court rejected plaintiff's claim that travel expenses incurred by its executives in "conducting a

damage assessment" would support a CFAA claim because this damage assessment was focused on responding to the actions of the defecting employees and not investigating and/or remedying computer breaches or damage to one of plaintiff's computers. *Id.* at 476.

Plaintiffs' claims here necessarily fail for the same reason. Plaintiffs' conclusory allegation, which does no more than ape the statutory language, that they suffered "loss" in "investigating and addressing the defendants' misappropriation of the plaintiffs' proprietary information" does not provide a basis for concluding that *any* of these supposed expenses relate in any way to investigating damage to a computer or computer system, something that is hardly surprising because Plaintiffs have not even alleged that Defendants accessed any material that they were not authorized to access. *See Southwest Airlines Co. v. BoardFirst, LLC*, No. 06-CV-0891, 2007 WL 4823761, at *16 (N.D. Tex. Sept. 12, 2007). Therefore, Plaintiffs have no reasonable likelihood of succeeding on their CFAA claim.

### 3.    Plaintiffs Have No Reasonable Likelihood of Prevailing on their Lanham Act Claim

Plaintiffs claim that Defendants violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by creating and offering for sale the Oculus recorder and other unspecified "goods and services." Pl. Mem. at 10. However, a plain reading of § 43(a) of the Lanham Act demonstrates its inapplicability. Specifically, Plaintiffs do not allege that Defendants are seeking to make the market believe that Defendants' products were produced by Plaintiffs; rather, Plaintiffs claim that Defendants' products, while clearly denominated as such, in essence are based on ideas and trade secrets stolen from Plaintiffs. That claim is not only factually unsupportable, but is not within the reach of the Lanham Act.

Section 43(a) of the Lanham Act provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term,

29

> name, symbol, or device, or any combination thereof, or any false
> designation of origin, false or misleading description of fact, or
> false or misleading representation of fact, which (A) is likely to
> cause confusion, or to cause mistake, or to deceive as to the
> affiliation, connection, or association of such person with another
> person, or as to the origin, sponsorship, or approval of his or her
> goods, services, or commercial activities by another person . . .
> shall be liable in a civil action by any person who believes that he
> or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  By its plain terms, § 43(a) of the Lanham Act only governs actions that are

likely to cause market confusion as to who is the producer or sponsor of a product on the market,

and is not aimed at claims that a party supposedly stole the ideas that went into its product.

  If the plain language of § 43(a) were not enough, the Supreme Court's decision in *Dastar*

*Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), definitively defeats Plaintiffs'

claim.  In *Dastar*, a European production company (Dastar), "copied substantially the entire

*Crusade in Europe* [television] series created by Twentieth Century Fox, labeled the resulting

product with a different name and marketed it without attribution to Fox[, and] therefore

committed a 'bodily appropriation' of Fox's series."  *Id.* at 28 (internal quotations and citation

omitted) (alteration in original).  However, Dastar put its own credits at the end of the production

and identified itself as the producer and distributor in its trade dress and advertising.  *Id.* at 26-

27.

  The Supreme Court, in an opinion joined by every Justice participating in the case, held

that § 43(a) of the Lanham Act did not apply to the production company's conduct.  Consistent

with § 43(a)'s plain language, the Court held that § 43(a) only prohibits conduct that misleads

the market as to who is the producer of the tangible goods sold, in *Dastar* the videocassettes sold

by Dastar on the market.  Section 43(a) does not create a cause of action where a distributor may

have stolen the ideas of others in making its product, so long as the distributor accurately

identifies itself as the distributor of the tangible product sold.  As the Court explained:

30

> In sum, reading the phrase "origin of goods" in the Lanham Act in accordance with the Act's common-law foundations (which were *not* designed to protect originality of creativity), and in light of the copyright and patent laws (which *were*), we conclude that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of the idea, concept, or communication embodied in those goods.

*Id.* at 37; *see also Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 148 (5th Cir. 2004). Because Dastar had truthfully identified itself as the company marketing the videocassettes it sold, § 43(a) did not apply no matter how much of the contents of the videocassettes were stolen from others.

That analysis directly defeats Plaintiffs' Lanham Act claim. Taking, for example, Defendants' Oculus product, a § 43(a) claim would lie only if Defendants were passing the physical product sold as having been manufactured by Plaintiffs. Plaintiffs do not allege this, and in fact admit that Covidence has purchased a booth *in its own name* for the Washington, D.C. trade show. Compl. ¶ 3.[8] Rather, Plaintiffs claim, without the slightest supporting facts, that Defendants have violated § 43(a) by stealing Plaintiffs' *ideas* in manufacturing Oculus. As *Dastar* makes clear, such a claim is not within the reach of § 43(a), so Plaintiffs could not possibly succeed on a Lanham Act claim even if there were evidence that Defendants misappropriated Plaintiffs' trade secrets and used them to manufacture Oculus.

Moreover, while Supreme Court precedent unambiguously defeats Plaintiffs' Lanham Act claim as a matter of law, Defendants also note that Plaintiffs have not provided any evidence that Defendants misappropriated any of Plaintiffs' trade secrets in developing Oculus or any of

---

[8] In any event, Plaintiffs have provided no evidence to suggest that there is anything about Covidence's products that has the potential to mislead a customer into believing the physical products actually sold by Covidence were actually manufactured and/or produced by Plaintiffs.

31

Defendants' other products.[9]  Therefore, even if § 43(a) of the Lanham Act could be twisted to provide a federal trade secrets statute, Plaintiffs still would not have a reasonable likelihood of prevailing on such a claim.

### 4.   Plaintiffs Have No Reasonable Likelihood of Prevailing on their District of Columbia Trade Secrets Act Claim

Plaintiffs have provided the Court with no specifics whatsoever as to what trade secrets Defendants supposedly stole from Plaintiffs.  Neither Plaintiffs' Verified Complaint nor the accompanying Affidavit of Christian Moestrup provides any specific statement of what trade secrets Defendants supposedly misappropriated, or how those trade secrets supposedly were used in the production of Defendants' products.  Generally, Plaintiffs claim that Defendants' Oculus video recording device is a "knock off" of a Spectronic product.  But this claim is demonstrably meritless because (1) Spectronic was not even developing a video recording device at the time of Defendants' departure, and (2) Spectronic, to this day, does not have a video recording device on the market.

Nevertheless, Plaintiffs claim that Defendants somehow violated the District of Columbia Trade Secrets Act, D.C. Code § 36-401, *et seq.*  That claim is not likely to succeed on the merits for at least two reasons.  First, the District of Columbia's Trade Secrets Act has no application to a dispute between Danish parties concerning a supposed misappropriation of trade secrets in Denmark.  Second, even if the statute theoretically could apply, Plaintiffs have presented the Court with no evidence from which it could conclude that Plaintiffs have misappropriated anything from Plaintiffs, and Defendants' evidence demonstrates beyond cavil that Plaintiffs' claim would fail.

---

[9] The absence of factual support for Plaintiffs' misappropriation of trade secrets claim is addressed in detail in Section III.D.4, *infra*.

32

a.    **The District of Columbia Trade Secrets Act Does Not Apply to this Dispute**

A federal court sitting in diversity applies the choice of law rules of the jurisdiction in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 490 (1941). For tort claims, District of Columbia courts consider the interest of the various jurisdictions, paying particular attention to the place of injury, the place of the allegedly tortious conduct, the parties' domiciles, and the place where the relationship is centered. *Drs. Groover, Christie & Merritt, P.C. v. Burke*, 917 A.2d 1110, 1117 (D.C. 2007); *see also Westech Gear Corp. v. Dep't of Navy*, No. 87-2609, 1988 WL 170558, at *5 n.2 (D.D.C. May 9, 1988) (applying interest analysis to determine governing law for trade secrets claim).

In assessing the various jurisdictions' interests, it bears mention that the District of Columbia Trade Secrets Act is concerned with the *misappropriation* of trade secrets. *See* D.C. Code § 36-402 ("Actual or threatened misappropriation may be enjoined."); *id.* § 36-403 ("A complainant is entitled to recover damages for misappropriation . . . ."). It is difficult to conceive of a theory under which the District of Columbia has a greater interest than Denmark in having its laws apply to allegations that Defendants, all of whom are Danish, misappropriated the trade secrets of a Danish company (Spectronic) that employed them in Denmark, pursuant to a Danish employment agreement, and supposedly used those trade secrets to form a Danish competitor (Covidence) to compete against their former employer. Indeed, in *Gilson v. Republic of Ireland*, 606 F. Supp. 38, 42 (D.D.C. 1984), this Court held that the District of Columbia's choice of law rules would dictate application of Irish law to a misappropriation of trade secrets claim where the defendants were Irish citizens and the alleged misappropriation occurred in Ireland.[10]

---

[10] While the Court concluded that District of Columbia choice of law rules would point to the application of Irish law, the Court applied domestic law because no party had given notice of

The same analysis requires that Plaintiffs' trade secrets allegations be evaluated under Denmark law. All of the persons and entities relevant to Plaintiffs' claims are Danish citizens, and all of the alleged misappropriation supposedly occurred in Denmark. Therefore, Denmark clearly has the strongest interest in having its laws govern Plaintiffs' trade secrets claim. It is difficult to conceive of a legitimate interest the District of Columbia would have in regulating the relationship between Danes concerning employment relationships and business competition that is centered in Denmark. Moreover, a jurisdiction must have a "significant contact or significant aggregation of contacts" to the parties and their claims in order for the application of that jurisdiction's laws to comport with the constitutional requirements of due process. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985). Thus, while District of Columbia choice of law rules clearly point to the application of Denmark law, and not to the District of Columbia's trade secrets statute, any attempt to apply the District of Columbia's laws to Plaintiffs' claims would be so random as to be constitutionally impermissible. Of course, Denmark's clear interest as the center of the parties' disputes may well explain why Plaintiffs originally filed their claims against Defendants in Denmark and why the parties are continuing to litigate their disputes in the Denmark case.

> **b.** **Even if the District of Columbia Trade Secrets Act Could Apply to the Parties' Dispute, Plaintiffs Are Not Likely to Prevail in Showing a Misappropriation of Trade Secrets**

Beyond the clear inapplicability of the District of Columbia Trade Secrets Act, the evidence makes clear that Plaintiffs are unlikely to prevail on a trade secrets claim asserted under the laws of *any* jurisdiction, no matter where their claims are litigated. Sifting through Plaintiffs' papers, it is difficult to identify exactly what trade secrets Plaintiffs allege were misappropriated

---

an intent to rely on foreign law under Federal Rule of Civil Procedure 44.1. *See Gilson*, 606 F. Supp. at 42.

by Defendants.  Of course, Defendants specifically deny having misappropriated any trade secrets under oath, Hansen Decl. ¶ 3, and Plaintiffs' vague and conclusory allegations do nothing to call that sworn testimony into question.  The closest Plaintiffs come to a specific allegation is their claim that Defendants misappropriated trade secrets relating to Plaintiffs' video recording device, and that Defendants are marketing Oculus, which Plaintiffs claim is a "knock off" product.  Compl. ¶ 92.  However, a careful reading of Plaintiffs' allegations reveals that Plaintiffs do not actually allege that they have a video recording device on the market, and Plaintiffs never explain what trade secrets or technology Defendants supposedly stole from Spectronic or how such technology is incorporated into Oculus.

The reason for these omissions is clear.  As explained in the Hansen Declaration, Spectronic had no video recording devices, and was not in the process of developing a video recording device, at the time the individual Defendants left Spectronic's employ.  Hansen Decl. ¶ 4.  Until the time of Defendants' departure from Spectronic, Spectronic had made the strategic decision to focus on audio recording devices to the exclusion of video recording devices.  *Id.* Moreover, Spectronic's Chief Executive Officer admitted in the Danish case that Spectronic did not begin development of a video recording device until July/August 2007, months after Defendants left Spectronic, and that Spectronic did not expect to have such a device on the market until the first quarter of 2008.  *Id.* ¶ 3.  At present, Spectronic has no video recording device on the market, and market sources indicate that Spectronic's launch of its own video recording device is now projected for December 2008.  *Id.* ¶ 7.

Thus, the evidence in this case demonstrates that Defendants could not have used misappropriated video recording technology to develop Oculus because Spectronic had no technology to steal, and Defendants could not possibly have copied Spectronic's video recording

35

device because Spectronic has no such device to copy. Therefore, even if the District of

Columbia Trade Secrets Act, against all notions of due process, somehow applied here, Plaintiffs

have not demonstrated any likelihood that they can prove the misappropriation of a trade secret,

much less show a substantial likelihood of making such a showing.

### E.    Plaintiffs Have Not Met Their Burden of Demonstrating They Would Suffer Irreparable Harm in the Absence of a Preliminary Injunction or Temporary Restraining Order

"The basis for injunctive relief in the federal courts has always been irreparable harm and

the inadequacy of legal remedies." *Monument Realty LLC v. WMATA*, ___ F. Supp. 2d ___,

2008 WL 555967, at *5 (D.D.C. Feb. 28, 2008) (citing *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674

(D.C. Cir. 1985)). For preliminary injunctive relief to issue, the threat of irreparable harm must

be clear and severe, and not based on conjecture. *Wis. Gas Co.*, 758 F.2d at 674. The possibility

that any harm suffered could be remedied through an award of monetary damages "weighs

heavily against a claim of irreparable harm." *Id.* "Mere injuries, however, substantial, in terms

of money, time and energy necessarily expended in the absence of [a preliminary injunction] are

not enough." *Id.*

As an initial matter, Plaintiffs are not likely to suffer irreparable harm because their case

on the merits is so flawed that it is highly unlikely that they have any entitlement to relief

whatsoever. *See* Section III.D.2, *supra*. A conclusion that plaintiffs are "not likely to succeed

on the merits effectively decides the preliminary injunction issue." *Long v. Dep't of Homeland*

*Security*, 436 F. Supp. 2d 38, 44 (D.D.C. 2006) (quoting *Serono Labs., Inc. v. Shalala*, 158 F.3d

1313, 1326 (D.C. Cir. 1998)). In addition, even if Plaintiffs had a substantial case on the merits,

there is no reasonable likelihood that they would suffer irreparable harm in the absence of a

preliminary injunction.

36

Plaintiffs' preliminary injunction papers offer vague and conclusory statements to the effect that Plaintiffs would suffer irreparable harm in the absence of a preliminary injunction, yet Plaintiffs never offer a coherent explanation for why this would be so.  Plaintiffs cite to a case holding that the "loss of confidentiality of customer information and the concomitant loss of customer trust and goodwill" can constitute irreparable harm.  Pl. Mem. at 11 (quoting *Morgan Stanley DW*, 150 F. Supp. 2d at 77).  Similarly, Plaintiffs allege that they would suffer irreparable harm through Defendants' attendance at the trade show because it would result in dissemination of Plaintiffs' trade secrets.  *Id.*  But Plaintiffs never explain why there is a risk that Defendants' attendance at the upcoming Washington, D.C. trade show would be likely to result in the dissemination of Plaintiffs' customer lists or trade secrets.  Indeed, common sense shows this not to be the case.

As noted in the Declaration of Jimmi Hansen, Covidence's Chief Executive Officer, Covidence has attended four major European trade shows in the last several months, including three in the last two months.  Hansen Decl. ¶ 17.  Spectronic has attended some of these same trade shows, and two of them were held in Plaintiff Domo Ltd.'s home country.  *See* Compl. ¶ 7. If Covidence's attendance at trade shows necessarily equates with dissemination of Plaintiffs' trade secrets and customer lists, then that horse has long since left the barn.  Moreover, though they do not exactly say it, if Plaintiffs' argument is that the sale by Covidence of the Oculus video recording device would result in the dissemination of Plaintiffs' trade secrets, issuing the requested preliminary injunction would not cure that alleged harm.  Plaintiffs have not asked the Court to enjoin Defendants' sale of Oculus generally, and the only court Plaintiffs have asked to issue such an order – the Denmark court presiding over the first-filed case – refused to grant such relief.  Finally, to the extent that Plaintiffs claim that Defendants' attendance at the Washington,

D.C. trade show will result in customers purchasing Oculus devices that were created through the theft of trade secrets, that is a claim easily remedied through an award of monetary damages based on Defendants' sales data for Oculus.

Therefore, it is difficult to discern how Plaintiffs would suffer irreparable harm if Defendants attended the upcoming trade show, or how the requested preliminary injunction would prevent any type of irreparable harm that Plaintiffs claim they would suffer. Therefore, Plaintiffs have not met their burden of proving a likelihood of irreparable harm in the absence of the requested injunction.

### F.    Covidence Would Suffer Irreparable Harm If a Preliminary Injunction Were Issued

By contrast to Plaintiffs, Covidence would suffer irreparable harm if the Court restrained Covidence from attending the upcoming trade show. If Plaintiffs were correct on the merits, it would be easy to calculate the losses suffered by Plaintiffs from customers pirated away by Covidence through the theft of trade secrets. It would be as simple as evaluating Covidence's sales records for Oculus and any other product found to have been manufactured based on stolen trade secrets. The injury analysis for Covidence is different, and much more difficult to quantify.

If Covidence is wrongly prohibited from marketing its wares at the upcoming trade show, its damages are the lost profits from customers that it never obtained, the customers who might have purchased Covidence products if Covidence had been at the trade show. Those damages might be impossible to quantify, as those lost customers would not necessarily have gone to Spectronic, and in the case of Oculus certainly would not have gone to Spectronic because Spectronic does not have a competing video recording device on the market. Therefore, the damages task would be to quantify Covidence's lost profits from customers who purchased products from third parties, forcing a finder of fact to divine which customers that purchased

from third parties would have purchased goods from Covidence if Covidence had been at the trade show. In addition, it would be difficult to quantify the reputational harm suffered by Covidence if it were forced to pull out of the upcoming trade show at the eleventh hour, under the cloud of a federal court injunction. This harm would be particularly unfair to Defendants given that the Danish court already ruled, after a four-day contested evidentiary hearing, that Defendants were free to compete against Plaintiffs so long as they did not do business with specified distributors and suppliers. The risk of irreparable injury to Defendants is one more reason why the Court should not enter the requested preliminary injunction.

### G. The Public Interest Would Be Disserved By Issuance of a Preliminary Injunction or Temporary Restraining Order

It is in the public interest to discourage litigants from engaging in forum shopping. *See, e.g.*, *Salve Regina College v. Russell*, 499 U.S. 225, 234 (1991). There is also an "overriding public policy in favor of competition." *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968). Plaintiffs have already sought a preliminary injunction that would have prohibited Defendants from competing against Plaintiffs, and the Danish court to which that application was made refused to grant such relief. O'Connor Decl., Ex. A at 3. It would be contrary to the public interest to grant Plaintiffs injunctive relief they sought in Denmark and were denied, injunctive relief that would stifle competition without the slightest evidence that Defendants have done anything wrong. Therefore, the public interest would be disserved if the Court were to issue the requested preliminary injunction or temporary restraining order.

## IV.    THE COURT SHOULD SANCTION PLAINTIFFS BY REQUIRING THEM TO REIMBURSE DEFENDANTS THEIR ATTORNEY'S FEES AND COSTS[11]

A federal district court has an "historic and frequently invoked inherent power to impose

sanctions"[12] on parties for inappropriate litigation conduct.  As the Supreme Court explained,

federal district courts have the inherent power, not displaced by Rule 11, to assess attorney's fees

as a sanction "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive

reasons."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (internal quotations omitted)

(quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975)).  "In this

regard, if a court finds 'that fraud has been practiced upon it, or that the very temple of justice

has been defiled,' it may assess attorney's fees against the responsible party, as it may when a

party 'shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a

court order."  *Id.* (quoting *Universal Oil Prods. Co. v. Root Refining Co.*, 328 U.S. 575, 580

(1946), and *Hutto v. Finney*, 437 U.S. 678, 689 n.14 (1978)); *see also Shepherd v. Am.*

*Broadcasting Co.*, 62 F.3d 1469, 1478 (D.C. Cir. 1995) (recognizing district court's inherent

power to impose sanctions, including an award of attorney's fees, for litigation misconduct);

*Assassination Archives & Research Ctr. v. CIA*, 48 F. Supp. 2d 1, 9 (D.D.C. 1999); *Alexander v.*

*FBI*, 192 F.R.D. 25, 31 (D.D.C. 2000).  In order to exercise its inherent power to impose

sanctions, a district court must make an explicit finding that the sanctioned party acted in bad

faith.  *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764-65 (1980).

---

[11] Defendants offered to forgo or withdraw their request for sanctions if Plaintiffs would agree to withdraw their request for a preliminary injunction or temporary restraining order and dismiss the present action.  As of the time of the filing of this opposition, Plaintiffs have not accepted that proposal.

[12] 5A Charles A. Wright, et al., *Federal Practice & Procedure* § 1336, at 617-19 (3d ed. 2004)

Here, it is difficult to reach any conclusion other than that Plaintiffs have acted dishonestly and in bad faith. Most egregiously, Plaintiffs have completely misrepresented to the Court the nature of the proceedings in the first-filed Danish action. Plaintiffs disclosed that the Danish court had issued a preliminary injunction that restricted Defendants from doing business with certain distributors, and then proceeded as if their requested preliminary injunction in this Court was a natural extension of the Danish injunction. Compl. ¶¶ 129-30. Plaintiffs created this false perception by supplying the Court with the text of the Danish preliminary injunction, in Danish, and then providing the Court with a translation of half of that decision, the part that supported what Plaintiffs wanted to say.

However, the full text of the Danish preliminary injunction decision, as well as Plaintiffs' Danish preliminary injunction motion itself, show that Plaintiffs actually asked the Danish court to issue an injunction that would have encompassed the relief sought here, but that the Danish court had refused to grant that relief. Thus, Plaintiffs were asking this Court to issue preliminary injunctive relief that the judge in the Denmark case would not give them, all the while misleading the Court into believing that the requested injunction here would be consistent with the injunction issued in Denmark. Moreover, because this is an expedited temporary restraining order proceeding, Plaintiffs' lack of candor is even more egregious, as the parties and the Court have extremely limited time to collect the facts and get to the bottom of the issues. Plaintiffs' misconduct essentially sought to take advantage of the limited time available for consideration of their motion.

In addition, the present action is incredibly vexatious. Plaintiffs essentially have asserted the same trade secrets claims they have been litigating in Denmark for nearly a year, forcing Defendants to defend against the same allegations simultaneously in two separate jurisdictions.

41

Moreover, because Plaintiffs could not obtain the preliminary injunction they desire in Denmark, having been denied that relief already, Plaintiffs used the vehicle of specious claims asserted under United States statutes in a cynical attempt to engineer federal question jurisdiction.  The affidavit submitted by Plaintiffs as evidence in support of their claims is lacking in substance, and it is clear from Plaintiffs' "evidence" that Plaintiffs have no facts whatsoever to support their claims.  The most Plaintiffs can allege in support of their CFAA claim is that Defendants, like Plaintiffs' other employees, simply had access to proprietary databases.  Compl. ¶¶ 146-47; Moestrup Aff. ¶¶ 11-12.  Plaintiffs have slandered Defendants for the purpose of trying to create federal court jurisdiction.  And even if Plaintiffs actually had a plausible claim of misappropriation of computerized data, the plain terms of the CFAA do not permit a claim under the circumstances alleged by Plaintiffs.  Similarly, Plaintiffs have tried to create federal court jurisdiction by pleading a Lanham Act claim where Plaintiffs make no claim whatsoever that the marketplace would be confused as to who was selling the products sold by Covidence at a trade show booth rented in Covidence's own name.

Plaintiffs' motivation is clear.  They are using litigation and the threat of litigation to stifle competition from a smaller, less established competitor.  Plaintiffs essentially "won" their motion the minute that Defendants had to hire United States counsel to defend against Plaintiffs' motion.  As a result of Plaintiffs' conduct, Defendants have suffered a "litigation tariff" of tens of thousands of dollars in order to market their products in the United States, even though Defendants had already won that battle in the Danish preliminary injunction proceedings.  It would not be fair for Plaintiffs to succeed in imposing these costs on Defendants as they seek to

establish Covidence in a marketplace the Danish court has, after a four-day contested hearing, allowed Covidence to pursue.[13]

Plaintiffs' conduct is essentially insulated from Rule 11 because the immediate nature of the proceedings on a temporary restraining order motion means that the injured party never can meet the twenty-one day notice period required for filing a Rule 11 motion. There is no doubt that Plaintiffs' actions in misleading the Court concerning the Danish case and asserting factually and legally frivolous federal statutory claims would merit sanctions under Rule 11. That Plaintiffs' conduct occurred in the expedited environment of a temporary restraining order motion makes their conduct more egregious, not less. In order to defend against this motion, Defendants have incurred tens of thousands of dollars in attorney's fees, and thousands of dollars to obtain "rush" translations of documents Plaintiffs rightfully should have translated for the Court in the first instance. Therefore, under this Court's inherent powers to award sanctions in the interest of justice, the Court should direct Plaintiffs to reimburse Defendants for the attorney's fees and costs they have incurred in defending this action.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion. In addition, because Plaintiffs' motion is premised on misleading characterizations to the Court, is duplicative of a suit already proceeding in Denmark, and is based on a bad faith, vexatious strategy to inflict litigation costs on Covidence, the Court should use its inherent powers to sanction Plaintiffs and

---

[13] Plaintiffs have done this once before, filing suit against Defendants in Pennsylvania in an effort to stop Covidence from appearing at a trade show in Philadelphia. Because the booths at that trade show were completely sold out, Covidence was unable to attend in any event and therefore did not have to incur litigation costs in dealing with litigation in Pennsylvania. Hansen Decl. ¶ 18.

order Plaintiffs to reimburse Defendants the attorney's fees and costs incurred in defending

against this motion.

Respectfully submitted,

/s/  John F. O'Connor

_____
Steven K. Davidson (D.D.C. Bar No. 407137)
John F. O'Connor (D.D.C. Bar No. 460688)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
sdavidson@steptoe.com
joconnor@steptoe.com

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SPECTRONIC DENMARK A/S, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:08-CV-00590 (PLF) |
| | ) | |
| v. | ) | |
| | ) | |
| JIMMI M. HANSEN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF JOHN F. O'CONNOR

I, John F. O'Connor, hereby declare as follows:

1.      I am a partner in the law firm of Steptoe & Johnson LLP.  I am one of the counsel of record for Defendants in this action.

2.      Attached as Exhibit A hereto is a true copy of an English translation we obtained of the three pages of the Danish preliminary injunction decision submitted as Exhibit 32 to Plaintiffs' Verified Complaint, with the Danish version of those same three pages directly behind it.

3.      Attached as Exhibit B hereto is a true copy of an English translation we obtained of the motion filed by Plaintiffs for a preliminary injunction in Denmark, with the Danish version of this document directly behind it.

4.      Attached as Exhibit C hereto is a true copy of the Declaration of Defendant Jimmi M. Hansen.

5.      Attached as Exhibit D hereto is a true copy of the Declaration of Peter Zacher Sorenson.

6.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 21, 2008.

_____
John F. O'Connor

# EXHIBIT A



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

AFFIDAVIT OF ACCURACY

I, Brian McCormick, hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of the accompanying documents from Danish into English.

Brian McCormick
TransPerfect
601 Thirteenth, Street, NW
Suite 370 South
Washington, DC 20005

Sworn to before me this
21st Day of April, 2008

Signature, Notary Public

**Lisa Chan**
Notary Public, District of Columbia
My Commission Expires 1/1/2013

_____
Stamp, Notary Public

Washington, DC

**Exhibit A**

601 THIRTEENTH STREET, NW, SUITE 370 SOUTH, WASHINGTON, DC 20005   T 202.347.2300   F 202.347.6861   WWW.TRANSPERFECT.COM

RANDERS COURT

[stamp:] RANDERS COURT, DENMARK'S COURT OF LAW

Transcript of the Records of the Court

On January 7, 2008 at 1.00 p.m. the courts ruled in the case

FS 40-556/2007

Spectronic Denmark A/S
Skindbjergvej 44
8500 Grenaa
(hereafter referred to as Distrainor 1)
and

DTC Communications Inc.
486 Amherst Street
Nashua, NH 03063
USA
(hereafter referred to as Distrainor 2)
and

Domo Ltd
Manor Court, Barnes Wallis Road
Segensworth, Hampshire, PO 15 5 TH
United Kingdom
(hereafter referred to as Distrainor 3)

Versus

Jimmi Møgelvang Hansen
Lyngdalvej 56
8500 Grenaa
(hereafter referred to as Distrainee 1)
and

Henrik Klebæk
Storegade 31
8500 Grenaa
(hereafter referred to as Distrainee 2)
and

Kent Messerschmidt
Parkvej30
8900 Randers
(hereafter referred to as Distrainee 3)
and

Covidence A/S

[illegible]

[see source for English]

Åkærsvej 1
8410 Rønde
(hereafter referred to as Distrainee 4)
KENDELSE

(Page 2/45)

Judgment

The case was conducted behind closed doors in conjunction with Danish Law §29 Article 1, no. 3.

According to this prohibitive injunction brought before the court on July 9, 2007, the distrainor claimants have brought the following claims against the distrainees:

Primarily:
Distrainees 1, 2, 3 and 4 are prohibited as individuals and as a whole or partial group for a period of 5 years starting April 1, 2007, unless the bailiff's court has determined a shorter period, to direct or indirectly provide, sell, rent, lease, or supply sound and video recording products as well as wireless sound and video surveillance products to police, military or governmental intelligence agencies in Denmark or abroad.

Secondary (prohibitions):

1. Distrainees 1, 2, 3 and 4 are prohibited as individuals and as a whole or partial group for a period of 5 years starting April 1, 2007 unless the bailiff's court has determined a shorter period, to direct or indirectly provide, sell, rent, lease, or supply sound and video recording products as well as wireless sound and video surveillance products to clients named in Appendix 1.

2. Distrainees 1, 2, 3 and 4 prohibited as individuals and as a whole or partial group for a period of 5 years starting April 1, 2007 unless the bailiff's court has determined a shorter period, to direct or indirectly to work with those customers identified in Appendix 2 as suppliers or other commercial relationships to produce sound and video recording products as well as wireless sound and video surveillance products.

This ruling is handed down on principle without securities unless determined otherwise by the bailiff's court.

The distrainors claim the distrainees have denied the terms set forth by the prohibitive injunction.

This judgment does not include a complete case hearing according to laws § 218b, 218a article 2.

Brief Summary of the Case

Claimant 1, Spectronic Denmark A/S (hereafter SD) has supplied electronic surveillance equipment to police, military and intelligence agencies nationally and internationally since 1983.

[illegible]

[see source for English]

(Page 45/45)

[…] use and will misuse technical and commercial information regarding the claimants end-point of sale customers. The distrainors have chosen not to name said customers to protect their privacy. The bailiff's court has determined that this injunction in accordance with the stated principal claim will be continued due to the need for the distrainor's protection. As a consequence, the claimants' secondary claims will be granted to be continued for a total of three years, which is the time period determining relevance of commercial and industrial privacy after which technical development will have rendered them out of concurrence.

This prohibitive injunction is conditioned upon securities set for laws §644. Securities are determined with regard to the economic conditions and information provided and will be awarded at the amount of DKK 3,000,000. The security will be paid no later than the date and method stated hereunder.

The burden of legal fees for this case will be determined during the closing confirmation proceedings.

It has therefore been decided that:

Distrainees 1, 2, 3 and 4 are hereby prohibited together and as individuals for a period of 3 years, starting April 1, 2007,  to directly or indirectly provide, sell, rent, lease, or supply sound and video recording products as well as wireless sound and video surveillance products to clients named in appendix 1.

Distrainees 1, 2, 3 and 4 prohibited as individuals and as a whole or partial group for a period of 3 years starting April 1, 2007, unless the bailiff's court has determined a shorter period, to direct or indirectly to work with those customers identified in Appendix 2 as suppliers or other commercial relationships to produce sound and video recording products as well as wireless sound and video surveillance products.

The injunction will be imposed after the distrainors have provided a security deposit of DKK 3,000,000 to the bailiff's court via bank guarantee or a notarized check. This security must be received no later than January 14, 2008 at 12:00 p.m. noon.

Astrid Lohmann Knudsen


Court transcript verified.
Rander District Court, January 8, 2008


Ulla O Jensen, Court Transcriber


[illegible]

[see source for English]

From: 87125178    Page: 1/45    Date: 08-01-2008 15:22:05

RETTEN I RANDERS



Udskrift af retsbogen

Den 7. januar 2008 kl. 13:00 afsagdes i

FS 40-4556/2007

Spectronic Denmark A/S
Skindbjergvej 44
8500 Grenaa
(herefter kaldet rekvirent 1)
og

DTC Communications Inc.
486 Amherst Street
Nashua, NH 03063
USA
(herefter kaldet rekvirent 2)
og

Dome Ltd
Manor Court, Barnes Wallis Road
Segensworth, Hampshire, PO 15 5 TH
United Kingdom
(herefter kaldet rekvirent 3)

mod

Jimmi Møgelvang Hansen
Lyngdalvej 56
8500 Grenaa
(herefter kaldet rekvisitus 1)
og

Henrik Klebæk
Storegade 31
8500 Grenaa
(herefter kaldet rekvisitus 2)
og

Kent Messerschmidt
Parkvej 30
8900 Randers
(herefter kaldet rekvisitus 3)
og

Covidence A/S

From: 67125178    Page: 2/45    Date: 08-01-2008 15:22:05

Side 2/45

Åkærsvej 1
8410 Rønde
(herefter kaldet rekvisitus 4)
KENDELSE

Sagen er behandlet for lukkede døre i medfør af retsplejelovens § 29, stk. 1
nr. 3.

Under denne forbudssag, der er indbragt for fogedretten den 9. juli 2007, har
rekvirenterne over for rekvisiti nedlagt følgende påstande:

Principalt:

Rekvisitus 1, 2, 3 og 4 forbydes hver især og helt eller delvist i forening, i en
periode på 5 år fra den 1. april 2007, subsidiært i en af fogedretten fastsat
kortere periode, direkte eller indirekte at udbyde, sælge, udleje eller levere
lyd- og video optagerprodukter samt trådløse lyd- og videoovervågningspro-
dukter til politi-, militær- eller efterretningsmyndigheder i ind- og udland.

Subsidiært (sideordnet):

1.    Rekvisitus 1, 2, 3 og 4 forbydes hver især og helt eller delvist i fore-
ning, i en periode på 5 år fra den 1. april 2007, subsidiært i en af fogedretten
fastsat kortere periode, direkte eller indirekte at udbyde, sælge, udleje eller
levere lyd- og video optagerprodukter samt trådløse lyd- og videoovervåg-
ningsprodukter til de i bilag 1 opregnede kunder.

2.    Rekvisitus 1, 2, 3 og 4 forbydes hver især og helt eller delvist i fore-
ning, i en periode på 5 år fra den 1. april 2007, subsidiært i en af fogedretten
fastsat kortere periode, direkte eller indirekte at samarbejde med de i bilag 2
opregnede leverandører og samarbejdspartnere med henblik på fremstilling
af lyd og video optagere samt trådløse lyd- og videoovervågningsprodukter
til brug for elektronisk overvågning.

Forbudet begæres nedlagt principalt uden sikkerhedsstillelse, subsidiært
med en af fogedretten fastsat sikkerhedsstillelse.

Rekvisiti har påstået forbudsbegæringen nægtet fremme.

Kendelsen indeholder ikke en fuldstændig sagsfremstilling, jf. retsplejelo-
vens § 218 b, jf. § 218 a, stk. 2.

Kort sagsfremstilling

Rekvirent 1, Spectronic Denmark A/S ( herefter SD) har siden 1983 natio-
nalt og internationalt drevet virksomhed med levering elektronisk overvåg-
ningsudstyr til politimyndigheder, militære myndigheder og andre regerings-

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

# EXHIBIT B



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

AFFIDAVIT OF ACCURACY

I, Brian McCormick, hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of the accompanying documents from Danish into English.

Brian McCormick
TransPerfect
601 Thirteenth, Street, NW
Suite 370 South
Washington, DC 20005

Sworn to before me this
21st Day of April, 2008

Signature, Notary Public

Lisa Chan
Notary Public, District of Columbia
My Commission Expires 1/1/2013

_____
Stamp, Notary Public

Washington, DC

**Exhibit B**

003

# DELACOUR

J.no. 172563/LLG/SLU

# REQUEST
# FOR INJUNCTION

As the attorney for

Spectronic Denmark A/S
CVR-no. 13 44 98 48
Skindbjergvej 44
8500 Grenaa
(hereinafter called "plaintiff 1")

and

DTC Communications Inc.
486 Amherst Street
Nashua, NH 03063
USA
(hereinafter called "plaintiff 2")

and

Domo Ltd
Manor Court, Barnes Wallis Road
Segensworth, Hampshire
PO15 5 TH
United Kingdom
(hereinafter called "plaintiff 3")

(by/attorney-at-law Anders Hedetoft)

**DELACOUR Advokatfirma**
Tel. (+45) 70 11 11 22
Fax. (+45) 70 11 11 33
www.delacour.dk
CVR-no. 88 18 31 18

**Copenhagen**
Hammerensgade 1
DK-1267 København K

**Aarhus**
Lille Torv 6, Box 505
DK-8100 Århus C

Member of [logo]

- an international network
of independent attorney firms

DE⌊⌊COUR

00-

I will hereby request
the bailiff's court ("Fogedretten") in Randers in regards to

Jimmi Møgelvang Hansen
Lyngdalvej 56
8500 Grenaa
hereinafter called "defendant 1"

and

Henrik Klebæk
Storegade 31
3500 Grenaa
hereinafter called "defendant 2"

and

Kent Messerschmidt
Parkvej 30
8900 Randers
(hereinafter called "defendant 3")

and

Covidence A/S
CVR-no. 30 49 27 65
Akærsvej 1
8410 Rønde
(hereinafter called "defendant 4")

to impose an injunction in accordance with the following:

**CLAIMS:**

Principal claim.

Defendant1, 2, 3, and 4 are separately, together or partially together, in a period of 5 years
starting April 1, 2007, (subsidiary in by the court determined shorter period) prohibited from
directly or indirectly supplying, selling, renting out or delivering sound- and video-recording
equipment as well as wireless sound- and video-surveillance products to police-, military-, or
intelligence-authorities domestically and abroad.

DELACOUR

Subsidiary claim (coordinated):

1. Defendant 1, 2, 3 and 4 are separately, together or partially together, in a period of 5 years starting April 1, 2007, (subsidiary in by the court determined shorter period) prohibited from directly or indirectly supplying, selling, renting out or delivering sound- and video-recording equipment as well as wireless sound- and video-surveillance products to the in appendix 1 listed customers.

2. Defendant 1, 2, 3 and 4 are separately, together or partially together, in a period of 5 years starting April 1, 2007, (subsidiary in by the court determined shorter period) prohibited from directly or indirectly collaborating with exhibit 2 listed vendors and partners with the intention of producing sound- and video-recorders as well as wireless sound- and video-surveillance products to be used for electronic surveillance.

The injunction is requested imposed without indemnity, subsidiary against by the court determined indemnity.

**MOTION FOR CLOSED DOORS:**

The plaintiffs motion that the case will be presented behind closed doors, cf. The Administration of Justice Act ("retsplejeloven") § 29, no. 3, since the case involves commercial secrets and since the case exhibited material to a substantial degree contains confidential data.

**CASE MOTIVATION:**

*Introduction*

This case concerns plaintiff 1's former employees, defendant 1's, 2's and 3's start-up of a business competing with plaintiffs (in the form of defendant 4), a business focused on development and delivery of products to the intelligence community. The three former employees have through defendant 4 hired another 3 employees, who also left plaintiff 1 to seek employment with defendant 4.

Defendant 4 markets – or intends to market – products completely equivalent to plaintiff 1's existing products or products that the plaintiff has under development. Furthermore, defendant 4 intends to promote products completely similar to plaintiff 2's and 3's existing products.

The case, therefore, involves breach of the Danish Marketing Practices Act § 1 regarding bona fide and established marketing practices as well as abuse of commercial secrets, cf. The Danish Marketing Practices Act § 19 and the agreed secrecy obligations.

The case, therefore, involves abuse of Spectronic's commercial secrets consisting of knowledge about customers' needs and experiences with the usage of electronic surveillance equipment as well as knowledge about

**DELACOUR**

how technologies are combined and components are assembled to meet customers' needs, hereunder knowledge about how and to which effect surveillance equipment is implemented secretly.

*Plaintiffs' commercial activity*

Since 1983, plaintiff 1 has operated enterprise with delivery of products and services in electronic surveillance equipment for police authorities, military authorities and other agencies within the intelligence service.

For more than two decades, plaintiff 1 has operated with governments and government-approved investigative- and intelligence-services as well as government approved vendors all over the world, and plaintiff 1 is today one of the industries top leading producers of sound surveillance equipment as well as supplier of internet and telecommunications monitoring solutions.

Plaintiff 1 is in many regards the market leader within its niche oriented product area. Plaintiff 1 has achieved this position by, throughout 24 years, building a very close cooperation with its customers, in which connection it is referred to in the section below regarding market barriers.

Plaintiff 1 has since November 2004 been a part of the English Cobham plc. with plaintiff 2 as plaintiff 1's direct parent company and plaintiff 3 as a sister company. The Cobham Group is an international group engaged in the development, delivery and support of advanced aerospace and defense systems, including surveillance systems. Plaintiff 2 and 3 primarily operates activities of development and promotion of surveillance systems.

The plaintiffs' enterprise is based partially on the sale of self-developed products, partially on the promotion rights for supplier products. The plaintiffs' development enterprise is based on user-oriented innovation, based on a detailed knowledge of the customers and customers' needs as well as knowledge about the usage of the newest thoroughly tested technology.

The plaintiffs are all part of the Cobham Group's LENS-group (Law Enforcement and National Security). The LENS-group is a very limited group of companies that operates in surveillance equipment for police authorities, military authorities and other agencies within intelligence service.

*Plaintiff's products and strategy*

Plaintiff 1's brochures regarding the plaintiffs' operations as well as current product assortment are presented as the case's <u>exhibit 3 and 4.</u> As it appears, plaintiff 1's sound surveillance products consists of:

- "Solid State Recorders" (SSR), meaning recorders without moving parts (no tape), i.e. "Beowulf,"
- "Wireless," meaning wireless sound surveillance products (both analog and digital), i.e. Inka, Loke and Thor,
- Wired sound surveillance products, i.e. Heimdahl, ACC, RFM, RMM and AWM

DELACOUR

007

As well as hybrids of above mentioned products.

Following circumstances – described by outline – separates plaintiff 1 and plaintiff 1's products from the competitors:

- The newest technology is used. Plaintiff 1 has thereby achieved to minimize the size of the electronic hardware to the smallest in the world without compromising either sound quality or technical/mechanical quality. Plaintiff 1 has furthermore achieved the possibility of, in any situation, to be able to offer customers to further transmit the collected evidence by using the newest technology.

- The recording products are characterized by containing an encrypted watermark to validate the accuracy of the recordings. Plaintiff 1 keeps this encrypted watermark secret.

- Plaintiff 1 has, through the previous 24 years, built a very special relationship to the many customers and end-users, which plaintiff 1 has worldwide. The relationship to the customers and end-users is therefore characterized by a close dialogue that provides a unique insight into how the workday for the policeman, intelligence officer, soldier or undercover agent is. This close contact and dialogue furthermore means that plaintiff 1 to a very high degree has insight and understanding of which functionality and which features the customer needs. The close contact through the years has furthermore caused that plaintiff 1 in recent years receive specific development projects for new products.

- Plaintiff 1's products are characterized by very high user friendliness. Plaintiff 1 has therefore been able to create some of the most advanced within the industry but still preserve the simple and user friendly concept, which is critical in light of the training time that the users have available - often minutes and not hours or days. At the same time, the users are operating under immense psychological pressure, which requires that the equipment is simple and user-friendly for the operation to succeed.

- The design direction that plaintiff 1 follows today has hit the spot in the users' minds. The simple black and "ruggedized" design is appealing and, at the same time, fulfills the requirements for duration and the possibility of concealing the product. There is a recognition factor through the entre product program and a customer can therefore easily, through the design, set apart plaintiff 1's products from the competitors.

As the case's exhibit 5 is presented a copy of an excerpt from plaintiff 1's strategy plan for 2007-2011, which is being implemented. From the excerpt it appears that the launch of a "digital video recorder" is part of plaintiff 1's strategy plan. This excerpt from the strategy plan is authored by plaintiff 1.

As the case's exhibit 6 is presented a "power point presentation" developed by plaintiff 1 in February 2006 regarding the development of a digital video recorder based on the so-called "Thor SSR" platform, which is under development at plaintiff 1. Defendant 1 and 3 has participated in this development. As the case's exhibit 7 is presented a presentation developed by defendant 1 regarding possible routes to substantial revenue increases within the surveillance area. From exhibit 7 it appears that plaintiff 1 must market

**DELACOUR**

008

video products – both in the form of a SSR as a wireless version, hereunder that the SSR version can be based on "Thor spin off," i.e. on technologies, knowledge and experience form the Thor project. As the case's <u>exhibit 8</u> is presented a "white paper" developed by defendant 1, containing a technical description as well as a description of the development project regarding the plaintiffs "Beowulf Digital Video Recorder."

Plaintiff 1 has thereby, through a longer period, both through strategic, operational, as well as technical studies and considerations worked on launching video surveillance products.

Plaintiffs' know-how, i.e. knowledge of usage of technologies on the market for electronic surveillance equipment for use for mission-critical situations, is a critical pre-requisite to enter the video surveillance market, and plaintiff 1's know-how concerning sound surveillance products is directly applicable for the development of electronic video surveillance products. The difference between the two types of surveillance equipment is only that both a video camera and a microphone are connected to the recorder on the video surveillance product, while only a microphone is connected to the recorder on the sound-only surveillance product, and that the data compression format is different.

Plaintiff 1's direct parent company, DTC Communications (plaintiff 2) and plaintiff 1's sister company , Domo (plaintiff 3) has through many years developed and marketed wireless video surveillance products. Plaintiff 2 markets one of the leading video recording products available on the market. As the case's <u>exhibit 9 and 10</u> is presented a copy of plaintiff 2's product brochure and as the case's <u>exhibit 11</u> is presented a copy of plaintiff 3's product brochure. Substantial knowledge and experience therefore exists regarding video products in the Group's LENS-group.

***The plaintiffs' commercial secrets and the protection thereof***

A substantial portion of the information and the knowledge that the plaintiffs are in possession of are either militarily or nationally classified information with the consequently stringent demands for handling, storage and transmission.

For other materials and other data from customers, suppliers and other collaborators, it applies almost without exception that there are confidentiality agreements, which obligate Spectronic to keep secret received information and solely use them for the confidentiality agreement's specified purpose.

It is a condition for employment at the plaintiffs that the employee can gain security clearance for Confidential and Secret level respectively.

The knowledge of plaintiff 1's products and their functionality, etc., is reserved to customers and the plaintiffs, since the products otherwise would lose their value. Plaintiff 1's website therefore does not contain information regarding the individual products' functionality, etc., just like the brochure materials for use at trade fairs, etc. only contain a brief and very perfunctory description of the products, cf. also exhibit 3 and 4.

Plaintiff 1's recording products are characterized by containing an encrypted watermark to validate the accuracy of the recordings. This encrypted watermark is kept secret by plaintiff 1.

DELACOUR

009

*Defendant*

On February 25th, 2007 defendant 1 and 2 quit their positions and on February 26, 2007 defendant 3 quit his position at plaintiff 1 to start his own enterprise through defendant 4.

Defendant 1 (Jimmi Møgelvang Hansen):

Defendant 1 commenced the position of leader of the surveillance area on January 1, 2003. Defendant 1 functioned later as development director reporting to CEO, Kim Lehmann.

Defendant 1 was, in his job, responsible for the development of electronic products (hardware and software) in the area of wireless as well as non-wireless surveillance equipment, including recorders.

Defendant 1 received through his employment a very considerable insight in plaintiff's know-how, including the assembly of components for surveillance products on the market for mission-critical surveillance and the market for recorders.

Defendant 1 secured a close relationship to some of plaintiff 1's most important customers and partners and a close knowledge of the customers' experiences and thereof derived needs.

Defendant 1 had, through his position as development director, complete insight in plaintiff 1's strategy, business plans and pricing. Defendant 1 participated in this way in strategic considerations regarding internal development of a video recorder contra acquiring existing company, cf. above as well as exhibit 6-9 and below regarding defendant 1's studies of a competing American company and recommendations for use in the plaintiff's decision regarding acquiring the company.

Defendant 1 has thoroughly followed the technological development in the Group and he had full access to the Group's technology, product development and commercial relations. As an example can be mentioned that defendant 1 participated in technology meetings in the Group's LENS-group, which primarily works with "Law Enforcement and National Security." Defendant 1 examined in 2006 in this way plaintiff 2's and plaintiff 3's surveillance products with the intention of gaining synergy effects by being member of the LENS-group. From the minutes of technology meeting in the LENS-group on September 19 and 20, 2006, which is presented as the case's exhibit 12 it appears on page 9 that plaintiff 1, represented by defendant 1, among other things should share information about protocols with the other LENS-members. In exhibit 13 it appears that defendant 1 confirms his participation in the meeting. From exhibit 14 it appears that defendant 1 had follow-up tasks after his participation in the meeting.

In regards to systems, defendant 1, as part of his position as Director, had access to plaintiff 1's customer system (Superoffice). All customer correspondence appears in the customer system. He, furthermore, had access to plaintiff 1's accounting system (Axapta) wherein customer order and other information can be found, like he had access to the customer database containing master data and contact information of the customers.

DELACOUR

010

Defendant 1 therefore had unlimited read-access in, as well as insight in, the most critical part of the plaintiffs' commercial secrets including, technical, financial, commercial and customer-related commercial secrets.

The development department consisted - at the time of defendant 1's resignation – of 16 employees.

The employment contract is presented as the case's exhibit 15. The employment contracts article 9.3 has the following wording:

"The employee has duty of confidentiality, both during the employment as well as after it is terminated, with regards to the company's business and operations circumstances, its technical experiences, working methods, production efforts or similar and not for own or others advantage to use your knowledge of the company's circumstances in general."

The employment contracts article 9.5, 2nd period, has the following wording:

"It is not consistent with the employment relationship that the employee has economical, commercial- or work related interests in or with another competing company without prior written permission from the company."

Defendant 2 (Henrik Klebæk):

Defendant 2 commenced employment with plaintiff on January 1, 2005, as Senior Engineer, Hardware, reporting to defendant 1.

Defendant 2's work consisted in the substantial of development and launch as well as subsequent maintenance of the platform for plaintiff's "Beowulf recorder" – a miniature SSR. Furthermore, the work consisted of project management, contact with suppliers, development of customer specifications, conducting customer adjustments, diagram drawings and print layout.

As part of the maintenance of the platform, defendant 2 covered customers' needs for changes and further developments of existing products as well as development of new products within the recording area. To illustrate defendant 2's tasks in this regard, the case's exhibit 16 is presented as a copy of defendant 2's travel report from his visit at plaintiff 1's American distributor November 6-11, 2006.

Defendant 2 had, due to his function, the contact to and the responsibility for Michael Gjern's development of the "Beowulf recorder," cf. below regarding defendants negotiations with Michael Gjern.

The technology that is behind the "Beowulf recorder" shaped the basis for the development, by plaintiff 1, of the planned video recorder.

DELACOUR

Defendant 2 participated in strategic considerations regarding internal development of a video recorder contra acquiring existing company, cf. below regarding defendant 2's studies of a competing American company for use in plaintiff 1's decision regarding acquiring the company.

Defendant 2 gained through his employment a thorough knowledge of plaintiff 1's know-how, including plaintiff 1's way of collecting data, encryption and compression factors as well as customer and competitor circumstances and pricing of development projects at plaintiff 1.

Regarding systems, defendant 2 had read-access to plaintiff 1's accounting system.

Defendant 2 had in this way both access to and insight in a very critical part of plaintiff 1's commercial secrets, at least not regarding the customers' needs and experiences, plaintiff 1's recorder products as well as plaintiff 1's strategic and business related considerations and studies regarding the marketing of video surveillance products.

The employment contract is presented as the case's <u>exhibit 17.</u> The employment contracts article 13.3 is worded as follows:

"The employee has duty of confidentiality, both during the employment as well as after it is terminated, with regards to the company's business and operations circumstances, its technical experiences, working methods, production efforts or similar and not for own or others advantage to use your knowledge of the company's circumstances in general."

The employment contracts article 13.5, 2nd period, has the following wording:

"It is not consistent with the employment relationship that the employee has economical, commercial- or work related interests in or with another competing company without prior written permission from the company."

<u>Defendant 3 (Kent Messerschmidt):</u>

Defendant 3 commenced at plaintiff 1 on November 13, 2006, as software project leader reporting to defendant 1. Defendant 3 was hired by recommendation from defendant 1, since defendant 1 had a close and private relationship with defendant 3 and previously had worked with defendant 3.

Defendant 3's work consisted of software project management. Defendant 3 was therefore project manager on one of plaintiff 1's major development projects. It was also defendant 3's task to systemize and create structure in plaintiff 1's software development generally.

Regarding systems, defendant 3 had read-access to the accounting system.

Despite defendant 3's short employment period, it must be assumed that defendant 3 gained insight into plaintiff 1's commercial secrets, at least not when it is considered that defendant 3 during at least

DELACOUR

012

the latter half of his employment has known that he was to start a competing business and therefore has had an obvious interest to obtain insight in circumstances of use to the operation of defendant 4.

The employment contract is presented as the case's underline(exhibit 18). The employment contracts article 13.3 is worded as follows:

"The employee has duty of confidentiality, both during the employment as well as after it is terminated, with regards to the company's business and operations circumstances, its technical experiences, working methods, production efforts or similar and not for own or others advantage to use your knowledge of the company's circumstances in general."

The employment contract's article 13.5. 2. period, is worded as follows:

"It is not consistent with the employment relationship that the employee has economical, commercial- or work-related interests in or with another competing company without prior written permission from the company."

--oOo--

Defendant 1, 2 as well as 3, were by plaintiff 1 suspended from duty on February 28, 2007 and were subsequently not present at the workplace hereafter. Formally they all resigned on March 31, 2007 in accordance with their applicable notices.

By identical letters of March 5, 2007, addressed to defendants 1, 2 and 3 respectively, plaintiff 1 repeated the for the defendants applicable secrecy and confidentiality obligations, cf. copy of the letter to defendant 1, which is presented as the case's underline(exhibit 19).

Defendant 4 (Covidence A/S):

As the case's underline(exhibit 20) is presented copy of printout from the Danish Commerce and Companies Agency, where it appears that defendant 1, 2 and 3 with start date of April 2, 2007 established defendant 4, Covidence A/S.

From defendant 4's website on the Internet (www.covidence.dk) it appears that defendant 4 designs, develops and produces miniature video surveillance equipment for police, intelligence services, special forces and other government approved organizations. Furthermore, it appears that defendant 4 offers the miniature video solution "Miniature Solid State Video Recorders" and "Miniature Wireless Video" for use for surveillance as well as other development of customer specific products and solutions.

Copy of printout from defendant 4's website is presented as the case's underline(exhibit 21).

As the case's underline(exhibit 22) is presented copy of updated budget for defendant 4. From the budget it appears that defendant 4, apart from the above-mentioned video recorder also budgets with income from sale of sound surveillance products, cf. account item "Audio recorder."

DELACOUR.

013

Defendant 4 therefore promotes – or intends to promote – products completely equivalent to plaintiff 1's existing products or products that the plaintiff has under development. Furthermore, defendant 4 intends to promote products completely similar to plaintiff 2's and 3's existing products.

Defendant 4 has in April, 2007, hired additional 3 of plaintiff 1's employees. Defendant has in this way hired:

1) Niels-Ole Pedersen, who has been employed as development engineer at plaintiff 1 since December 1, 1994 and who also in recent years reported to defendant 1. Niels-Ole Petersen was, through his many years of employment at plaintiff 1, tasked with developing hardware, especially including products within radio communication. Niels-Ole Pedersen gained, through his employment at plaintiff 1, thorough knowledge of and experience regarding plaintiff 1's products, including the way in which plaintiff 1 assembles the various components. Niels-Ole Pedersen has furthermore, throughout his entire employment, regularly had extensive customer contact, since he has been involved in defining customer demands and development from the concept phase to presentation of the finished design, as well as spending time with customers to solve technical problems.

2) Ulrich Sørensen commenced employment, reporting to defendant 1, as development engineer May 1, 2004. Ulrich Sørensen functioned as programmer for recorders and protocols for the wireless products. He gained, through his employment at plaintiff 1, detailed knowledge of and experience regarding plaintiff 1's products, including regarding the way plaintiff 1 assembles the various components, as well as of the by plaintiff 1 utilized encryption and compression algorithms, as well as not least detailed knowledge of the unique industry related demands that are stipulated for verification of evidence.

The employment contract is presented as the case's <u>exhibit 23</u>. The employment contract's article 13.7 (3rd paragraph under "13. Other regulations ("Øvrige bestemmelser")" is worded as follows:

"The employee has duty of confidentiality, both during the employment as well as after it is terminated, with regards to the company's business and operations circumstances, its technical experiences, working methods, production efforts or similar and not for own or others advantage to use your knowledge of the company's circumstances in general."

The employment contract's article 13.5, 2nd period is worded as follows:

"It is not consistent with the employment relationship that the employee has economical, commercial- or work-related interests in or with another competing company without prior written permission from the company."

3) Kim Torbjørn Schjødt, who, reporting to defendant 1, commenced employment at plaintiff 1 as development engineer on September 11, 2006. Kim Torbjørn Schjødt was at plaintiff 1 tasked with microprocessor programming with the intention of producing a software tool to

DELACOUR

014

establish a configurations program as well as interface for one of plaintiff 1's major development projects,

The employment contract is presented as the case's <u>exhibit 24</u>. The employment contracts article 13.3 is worded as follows:

"The employee has duty of confidentiality, both during the employment as well as after it is terminated, with regards to the company's business and operations circumstances, its technical experiences, working methods, production efforts or similar and not for its own or others advantage to use your knowledge of the company's circumstances in general."

The employment contracts article 13.5. 2. period, is worded as follows:

"It is not consistent with the employment relationship that the employee has economical, commercial- or work related interests in or with another competing company without prior written permission from the company."

On March 12, 2007 Ulrich Sørensen and Kim Torbjørn Schjødt participated in a highly confidential meeting with two specialists representing plaintiff 1's largest and most important end-user. The purpose of the meeting was that the two specialists would provide confidential information about this most important end-users completely unique demands for the method that is used for gathering, storage and presentation of sound and video, in order for the legal system to accept specific evidence as being 100% correct. ts <u>exhibit 25</u> is presented the minutes of the meeting. Prior to the meeting, the representatives' boss, Terry Andersen, presented demands for the technical circumstances of substantial importance for the future usage of miniature "undercover" surveillance equipment, which demands defendant 2 commented on in the non-dated document that is presented as the case's <u>exhibit 26.</u>

A few days before their resignation, Ulrich Sørensen and Kim Torbjørn Schjødt also participated in a seminar with two previous "undercover" agents – a police agent and a military agent. The two previous "undercover" agents represented plaintiff 1's most professional collaborator/end-user, regarding the usage of the type of equipment produced by plaintiff 1. The seminar in this way provided vital knowledge of miniature "undercover" surveillance equipment in relation to current experiences and needs in relation to subsequent presentation of evidence. A knowledge the relevant parties could not, under any circumstances, have gained had they not been employed by a company that was well established in the market for mission-critical surveillance equipment. As the case's <u>exhibit 27</u> is attached copy of e-mail from April 20, 2007, with the heading "applikationstræning" containing the program of the meeting.

The 3 employees in question all resigned their positions with plaintiff 1 on May 31, 2007, and commenced employment with defendant 4 on June 1, 2007.

Defendant 4 today, with defendant 1, 2 and 3 as well as the named additional 3 employees, commands a total of 6 employees. All these employees came directly from plaintiff 1. With the subsequent three employments, defendant 4 commands an almost complete insight into all functions both on the

DELACOUR

015

technical and functional areas of plaintiff 1's business. That means an insight that is beyond regularly obtainable professional knowledge.

As mentioned above, the knowledge of usage of technologies on the market for electronic surveillance equipment for use in mission critical situations is critical to enter and sustain market shares on the market for surveillance equipment for use in mission critical situations, and plaintiff 1's and 2's know-how concerning sound surveillance products as well as plaintiff 2's and 3's know-how regarding video surveillance products are directly applicable to the development of electronic video surveillance products.

Since defendant 4 commands an – at least approximately – complete knowledge of both technology as well as business-related and commercial circumstances regarding both plaintiff 1's and 2's sound surveillance products as well as the upcoming video surveillance as well as plaintiff 2's and plaintiff 3's existing video surveillance products, and since the usage of plaintiff 1's, 2's and 3's know-how as well as other commercial secrets is critical for defendant 4's entrance to the relevant market, the plaintiff's commercial secrets will surely or at least most likely be abused in defendant 4's enterprise.

*Market barriers*

The market is characterized by unusually high market barriers.

The customers are characterized by operating in a very closed and extremely secret dominated environment. Access to the market requires the creation of a trust relationship through documentation of knowledge of customer needs and documentation of technical ability and quality.

The market is therefore characterized by everything depending on trust. Trust in that the products function when intelligence people put their life at risk to prevent terror and reveal organized crime. Trust in that the suppliers understand to treat information regarding its customers at a high confidentiality level as well as trust in that the needed support immediately is extended when the specific mission demands it. To obtain this trust demands many years of concentrated and dedicated effort, and there is no room for mistakes.

Inside the industry the unwritten "law" applies that you in no way use references. Even though it therefore could be a considerable factor for sales that the plaintiffs could refer to sales to several important intelligence organizations in North America, the plaintiffs – like the other market players – do not utilize this, since the plaintiffs would then break the trust-code that is the premise for being a successful player in the industry.

The industry can be described as a sort of "club" – a club where membership depends on goodwill achieved through many years of good specialist, technical and professional efforts as well as personal trust relationships.

DELACOUR

Knowledge of customers' needs and experiences is of critical importance to the presence on the surveillance market. It is the customers' experiences from surveillance operations that trigger new ideas, improvements and changes in existing products.

Access to the market, therefore, requires that you have been part of the "club," for example as a former chief of an intelligence organization, or as a former leading employee at a recognized company within the industry. To start a company within the plaintiffs' industry without possessing the above-mentioned qualifications or without exuberant financial means would therefore be doomed to fail.

*Defendants' initiatives towards customers and suppliers, etc., with relevance to this case.*

ELSY:

ESLY, a check developer and producer of surveillance systems is one of plaintiff 1's important suppliers. Shortly before defendant 1 commenced employment, ELSY had developed digital systems – called "Loke," which plaintiff 1 gained worldwide exclusive marketing rights for. Jiri Krcmar is ELSY's most important product developer and is as such a very central person in relation to "Loke."

In 2006 defendant 1 was tasked with negotiating an agreement with ELSY with the content that plaintiff 1 should have exclusive marketing rights for all the products that ELSY had developed and might develop in the future.

Defendant 1 in this connection expressed that it was critical that Jiri Krcmar was part of the agreement and therefore that the agreement was conditioned on his continued employment at ELSY, since the right in the opposite case would not be of interest.

The negotiations between defendant 1 and ELSY failed in November, 2006. CFO Poul Reinholdt thereafter took over the responsibility for the negotiations. In connection with the transfer of the negotiations, Poul Reinholdt asked defendant 1 what the status in relation to Jiri's involvement in the agreement was, whereto defendant 1 surprisingly replied that Jiri was not crucial for the value of the rights.

Plaintiff 1 would later realize that this "U-turn" in relation to Jiri Krcmar's importance to the collaboration with ELSY was caused by defendant 1's interest in – through defendant 4 – to attach close relations to Jiri Krcmar.

*Jiri Krcmar's "Omega"*

Jiri Krcmar has at own accord developed a analog video surveillance system. The product is called "Omega." Plaintiff 1 was in the fall of 2006 offered worldwide marketing rights for "Omega" with a "first right of refusal," which expired on December 24, 2006. Defendant 1 was tasked with compiling a brief on Omega. The brief "Omega Video Background" is compiled by defendant 1 in November, 2006. The brief is attached as <u>exhibit 28.</u> The brief shows, among other things, how the product will fit into the Group's product portfolio in the area defendant 1 had full knowledge of. At the "Surveillance Management

# DELACOUR

Team" meeting on December 4, 2006 defendant 1 expressed that there was not among his staff time to test the "Omega" product. Copy of the meeting minutes from the specific meeting is presented as the case's exhibit 29. Plaintiff 1's Managing Director, Kim Lehmann, insisted however that the product should be purchased, the reason the topic on the agenda for the board meeting on December 12, 2006. The agenda is put together on December 8, 2006 and has been attached as exhibit 30. Defendant 1 was made aware that the brief regarding Omega and its place in the Group's product portfolio in the area was on the agenda for the above mentioned board meeting. Defendant 1 hereafter contacted Kim Lehmann by telephone and informed him that it was now his opinion that the quality of the product was now too poor, causing him to recommend that plaintiff 1 should not purchase the rights for Omega. This resulted in that plaintiff 1 lost its "first right of refusal."

Plaintiff 1 has, after defendant 1's resignation, found that defendant 1 on behalf of defendant 4 in March, 2007 had negotiations with Jiri Krcmar regarding worldwide rights for "Omega."

It appears in "Working document between Jiri Krcmar and Spectronic" of May 2, 2007, which is presented as the case's exhibit 31, that defendant 1 on behalf of defendant 4 in April, 2007 asked Jiri Krcmar about the possibility of purchasing up to 30 systems. Furthermore, it appears from the document that has been signed by Jiri Krcmar that all communication was in writing and that defendant 1 and Jiri Krcmar agreed to delete all e-mails.

As the case's exhibit 32 is also presented copy of e-mail correspondence of June 11, 2007 between sales Director, Steen Gammelgaard, to Dave Tilton. The latter was previously employed at the plaintiffs' vendor in the USA, Gans & Pugh, but has now established his own trading company, Brimtek. According to the correspondence, defendant 1 has contacted Dave Tilton regarding Dave Tilton's possible negotiation of "Omega" for defendant 4.

<u>Knowledge of American business in connection with plaintiff 1's purchase of the specific company.</u>

In the fall of 2006 plaintiff 1 initiated the purchase of an American company, Adaptive Digital Systems Inc. (ADS) – a privately held company that delivers video surveillance equipment primarily to the American investigative and intelligence services.

On September 26, 2006, ADS and plaintiff 1 signed a Non-Disclosure Agreement with the purpose that plaintiff 1 could undertake investigations of ADS regarding the company's circumstances. Copy of the agreement is presented as exhibit 33. Defendant 1 and defendant 2 hereafter separately visited the company in September and December, 2006, to gain detailed knowledge of their technologies, products, competencies, strategies, customer relations, pricing, etc.

Defendant 1 visited together with managing director, Kim Lehmann, ADS at the end of September, 2006. In October 2006, Kim Lehmann together with defendant 1 compiled an "Executive Brief" containing facts, evaluations and recommendations for use for the Group's decision regarding a possible purchase of the company. Copy of the document is presented as the case's exhibit 34. As exhibit 35 is presented copy of mail correspondence, which documents defendant 1's active participation in the evaluation.

DELACOUR

After defendant 2's visit at ADS on December 5th and 6th, 2006, defendant 2 developed a report that is presented as the case's exhibit 36. The report contains a detailed technical description of ADS' digital video recorder.

Both defendant 1 as well as defendant 2 therefore gained insight in highly sensitive information regarding ADS' products and business. As mentioned above, defendant 4 today markets products similar to ADS'.

MiTek Elektronics (hereafter MiTek) by Michael Gjern

The owner of MiTek, Michael Gjern, was an employee of plaintiff 1 in the period from August, 1999, when he commenced employment as a newly educated electronics engineer, until July 31, 2004. During his employment he developed a concept for a digital recorder, which plaintiff 1 took over the rights for in the beginning of 2004. Michael Gjern resigned right after this his position to initially take other employment and later establish the consultant company MiTek. In his role as consultant for plaintiff 1, he developed in collaboration with plaintiff 1's development team managed by defendant 2 the digital recorder that has since 2006 been marketed and sold as the "Beowulf recorder."

As previously mentioned the plaintiffs' know-how is directly applicable to the development of video products for the surveillance market and Michael Gjern, on the basis of his knowledge of the existing digital recorder, developed a video recorder – the so-called Solid State Video Recorder, which plaintiff 1 was first made aware of in March 2007, when Michael Gjern himself contacted plaintiff 1 about this.

Defendant 1, 2 and 3, meanwhile, knew about Michael Gjern's development at a far earlier stage.

Defendant 1, 2 and 3 already contacted Michael Gjern in February 2007, meaning before their resignations, with the intention of including him in defendant 4 – as a consultant or otherwise. Defendant 4 negotiated hereafter primo February 2007, with Michael Gjern/MiTek regarding the rights for the video recorder. The negotiations failed due to disagreements. As exhibit 37 is presented copy of e-mail sent from Michael Gjern to Kim Lehmann on June 13th, 2007. In the e-mail Michael Gjern confirms that he, in the period from January 19th to February 21st, 2007, has received about 50 e-mails from and sent about 40 e-mails to defendant 1, 2 or 3.

Defendant 1, 2 and 3 therefore concealed – during their employment with plaintiff 1 and therefore while still under loyalty obligation to plaintiff 1 – highly relevant information regarding Michael Gjern's development of the video recorder. Information that had it been in the possession of plaintiff 1, would have naturally resulted in plaintiff 1 would have started negotiations with Michael Gjern regarding the rights for the video recorder. The failure to disclose – as it appeared from the above mentioned – was caused by defendant 1's, 2's and 3's wish to use Michael Gjern's invention for own gain.

DELACOUR

<u>The NATIA and MILIPOL trade fairs</u>

Plaintiff 1, 2 and 3 have been made aware that defendant 4 is intending to be present at or in connection with the trade fairs NATIA and MILIPOL, which take place in July 2007 in USA and in October in Paris, respectively. <u>Exhibit 38</u> is presented a printout of the participant list at MILIPOL, where it appears that defendant 4 is intending to participate. The plaintiffs are therefore aware that defendant 4 will primarily try to participate at the fairs themselves, and alternatively – in case this is not possible – to set up in the area around the fairs, including, for example, nearby hotels.

The specific fairs are definitely the most important trade fairs in the industry and constitute a considerable "display window." The plaintiffs, therefore, also for this reason have a clear interest in imposing an expedient end to the defendant's business.

**ALLEGATIONS:**

To support the claims it is asserted,

| | |
|---|---|
| that | defendant 1, 2 and 3 by their employment has assumed a non-limited duty to keep secret those circumstances around the plaintiffs' operations that are not available to the public. |
| that | defendant 1, 2 and 3, through their employment at plaintiff 1 have gained detailed knowledge of and expertise about elements that can be characterized as commercial secrets, in particular commercial secrets regarding the customers' needs and experiences as well as the subsequent knowledge about how technologies are assembled to fill customers' needs. |
| that | defendant 1 and 2, through their employment, gained detailed knowledge of the strategy, technology and products within video Solid State Recorders and that they, during their employment at plaintiff 1, were the people who knew the most about this. |
| that | it is similarly applicable that Niels-Ole Pedersen, Ulrich Sørensen and Kim Torbjørn Schjødt through their employment at plaintiff 1 have gained detailed knowledge of and expertise regarding circumstances that can be characterized as commercial secrets, |
| that | at least all defendants' total knowledge regarding plaintiff 1, 2 and 3 constitute a commercial secret. |
| that | defendant 1, 2 and 3 already during their employment at plaintiff 1 established and planned their competing business and carried out competitive actions, including through utilizing plaintiff 1's commercial secrets, |
| that | defendant 1, 2 and 3 during their employment at plaintiff 1 behaved most disloyal and in substantial ways disregarded plaintiffs' interests, |

# DELACOUR

020

| | |
|---|---|
| that | the obligation to not use or transmit commercial secrets is and will be violated through the operation of defendant 4, |
| that | the operation of defendant 4 will constitute both a violation of the duties of confidentiality contained in the employment contracts and of the Danish Marketing Practices Act's § 19, |
| that | the operation of defendant 4 furthermore will constitute a violation to the Danish Marketing Practices Act § 1 regarding bona fide and established marketing practices, since defendant 4 in its marketing is piggybacking on the plaintiffs' goodwill, |
| that | the conditions for imposing injunction are fulfilled, since |

- the actions that are sought prohibited are against the rights of the plaintiffs,
- defendant 1, 2, 3 and 4, will execute actions that are sought prohibited,
- the purpose will be wasted in case the plaintiffs are referred to claim their rights at regular court
- the law's regular rules regarding punishment and compensation and a possible  defendant offer indemnity will not sufficiently protect the plaintiff,
- an injunction will not cause defendants damage or inconvenience that is in  clear disproportion to the plaintiffs' interest in the injunction being imposed.


Aarhus, July 6, 2007


Attorney Anders Hedetoft


by/attorney Lene Lange Gammelgaard

# DELACOUR

003

J.nr. 172563/LLG/SLU

## BEGÆRING

## OM

## FOGEDFORBUD

Som advokat for

Spectronic Denmark A/S
CVR-nr. 13 44 98 48
Skindbjergvej 44
8500 Grenaa
(herefter kaldet rekvirent 1)

og

DTC Communications Inc.
486 Amherst Street
Nashua, NH 03063
USA
(herefter kaldet rekvirent 2)

og

Domo Ltd
Manor Court, Barnes Wallis Road
Segensworth, Hampshire
PO15 5 TH
United Kingdom
(herefter kaldet rekvirent 3)

(v/advokat Anders Hedetoft)

DELACOUR Advokatfirma
Tel. (+45) 70 11 11 22
Fax. +45) 70 11 11 33
www.delacour.dk
CVR-nr. 88 18 31 18

København
Hammerensgade 1
DK-1267 København K

Århus
Lille Torv 6, Box 505
DK-8100 Århus C

Medlem af advoc

- et internationalt netværk
af uafhængige advokatfirmaer

DE COUR

004

skal jeg herved anmode
Fogedretten i Randers om overfor

Jimmi Møgelvang Hansen
Lyngdalvej 56
8500 Grenaa
(herefter kaldet rekvisitus 1)

og

Henrik Klebæk
Storegade 31
8500 Grenaa
(herefter kaldet rekvisitus 2)

og

Kent Messerschmidt
Parkvej 30
8900 Randers
(herefter kaldet rekvisitus 3)

og

Covidence A/S
CVR-nr. 30 49 27 65
Åkærsvej 1
8410 Rønde
(herefter kaldet rekvisitus 4)

at nedlægge fogedforbud i henhold til følgende:

**PÅSTANDE:**

Principalt:

Rekvisitus 1, 2, 3 og 4 forbydes hver især og helt eller delvist i forening, i en periode på 5 år
fra den 1. april 2007, subsidiært i en af fogedretten fastsat kortere periode, direkte eller indi-
rekte at udbyde, sælge, udleje eller levere lyd- og video optagerprodukter samt trådløse lyd-
og videoovervågningsprodukter til politi-, militær- eller efterretningsmyndigheder i ind- og ud-
land.

DE    COUR

Subsidiært (sideordnet):

1   Rekvisitus 1, 2, 3 og 4 forbydes hver især og helt eller delvist i forening, i en periode på 5 år fra den 1. april 2007, subsidiært i en af fogedretten fastsat kortere periode, direkte eller indirekte at udbyde, sælge, udleje eller levere lyd- og video optagerprodukter samt trådløse lyd- og videoovervågningsprodukter til de i bilag 1 opregnede kunder.

2.   Rekvisitus 1, 2, 3 og 4 forbydes hver især og helt eller delvist i forening, i en periode på 5 år fra den 1. april 2007, subsidiært i en af fogedretten fastsat kortere periode, direkte eller indirekte at samarbejde med de i bilag 2 opregnede leverandører og samarbejdspartnere med henblik på fremstilling af lyd og video optagere samt trådløse lyd- og videoovervågningsprodukter til brug for elektronisk overvågning.

Forbudet begæres nedlagt principalt uden sikkerhedsstillelse, subsidiært mod en af fogedretten fastsat sikkerhedsstillelse.

## ANMODNING OM LUKKEDE DØRE:

Rekvirenterne anmoder om, at sagen føres for lukkede døre, jf. retsplejelovens § 29, nr. 3, idet sagen omhandler erhvervshemmeligheder, og idet det i sagen fremlagte materiale i betydeligt omfang indeholder fortrolige data.

## SAGSFREMSTILLING:

### Indledning

Denne sag handler om rekvirent 1's tidligere medarbejdere, rekvisitus 1, 2 og 3's opstart af en med rekvirenterne konkurrerende virksomhed (i form af rekvisitus 4) med udvikling og leverance af produkter til efterretningsmarkedet. De tre tidligere medarbejdere har i rekvisitus 4 ansat yderligere 3 medarbejdere, der ligeledes forlod rekvirent 1 for at tage ansættelse hos rekvisitus 4.

Rekvisitus 4 markedsfører – eller agter at markedsføre – produkter fuldstændig svarende til rekvirent 1's eksisterende produkter eller produkter, som rekvirent 1 har under forberedelse. Endvidere agter rekvisitus 4 at markedsføre produkter fuldstændig svarende til rekvirent 2's og 3's eksisterende produkter

Sagen handler som følge heraf om overtrædelse af markedsføringslovens § 1 om god markedsføringsskik samt misbrug af erhvervshemmeligheder, jf. markedsføringslovens § 19 og de aftalte hemmeligholdelsesforpligtelser

Sagen handler således om misbrug af Spectronics erhvervshemmeligheder bestående i viden om kundernes behov og erfaringer med anvendelse af elektronisk overvågningsudstyr samt viden om,

DE COUR

006

hvordan teknologier kombineres og komponenter sammensættes for at opfylde kundernes behov, herunder også viden om, hvordan og i hvilke effekter overvågningsudstyret indbygges på skjult vis.

### Rekvirenternes virksomhed

Siden 1963 har rekvirent 1 drevet virksomhed med levering af produkter og ydelser inden for elektronisk overvågningsudstyr til politimyndigheder, militære myndigheder og andre organer indenfor efterretningstjeneste.

I mere end to årtier har rekvirent 1 således opereret med regeringer og regerings-godkendte efterforsknings- og efterretningstjenester samt regeringsgodkendte forhandlere over hele verden, og rekvirent 1 udgør i dag en af branchens absolut førende producenter af lydovervågningsudstyr samt leverandør af internet- og telekommunikations monitorerings-løsninger.

Rekvirent 1 er i mange henseender markedsleder indenfor for sit meget niche orienterede produktområde. Rekvirent 1 har opnået denne position ved gennem 24 år at have opbygget et meget tæt samarbejde med sine kunder, i hvilken forbindelse der henvises til afsnittet nedenfor vedrørende markedsbarrierer.

Rekvirent 1 har siden november 2004 været en del af den engelske Cobham koncern med rekvirent 2 som rekvirent 1's umiddelbare moderselskab og rekvirent 3 som søsterselskab. Cobham koncernen er en international koncern engageret i udvikling, levering og supportering af avanceret luftrums- og forsvarssystemer, herunder overvågningssystemer. Rekvirent 2 og 3 driver primært virksomhed med udvikling og markedsføring af videoovervågningsprodukter.

Rekvirenternes virksomhed er baseret dels på salg af egenudviklede produkter, dels på markedsføringsrettigheder til leverandørprodukter. Rekvirenternes udviklingsvirksomhed er baseret på brugerorienteret innovation, der bygger på et indgående kendskab til kunderne og kundernes behov samt indsigt i anvendelsen af den nyeste gennemprøvede teknologi.

Rekvirenterne indgår alle i Cobham koncernens LENS-gruppe (Law Enforcement and National Security). LENS-gruppen er en meget afgrænset gruppe af selskaber, som opererer indenfor overvågningsudstyr til politimyndigheder, militære myndigheder og andre organer indenfor efterretningstjeneste.

### Rekvirenternes produkter og strategi

Rekvirent 1's pjecer vedrørende rekvirentens virksomhed samt nuværende produktspektrum fremlægges som sagens bilag 3 og 4. Som det fremgår, består rekvirent 1's lyd-overvågningsudstyrsprodukter af:

- "Solid State Recordere" (forkortes SSR), dvs. optagere uden bevægelige dele (uden bånd), eksempelvis Beowulf.
- "Wireless", dvs. trådløse lydovervågningsprodukter (såvel analog som digital), eksempelvis Inka, Loke og Thor.
- Wired lydovervågningsprodukter, eksempelvis Heimdahl, ACC, RFM, RMM og AWM

DE  COUR

007

- Samt hybrider af ovennævnte produkter

Følgende forhold – beskrevet i hovedtræk - adskiller rekvirent 1 og rekvirent 1's produkter fra konkurrenterne:

- Den nyeste teknologi anvendes. Rekvirent 1 har herved opnået at minimere størrelsen på den elektroniske hardware til den mindste i verden uden at gå på kompromis med hverken lydkvalitet eller teknisk/mekanisk kvalitet. Rekvirent 1 har endvidere herved opnået mulighed for i enhver situation at kunne tilbyde kunder at videre transmittere det opsamlede bevismateriale ved brug af den nyeste teknologi.

- Recorder produkterne er kendetegnede ved, at de har et krypteret vandmærke til validering at optagelsens ægthed. Dette krypterede vandmærke holdes hemmeligt af rekvirent 1

- Rekvirent 1 har gennem de forgangne 24 år opbygget et helt specielt forhold til de mange kunder og slutbrugere, som rekvirent 1 har på verdensplan. Forholdet til kunderne og slutbrugerne er således kendetegnet ved en tæt dialog, der giver et unikt indblik i, hvordan hverdagen for politimanden, efterretningsmanden, soldaten eller undercover agenten forløber. Den tætte kontakt og dialog betyder endvidere, at rekvirent 1 i meget høj grad har indsigt i og forståelse for, hvilken funktionalitet og hvilke features, kunderne har brug for. Den tætte kontakt gennem årene har tillige affødt så stor tillid, at rekvirent 1 de senere år i stigende grad har modtaget specifikke udviklingsopgaver på nye produkter.

- Rekvirent 1's produkter er kendetegnet ved meget høj brugervenlighed. Rekvirent 1 har således formået at skabe noget at det mest avancerede inden for branchen, men samtidig at bevare det simple og brugervenlige koncept, hvilket er helt centralt i lyset af at træningstiden, som brugerne har til rådighed, ofte kan tælles i minutter og ikke timer eller dage. Samtidig opererer brugerne under et stort psykisk pres, som fordrer, at udstyret er simpelt og brugervenligt, for at operationen skal lykkes.

- Den design linje, som rekvirent 1 følger i dag, har ramt plet i brugernes bevidsthed. Det enkle sorte og "ruggedized" design virker appellerende, og opfylder samtidig kravene til holdbarhed og muligheden for at kunne skjule produktet. Der er en genkendelighed i hele produktprogrammet, og en kunde kan således umiddelbart via designet adskille rekvirent 1's design fra konkurrenternes.

Som sagens bilag 5 fremlægges kopi af uddrag af rekvirent 1's strategiplan for 2007-2011, der er under implementering. Af uddraget fremgår, at lanceringen af en "digital video recorder" udgør en del af rekvirent 1's strategiplan. Det pågældende uddrag af strategiplanen er forfattet af rekvisitus 1.

Som sagens bilag 6 fremlægges "power point presentation" udarbejdet af rekvisitus 1 i februar 2006 vedrørende udviklingen af en digital video recorder baseret på den såkaldte "Thor SSR" platform, som er under udvikling hos rekvirent 1. Rekvisitus 1 og 3 har deltaget i denne udvikling. Som sagens bilag 7 fremlægges en af rekvisitus 1 udarbejdet præsentation vedrørende mulige veje til betydelige omsætningsstigninger indenfor overvågningsområdet. Af bilag 7 fremgår, at rekvirent 1 skal markedsføre

DE     COUR

008

video-produkter – såvel i form af en SSR som en trådløs version, herunder at SSR versionen kan ba-
seres på "Thor spin off", dvs. på teknologier, viden og erfaring fra Thor-projektet. Som sagens bilag 8
fremlægges et af rekvisitus 1 udarbejdet "white paper" indeholdende en teknisk beskrivelse samt en
beskrivelse af udviklingsprojektet vedrørende rekvirentens "Beowulf Digital Video Recorder".

Rekvirent 1 har således gennem længere tid såvel i form af strategiske, forretningsmæssige som tek-
niske undersøgelser og overvejelser arbejdet på lanceringen af video-overvågningsprodukter.

Rekvirenternes knowhow, dvs. viden om anvendelse af teknologier på markedet for elektronisk over-
vågningsudstyr til brug for missionskritiske situationer, er en afgørende forudsætning for at entrere vi-
deo-overvågningsmarkedet, og rekvirent 1's knowhow vedrørende lydovervågnings-produkterne er di-
rekte anvendelig på udviklingen af elektroniske videoovervågningsprodukter. Forskellen mellem de to
typer overvågningsudstyr er alene, at både et videokamera og en mikrofon er tilkoblet recorderen på
video-overvågningsproduktet, mens alene en mikrofon er tilkoblet recorderen på det rene lydovervåg-
nings-produkt, samt at datakomprimeringsformen er forskellig.

Rekvirent 1's umiddelbare moderselskab, DTC Communications (rekvirent 2) og rekvirent 1's søster-
selskab, Domo (rekvirent 3), har gennem mange år udviklet og markedsført trådløse videoovervåg-
ningsprodukter. Rekvirent 2 markedsfører et af de førende video recorder produkter, der er tilgængeli-
ge på markedet. Som sagens bilag 9 og 10 fremlægges kopi af rekvirent 2's produkthæfte og som sa-
gens bilag 11 fremlægges kopi af rekvirent 3's produkthæfte. Der eksisterer således betydelig viden
og erfaring omkring video produkterne i koncernens LENS-gruppe.

*Rekvirenternes erhvervshemmeligheder og beskyttelsen heraf*

En væsentlig del af de informationer og den viden, som rekvirenterne er i besiddelse af, er enten mili-
tært eller nationalt klassificerede information med de heraf følgende strenge krav til håndtering, opbe-
varing og videregivelse.

For øvrigt materiale og øvrige data fra kunder, leverandører og andre samarbejdspartnere gælder det,
at der stort set uden undtagelse foreligger fortrolighedsaftaler, der forpligter Spectronic til at hemme-
ligholde modtagne informationer og alene anvende dem til det i fortrolighedsaftalen specificerede for-
mål.

Det er en betingelse for ansættelse hos rekvirenterne, at medarbejderen kan sikkerhedsgodkendes til
henholdsvis Fortroligt og Hemmeligt niveau.

Kendskabet til rekvirent 1's produkter og deres funktionalitet mv. er forbeholdt kunderne og rekviren-
terne, da produkterne ellers ville miste deres værdi. Rekvirent 1's hjemmeside indeholder således hel-
ler ikke information omkring de enkelte produkters funktionalitet mv, ligesom pjecemateriale til brug for
messer og lignende alene indeholder en kort og meget overordnet beskrivelse af produkterne, jf. såle-
des også bilag 3 og 4.

Rekvirent 1's recorder produkter er kendetegnede ved, at de har et krypteret vandmærke til validering
at optagelsens ægthed. Dette krypterede vandmærke holdes hemmeligt af rekvirent 1.

## DE ⋅ COUR

009

*Rekvisiti*

Den 25. februar 2007 opsagde rekvisitus 1 og 2 deres stillinger og den 26. februar 2007 rekvisitus 3 sin stilling hos rekvirent 1 for at påbegynde egen virksomhed i rekvisitus 4.

### Rekvisitus 1 (Jimmi Møgelvang Hansen):

Rekvisitus 1 tiltrådte stillingen som leder af overvågningsområdet den 1. januar 2003. Rekvisitus 1 fungerede senere som udviklingsdirektør med reference til den administrerende direktør, Kim Lehmann.

Rekvisitus 1 var i sit job ansvarlig for udviklingen af elektroniske produkter (hardware og software) indenfor området for såvel trådløst som ikke-trådløst overvågningsudstyr, herunder recordere.

Rekvisitus 1 fik under sin ansættelse et meget betydeligt indblik i rekvirentens knowhow, herunder i sammensætning af komponenter til overvågningsprodukter på markedet for missionskritisk overvågning og markedet for recordere.

Rekvisitus 1 fik et nært forhold til nogle af de vigtigste af rekvirent 1's kunder og samarbejdspartnere og et indgående kendskab til kundernes erfaringer og heraf afledte behov.

Rekvisitus 1 havde via sin stilling som udviklingsdirektør fuldstændigt indblik i rekvirent 1's strategi, forretningsplaner og prisforhold. Rekvisitus 1 deltog således blandt andet i strategiske overvejelser om egenudvikling af en video recorder contra opkøb af bestående virksomhed, jf. ovenfor samt bilag 6-9 og nedenfor vedrørende rekvisitus 1's undersøgelser af en konkurrerende amerikansk virksomhed og anbefalinger til brug for rekvirentens beslutning om køb af virksomheden.

Rekvisitus 1 har indgående fulgt den teknologiske udvikling i koncernen, og han havde fuld adgang til koncernens teknologi, produktudviklinger og kommercielle forhold. Til eksempel kan nævnes, at rekvisitus 1 deltog i teknologimøder i koncernens LENS-gruppe, der primært arbeder med "Law Enforcement and National Security". Rekvisitus 1 gennemgik i 2006 således rekvirent 2 og rekvirent 3's overvågnings-produkter med henblik på opnåelse af synergieffekt ved at være medlem af LENS-gruppen.. Af referat fra teknologimøde i LENS-gruppen den 19. og 20. september 2006, der fremlægges som sagens bilag 12, fremgår det si side 9, at rekvirent 1, der var repræsenteret ved rekvisitus 1 blandt andet skulle dele information omkring protokoller med de øvrige LENS-medlemmer. Af bilag 13 fremgår det, at rekvisitus 1 bekræfter sin deltagelse i mødet. Af bilag 14 fremgår det, at rekvisitus 1 har haft opfølgende arbejdsopgaver efter sin deltagelse i mødet.

Systemmæssigt havde rekvisitus 1 som led i sin direktørstilling adgang til rekvirent 1's kundesystem (Superoffice). I kundesystemet findes al korrespondance med kunder. Han havde desuden adgang til rekvirent 1's regnskabssystem (Axapta), hvori blandt andet kundeordrer forefindes, ligesom han havde adgang til kundedatabasen, indeholdende stamoplysninger og kontaktinformationer på kunderne

**DE ... COUR**

010

Rekvisitus 1 havde således såvel ubegrænset læseadgang til som indsigt i den væsentligste del af rekvirentens erhvervshemmeligheder, herunder tekniske, økonomiske, kommercielle og kunderelaterede erhvervshemmeligheder.

Udviklingsafdelingen bestod - på tidspunktet for rekvisitus 1's opsigelse - af 16 medarbejdere.

Ansættelseskontrakten fremlægges som sagens bilag 15. Ansættelseskontraktens pkt. 9.3 har følgende ordlyd:

"Medarbejderen har tavshedspligt, såvel under ansættelsen som efter dens ophør, med hensyn til firmaets forretnings- og driftsforhold, dets tekniske erfaringer, arbejdsmetoder, fabrikationsforsøg eller lignende og hverken til egen eller udenforståendes fordel at benytte dit kendskab til firmaets forhold i det hele taget".

Ansættelseskontraktens pkt. 9.5, 2. punktum, har følgende ordlyd:

"Det er ikke foreneligt med ansættelsesforholdet, at medarbejderen har økonomiske, erhvervs- eller arbejdsmæssige interesser i eller med anden konkurrerende virksomhed uden forudgående skriftlig tilladelse fra virksomheden."

Rekvisitus 2 (Henrik Klæbæk):

Rekvisitus 2 tiltrådte hos rekvirent 1 den 1. januar 2005 som Senior Engineer, Hardware, med reference til rekvisitus 1.

Rekvisitus 2's arbejde bestod i det væsentlige i udvikling og lancering samt efterfølgende vedligeholdelse af platformen til rekvirentens "Beowulf recorder" – en miniature SSR. Endvidere bestod arbejdet i projektledelse, kontakt til leverandører, udarbejdelse af kundespecifikationer, udførelse af kundetilpasninger, diagramtegning og printudlægning.

Som led i vedligeholdelsen af platformen afdækkede rekvisitus 2 kundernes behov for ændringer og videreudklinger af bestående produkter samt udvikling af nye produkter indenfor recorderområdet. Til illustration af rekvisitus 2's arbejde i den henseende fremlægges som sagens bilag 16 kopi af rekvisitus 2's rejserapport fra dennes besøg hos rekvirent 1's amerikanske distributør den 6. – 11. november 2006.

Rekvisitus 2 havde i kraft af sin funktion kontakten til og ansvaret for Michael Gjerns udvikling af "Beowulf recorderen", jf. nedenfor om rekvisitii forhandlinger med Michael Gjern.

Den teknologi, der ligger bag "Beowulf recorderen", danner grundlag for udviklingen af den af rekvirent 1 planlagte video recorder.

DE    COUR

011

Rekvisitus 2 var involveret i strategiske overvejelser om egenudvikling af en video recorder contra op-køb af bestående virksomhed, jf. nedenfor vedrørende rekvisitus 2's undersøgelser omkring konkurre-rende amerikansk virksomhed til brug for rekvirent 1's beslutning om køb af virksomheden.

Rekvisitus 2 opnåede under sin ansættelse et indgående kendskab til rekvirent 1's knowhow, herun-der rekvirent 1's måde at opsamle data på, krypterings- og komprimeringsfaktorer, samt til kunde- og konkurrentforhold og prissætning af udviklingsprojekter hos rekvirent 1.

Systemmæssigt havde rekvisitus 2 læseadgang til rekvirent 1's regnskabssystem .

Rekvisitus 2 havde således både adgang til og indsigt i en meget væsentlig del af rekvirent 1's er-hvervshemmeligheder, ikke mindst vedrørende kundernes behov og erfaringer, rekvirent 1's recorder produkter samt rekvirent 1's strategiske og forretningsmæssige overvejelser og undersøgelser vedrø-rende markedsføringen af videoovervågningsprodukter.

Ansættelseskontrakten fremlægges som sagens bilag 17. Ansættelseskontraktens pkt. 13.3 har føl-gende ordlyd:

"Medarbejderen har tavshedspligt, såvel under ansættelsen som efter dens ophør, med hensyn til fir-maets forretnings- og driftsforhold, dets tekniske erfaringer, arbejdsmetoder, fabrikationsforsøg eller lignende og hverken til egen eller udenforståendes fordel at benytte dit kendskab til firmaets forhold i det hele taget".

Ansættelseskontraktens pkt. 13.5, 2. punktum, har følgende ordlyd:

"Det er ikke foreneligt med ansættelsesforholdet, at medarbejderen har økonomiske, erhvervs- eller arbejdsmæssige interesser i eller med anden konkurrerende virksomhed uden forudgående skriftlig til-ladelse fra virksomheden."

Rekvisitus 3 (Kent Messerschmidt)

Rekvisitus 3 tiltrådte hos rekvirent 1 den 13. november 2006 som software projektleder med reference til rekvisitus 1. Rekvisitus 3 blev ansat på rekvisitus 1's anbefaling, da rekvisitus 1 havde et nært og privat forhold til rekvisitus 3 og tidligere havde arbejdet sammen med rekvisitus 3.

Rekvisitus 3's arbejde bestod i software projektledelse. Rekvisitus 3 var således projektleder på ét af rekvirent 1's store udviklingsprojekter. Det var ligeledes rekvisitus 3's opgave at skabe systematik og struktur i rekvirent 1's softwareudvikling generelt.

Systemmæssigt havde rekvisitus 3 læseadgang til regnskabssystemet

På trods af rekvisitus 3's kortvarige ansættelse må det antages, at rekvisitus 3 har fået indsigt i rekvi-rent 1's erhvervshemmeligheder, ikke mindst, når der henses til, at rekvisitus 3 i løbet af i hvert fald

# DE ⸱ COUR

012

den sidste halvdel af sin ansættelse har vidst, at han skulle starte konkurrerende virksomhed og derfor har haft en oplagt interesse i at opnå indsigt i forhold af betydning for driften af rekvisitus 4

Ansættelseskontrakten fremlægges som sagens bilag 18. Ansættelseskontraktens pkt. 13.3 har følgende ordlyd:

"Medarbejderen har tavshedspligt, såvel under ansættelsen som efter dens ophør, med hensyn til firmaets forretnings- og driftsforhold, dets tekniske erfaringer, arbejdsmetoder, fabrikationsforsøg eller lignende og hverken til egen eller udenforståendes fordel benytte dit kendskab til firmaets forhold i det hele taget".

Ansættelseskontraktens pkt. 13.5, 2. punktum, har følgende ordlyd:

"Det er ikke foreneligt med ansættelsesforholdet, at medarbejderen har økonomiske, erhvervs- eller arbejdsmæssige interesser i eller med anden konkurrerende virksomhed uden forudgående skriftlig tilladelse fra virksomheden."

--oOo---

Såvel rekvisitus 1, 2 og 3 blev af rekvirent 1 den 28. februar 2007 suspenderet fra tjenesten og var følgelig ikke til stede på arbejdspladsen herefter. Formelt fratrådte de alle først den 31. marts 2007 i henhold til deres gældende opsigelsesvarsler.

Ved enslydende breve af 5. marts 2007 til henholdsvis rekvisitus 1, 2 og 3, gengav rekvirent 1 de for rekvisiti gældende hemmeligholdeise- og fortrolighedsforpligtelser, jf. således kopi af brevet til rekvisitus 1, der fremlægges som sagens bilag 19.

Rekvisitus 4 (Covidence A/S):

Som sagens bilag 20 fremlægges kopi af udskrift fra Erhvervs- og Selskabsstyrelsen, hvoraf fremgår, at rekvisitus 1, 2 og 3 med stiftelsesdato den 2. april 2007 etablerede rekvisitus 4, Covidence A/S.

Af rekvisitus 4's hjemmeside på Internettet (www.covidence.dk) fremgår det, at rekvisitus 4 designer, udvikler og producerer miniature video overvågningsudstyr til politi, efterretningstjenester, specialstyrker og andre regeringsgodkendte organisationer. Det fremgår endvidere, at rekvisitus 4 tilbyder miniature video løsninger; "miniature Solid State Video Recorders" og "miniature Wireless Video" til brug for overvågning samt i øvrigt udvikling af kundespecifikke produkter og løsninger.

Kopi af udskrift fra rekvisitus 4's hjemmeside fremlægges som sagens bilag 21.

Som sagens bilag 22 fremlægges kopi af udateret budget for rekvisitus 4. Af budgettet fremgår, at rekvisitus 4 udover den ovenfor beskrevne video recorder tillige budgetterer med indtægter ved salg af lydovervågningsprodukter, jf. regnskabsposten "Audio recorder"

DE COUR

013

Rekvisitus 4 markedsfører således – eller agter at markedsføre – produkter fuldstændig svarende til rekvirent 1's eksisterende produkter eller produkter, som rekvirent 1 har under forberedelse. Endvidere agter rekvisitus 4 at markedsføre produkter fuldstændig svarende til rekvirent 2's og 3's eksisterende produkter

Rekvisitus 4 har i april 2007 ansat yderligere 3 af rekvirent 1's medarbejdere. Rekvisitus 4 har således ansat:

1) Niels-Ole Pedersen, der har været ansat som udviklingsingeniør hos rekvirent 1 siden 1. december 1994 og har ligeledes de seneste år refereret til rekvisitus 1. Niels-Ole Pedersen var gennem sin mangeårige ansættelse hos rekvirent 1 beskæftiget med udvikling af hardware, herunder i særdeleshed produkter indenfor radiokommunikation. Niels-Ole Pedersen opnåede gennem sin ansættelse hos rekvirent 1 indgående kendskab til og erfaring vedrørende rekvirent 1's produkter, herunder til måden, hvorpå man hos rekvirent 1 sammensætter de enkelte komponenter. Niels-Ole Pedersen har desuden gennem hele sit ansættelsesforløb løbende haft stor kundekontakt, idet han har været involveret i definering af kundekrav og udvikling fra konceptfasen til præsentation af det færdige design, ligesom han har opholdt sig hos kunder for at løse tekniske problemer.

2) Ulrich Sørensen tiltrådte, med reference til rekvisitus 1, som udviklingsingeniør den 1. maj 2004. Ulrich Sørensen fungerede som programmør til recordere og protokoller til de trådløse produkter. Han opnåede gennem sin ansættelse hos rekvirent 1 indgående kendskab til og erfaring vedrørende rekvirent 1's produkter, herunder vedrørende måden, hvorpå man hos rekvirent 1 sammensætter de enkelte komponenter samt til de af rekvirent 1 anvendte krypterings- og komprimeringsalgoritmer samt ikke mindst indgående kendskab til de unikke branchemæssige krav der stilles til verifikation af bevismateriale.

Ansættelseskontrakten fremlægges som sagens bilag 23. Ansættelseskontraktens pkt. 13.7 (3. afsnit under "13. Øvrige bestemmelser" har følgende ordlyd:

"Medarbejderen har tavshedspligt, såvel under ansættelsen som efter dens ophør, med hensyn til firmaets forretnings- og driftsforhold, dets tekniske erfaringer, arbejdsmetoder, fabrikationsforsøg eller lignende og hverken til egen eller udenforståendes fordel at benytte sit kendskab til firmaets forhold i det hele taget"

Ansættelseskontraktens pkt. 13.5. 2. punktum, har følgende ordlyd:

"Det er ikke foreneligt med ansættelsesforholdet, at medarbejderen har økonomiske, erhvervs- eller arbejdsmæssige interesser i eller med anden konkurrerende virksomhed uden forudgående skriftlig tilladelse fra virksomheden."

3) Kim Torbjørn Schjødt, der med reference til rekvisitus 1 tiltrådte hos rekvirent 1 som udviklingsingeniør den 11. september 2006. Kim Torbjørn Schjødt var hos rekvirent 1 beskæftiget med mikroprocessor programmering med henblik på tilvejebringelse af software værktøj til

## DE ... COUR

014

etablering af et konfigurationsprogram, samt brugerinterface til et af rekvirent 1's store udvik-
lingsprojekter

Ansættelseskontrakten fremlægges som sagens bilag 24. Ansættelseskontraktens pkt. 13.3
har følgende ordlyd:

"Medarbejderen har tavshedspligt, såvel under ansættelsen som efter dens ophør, med hen-
syn til firmaets forretnings- og driftsforhold, dets tekniske erfaringer, arbejdsmetoder, fabrikati-
onsforsøg eller lignende og hverken til egen eller udenforståendes fordel at benytte dit kend-
skab til firmaets forhold i det hele taget".

Ansættelseskontraktens pkt. 13.5. 2. punktum, har følgende ordlyd.

"Det er ikke foreneligt med ansættelsesforholdet, at medarbejderen har økonomiske, erhvervs-
eller arbejdsmæssige interesser i eller med anden konkurrerende virksomhed uden forudgå-
ende skriftlig tilladelse fra virksomheden."

Den 12. marts 2007 deltog Ulrich Sørensen og Kim Torbjørn Schjødt i et meget fortroligt møde med to
specialister repræsenterende rekvirent 1's største og vigtigste slutbruger. Mødets formål var, at de to
specialister skulle komme med fortrolige informationer om denne vigtigste slutbrugers helt unikke krav
til den metode, der benyttes til indsamling, lagring og præsentation af lyd (audio) og video, for at rets-
systemet accepterer de pågældende beviser som værende 100% korrekte. Som bilag 25 fremlægges
referat fra mødet, Forud for mødet havde repræsentanternes chef, Terry Andersen, præsenteret krav
til de tekniske forhold af væsentlig betydning for den fremtidige anvendelse af miniature "undercover"
overvågningsudstyr, hvilke krav rekvisitus 2 kommenterede på i det udaterede dokument, der frem-
lægges som sagens bilag 26

Få dage forinden deres opsigelse deltog Ulrich Sørensen og Kim Torbjørn Schjødt endvidere i et se-
minar med to forhenværende "undercover" agenter – en politiagent og en militæragent. De to forhen-
værende "undercover" agenter repræsenterede rekvirent 1's mest professionelle samarbejdspart-
ner/slutbruger, når det drejer sig om brugen af den type udstyr, der fremstilles af rekvirent 1. Semina-
ret gav således vital viden om anvendelse af miniature "undercover" overvågningsudstyr i relation til
aktuelle erfaringer og behov i relation til efterfølgende bevisførelse. En viden, som de pågældende un-
der ingen omstændigheder ville kunne have opnået, hvis ikke de havde været ansat i en virksomhed,
der var veletableret på markedet for missionskritisk overvågningsudstyr. Som sagens bilag 27 ved-
lægges kopi af e-mail af 20. april 2007 med overskriften "applikationstræning", indeholdende program
for mødet,

De pågældende 3 medarbejdere fratrådte alle hos rekvirent 1 den 31. maj 2007 og tiltrådte hos rekvi-
situs 4 den 1. juni 2007

Rekvisitus 4 råder i dag med rekvisitus 1, 2 og 3 samt de nævnte yderligere 3 ansatte over i alt 6
medarbejdere. Alle disse medarbejdere kommer direkte fra rekvirent 1, Med de efterfølgende tre an-
sættelser råder rekvirent 4 over en tilnærmelsesvis komplet indsigt i samtlige funktioner, både på den

DE COUR

015

tekniske og funktionelle side af rekvirent 1's virksomhed. Det vil sige en indsigt der rækker langt ud over almindelig tilgængelig faglig viden.

Som nævnt ovenfor er viden om anvendelse af teknologier på markedet for elektronisk overvågnings-udstyr til brug for missionskritiske situationer en afgørende forudsætning for at entrere og oprethoide markedsandele på markedet for overvågningsudstyr til brug for missionskritiske situationer, og rekvi-rent 1 og 2's knowhow vedrørende lydovervågnings-produkterne samt rekvirent 2 og rekvirent 3's knowhow vedrørende videoovervågnings-produkter er direkte anvendelig på udviklingen af elektroni-ske videoovervågningsprodukter.

Idet rekvisitus 4 råder over en – i hvert fald tilnærmelsesvis - komplet viden om såvel teknologi som forretningsmæssige og kommercielle forhold vedrørende såvel rekvirent 1 og 2's lydovervågningspro-dukter som de forestående videoovervågningsprodukter samt rekvirent 2 og rekvirent 3's eksisterende videoovervågningsprodukter, og idet anvendelse af rekvirent 1, 2 og 3's knowhow samt andre er-hvervshemmeligheder er afgørende for rekvisitus 4's entre på det relevante marked, vil rekvirenternes erhvervshemmeligheder med en til vished grænsende sandsynlighed blive misbrugt i rekvisitus 4's virksomhed.

*Markedsbarrierer*

Markedet er kendetegnet ved usædvanligt høje markedsbarrierer.

Kunderne er kendetegnede ved at operere i et meget lukket og yderst hemmelighedspræget miljø. Adgang til markedet forudsætter skabelse af et tillidsforhold gennem dokumentation af kendskab til kundebehov og dokumentation af teknisk kunnen og kvalitet.

Markedet er således kendetegnet ved, at alt afhænger af tillid. Tillid til at produkterne fungerer, når ef-terretningsfolk sætter deres liv på spil for at forhindre terror og afsløre organiseret kriminalitet. Tillid til at leverandørerne forstår at behandle informationer vedrørende sine kunder på et højt fortrolighedsni-veau, samt tillid til at den fornødne support omgående bliver ydet, når den pågældende mission kræ-ver det. At opnå denne tillid kræver mange års koncentreret og dedikeret indsats, og der er ikke plads til fejltagelser.

Inden for branchen gælder den klare uskrevne "lov", at man på ingen måder bruger referencer. Selv-om det således kunne være en betydende faktor for salg, at rekvirenterne kunne referere til salg til fle-re betydende efterretnings-organisationer i Nordamerika, gør rekvirenterne – ligesom de øvrige mar-kedsaktører – ikke brug heraf, da rekvirenterne i så fald ville bryde det tillidskodeks, der er forudsæt-ningen for at være succesfuld aktør i branchen.

Branchen kan karakteriseres som værende en form for 'klub' - en klub hvor medlemskabet afhænger af goodwill opnået gennem mange års god faglig, teknisk og professionel indsats samt personligt til-lidsforhold.

DE ... COUR

016

Indsigt i kundernes behov og erfaringer er af afgørende betydning for tilstedeværelsen på overvåg-ningsmarkedet. Det er således kundernes erfaringer fra overvågningsoperationer, der afstedkommer nye ideer, forbedringer og ændringer af bestående produkter.

Adgang til markedet forudsætter derfor, at man har været en del af "klubben", eventuelt som tidligere chef for en efterretningsorganisation, eller som tidligere ledende medarbejder for en anerkendt virk-somhed indenfor branchen. At starte virksomhed indenfor rekvirenternes branche uden at være i be-siddelse af ovenstående kvalifikationer eller uden eksorbitante økonomiske midler vil således være dømt til at mislykkes.

*Rekvisitii tiltag overfor kunder og leverandører mv. med relevans for denne sag*

ELSY:

ELSY, en tjekkisk udvikler og producent af overvågningssystemer, er en af rekvirent 1's betydende le-verandører. Kort forinden rekvisitus 1 tiltrådte, havde ELSY udviklet digitale systemer – kaldet "Loke", som rekvirent 1 opnåede verdensomspændende eksklusive markedsføringsrettigheder til. Jiri Kromar er ELSY's mest betydende produktudvikler og som sådan en meget central person i forhold til "Loke".

I 2006 fik rekvisitus 1 til opgave at forhandle en aftale med ELSY på plads med det indhold, at rekvi-rent 1 skulle have eksklusive markedsføringsrettigheder til samtlige de produkter, som ELSY havde udviklet og måtte udvikle i fremtiden.

Rekvisitus 1 gav i den forbindelse udtryk for, at det var afgørende, at Jiri Kromar var en del af aftalen og dermed at aftalen betingedes af hans fortsatte ansættelse hos ELSY, da rettighederne i modsat fald ikke ville være interessante.

Forhandlingerne mellem rekvisitus 1 og ELSY kuldsejlede i november 2006. Økonomichef Poul Rein-holdt overtog herefter ansvaret for forhandlingerne. I forbindelse med overdragelsen af forhandlinger-ne spurgte Poul Reinholdt rekvisitus 1, hvad status i forhold til Jiris involvering i aftalen var, hvortil re-kvisitus 1 overraskende svarede, at Jiri ikke var afgørende for værdien af rettighederne.

Rekvirent 1 måtte senere indse, at denne "kovending" i forhold til Jiri Kromars betydning for samarbej-det med ELSY skyldtes rekvisitus 1's interesse i – gennem rekvisitus 4 – at knytte tætte bånd til Jiri Kromar.

*Jiri Kromars "Omega"*

Jiri Kromar har i eget regi udviklet et analogt video surveillance system. Produktet kaldes "Omega". Rekvirent 1 fik i efteråret 2006 tilbudt world wide markedsføringsrettigheder til "Omega" med en "first right of refusal" som udløb den 24. december 2006. Rekvisitus 1 blev sat til at udarbejde et notat om Omega. Notatet "Omega Video Background" er udarbejdet af rekvisitus 1 i november 2006. Notatet er vedlagt som bilag 28. Notatet viser blandt andet, hvorledes produktet vil passe ind i koncernes pro-duktportefølje på området, som rekvisitus 1 havde fuldt kendskab til. På "Surveillance Management

DE  COUR

017

Team"-mødet den 4. december 2006 gav rekvisitus 1 udtryk for, at der ikke blandt hans medarbejdere var tid til at teste "Omega"-produktet. Kopi af mødereferatet fra det pågældende møde fremlægges som sagens bilag 29. Rekvirent 1's administrerende direktør, Kim Lehmann insisterede imidlertid på, at produktet burde købes, hvorfor emnet var på dagsordenen til bestyrelsesmødet den 12. december 2006. Dagsordenen er udarbejdet den 8. december 2006 og er vedlagt som bilag 30. Rekvisitus 1 blev gjort bekendt med, at notatet omkring Omega og dets indplacering i koncernens produktportefølje på området, var på dagsordenen for det pågældende bestyrelsesmøde. Rekvisitus 1 kontaktede herefter telefonisk Kim Lehmann og meddelte nu, at han mente, at kvaliteten af produktet var for dårlig, hvorfor han anbefalede, at rekvirent 1 ikke skulle købe rettighederne til Omega. Dette resulterede i, at rekvirent 1 mistede sin "first right of refusal".

Rekvirent 1 har efter rekvisitus 1's fratrædelse konstateret, at rekvisitus 1 på vegne af rekvisitus 4 i marts 2007 havde forhandlinger med Jiri Krcmar om verdensomspændende rettigheder til "Omega".

Det fremgår således af "Working document between Jiri Krcmar og Spectronic" af 2. maj 2007, der fremlægges som sagens bilag 31, at rekvisitus 1 på vegne af rekvisitus 4 i april 2007 forespurgte Jiri Krcmar om mulighed for at købe op til 30 systemer. Det fremgår endvidere af dokumentet, der er underskrevet af Jiri Krcmar, at kommunikation var af skrift, og at rekvisitus 1 og Jiri Krcmar blev enige om at slette alle e-mails.

Som sagens bilag 32 fremlægges endvidere kopi af e-mail korrespondance af 11. juni 2007 mellem salgsdirektør Steen Gammelgaard til Dave Tilton. Sidstnævnte var tidligere ansat hos rekvirentens forhandler i USA, Gans & Pugh, men har nu etableret sin egen forhandlervirksomhed, Brimtek. Ifølge e-mail korrespondancen har rekvisitus 1 kontaktet Dave Tilton vedrørende Dave Tiltons mulige forhandling af "Omega" for rekvisitus 4.

Indsigt i amerikansk virksomhed i forbindelse med rekvirent 1's køb af den pågældende virksomhed

I efteråret 2006 indledte rekvirent 1 købet af et amerikansk selskab, Adaptive Digital Systems Inc. (ADS) - en privatejet virksomhed, der leverer videoovervågningsudstyr primært til de amerikanske efterforsknings- og efterretningstjenester.

Den 26. september 2006 underskrev ADS og rekvirent 1 en Non-disclosure Agreement med henblik på, at rekvirent 1 kunne foretage undersøgelser af ADS omkring virksomhedens forhold. Kopi af aftalen fremlægges som bilag 33. Rekvisitus 1 og rekvisitus 2 besøgte herefter hver især i september og december 2006 selskabet for at få indgående indsigt i deres teknologier, produkter, kompetencer, strategier, kundeforhold, prissætning mv.

Rekvisitus 1 besøgte således sammen med administrerende direktør Kim Lehmann ADS i slutningen af september 2006. I oktober 2006 udarbejdede Kim Lehmann i samarbejde med rekvisitus 1 et 'Executive Brief' indeholdende fakta, vurderinger og anbefalinger til brug for koncernens afgørelse omkring et eventuelt køb af selskabet. Kopi af dokumentet fremlægges som sagens bilag 34. Som bilag 35 fremlægges kopi af mailkorrespondance, der dokumenterer rekvisitus 1's aktive deltagelse i vurderingen.

DE   COUR

Efter rekvisitus 2's besøg hos ADS den 5. og 6. december 2006 udarbejdede rekvisitus 2 en rapport, der fremlægges som sagens bilag 36. Rapporten indeholder en udførlig teknisk beskrivelse af ADS' digitale video recorder

Såvel rekvisitus 1 som rekvisitus 2 fik således indsigt i særdeles sensitiv information vedrørende ADS' produkter og forretning. Som nævnt ovenfor, markedsfører rekvisitus 4 i dag produkter svarende til ADS'.

MiTek Electronics (herefter MiTek) v/Michael Gjern

Indehaveren af MiTek, Michael Gjern, var ansat hos rekvirent 1 i perioden fra august 1999, hvor han tiltrådte som nyuddannet elektronikingeniør til den 31. juli 2004. Under sin ansættelse udviklede han et koncept for en digital recorder, som rekvirent 1 overtog rettighederne til i begyndelsen af 2004. Michael Gjern opsagde umiddelbart herefter sin stilling, for først at tage anden ansættelse og siden at etablere konsulentvirksomheden MiTek. I sin egenskab af konsulent for rekvirent 1 færdigudviklede han i samarbejde med rekvirent 1's udviklingsteam ledet af rekvisitus 2 den digitale recorder, der siden 2006 er blevet markedsført og solgt som "Beowulf recorderen".

Som nævnt tidligere er rekvirenternes knowhow direkte anvendelig på udviklingen af videoprodukter til overvågningsmarkedet, og Michael Gjern udviklede på baggrund af sin viden om den eksisterende digitale recorder en video recorder – den såkaldte Solid State Video Recorder, hvilket rekvirent 1 først blev bekendt med i marts 2007, da Michael Gjern selv henvendte sig til rekvirent 1 herom.

Rekvisitus 1, 2 og 3 var imidlertid bekendte med Michael Gjerns seneste udvikling på et langt tidligere tidspunkt.

Rekvisitus 1, 2 og 3 kontaktede således allerede i februar 2007, dvs. forinden deres opsigelser, Michael Gjern med henblik på at inddrage ham i rekvisitus 4 – som konsulent eller på anden vis. Rekvisitus 4 forhandlinger herefter primo februar 2007 med Michael Gjern/MiTek om rettighederne til video recorderen. Forhandlingerne kuldsejlede imidlertid på grund af uenighed. Som bilag 37 fremlægges kopi af e-mail sendt fra Michael Gjern den 13. juni 2007 til Kim Lehmann. I mailen bekræfter Michael Gjern, at han i perioden fra 19. januar til 21. februar 2007 har modtaget ca. 50 e-mails fra og sendt ca. 40 e-mails til rekvisitus 1, 2 eller 3.

Rekvisitus 1, 2 og 3 fortiede således – under deres ansættelse hos rekvirent 1, og således mens deres loyalitetsforpligtelse overfor rekvirent 1 fortsat bestod - yderst væsentlig information omkring Michael Gjerns udvikling af video recorderen. En information som, hvis den havde været i rekvirent 1's besiddelse, helt naturligt ville have resulteret i, at rekvirent 1 ville påbegynde forhandlinger med Michael Gjern om rettighederne til video recorderen. Fortielsen skyldtes – som det vil være fremgået af det ovenstående – at rekvisitus 1, 2 og 3 ønskede at udnytte Michael Gjerns opfindelse til egen vinding.

DE  COUR

NATIA og MILIPOL messerne

Rekvirent 1, 2 og 3 er blevet gjort bekendt med, at rekvisitus 4 agter at være til stede på eller i tilknytning til messerne NATIA og MILIPOL, der afholdes i henholdsvis juli 2007 i USA og i oktober i Paris. Som bilag 38 fremlægges udskrift af deltagerliste på MILIPOL, hvoraf fremgår, at rekvisitus 4 agter at deltage. Rekvirenterne er således bekendt med, at rekvisitus 4 primært vil forsøge at deltage på selve messerne, og subsidiært – såfremt dette ikke måtte være muligt – at tage opstilling i området omkring messerne, herunder eksempelvis på de nærliggende hoteller.

De pågældende messer er de absolut vigtigste messer indenfor branchen og udgør et væsentligt "udstillingsvindue". Rekvirenterne har således også af denne grund en oplagt interesse i hurtigt at få rekvisiti virksomhed stoppet.

ANBRINGENDER:

Til støtte for de nedlagte påstande gøres det gældende,

at          rekvisitus 1, 2 og 3 ved deres ansættelse har påtaget sig en tidsubegrænset pligt til at
            hemmeligholde forhold omkring rekvirenternes virksomhed, der ikke er offentligt tilgæn-
            gelige,

at          rekvisitus 1, 2 og 3 gennem deres ansættelse hos rekvirent 1 har fået indgående kend-
            skab til og viden om forhold, der kan karakteriseres som erhvervshemmeligheder, her-
            under i særdeleshed erhvervshemmeligheder vedrørende kundernes behov og erfarin-
            ger samt den heraf følgende viden om, hvordan teknologier sammensættes for at op-
            fylde kundernes behov,

at          rekvisitus 1 og 2 gennem deres ansættelse opnåede dyb indsigt i strategien, teknologi-
            en og produkterne indenfor video Solid State Recorders, og at de under deres ansæt-
            telse hos rekvirent 1 var de personer, der vidste mest herom,

at          det tilsvarende gælder, at Niels-Ole Pedersen, Ulrich Sørensen og Kim Torbjørn
            Schjødt gennem deres ansættelse hos rekvirent 1 har fået indgående kendskab til og
            viden om forhold, der kan karakteriseres som erhvervshemmeligheder,

at          i hvert fald rekvisiti samlede sum af viden omkring rekvirent 1, 2 og 3 udgør en er-
            hvervshemmelighed,

at          rekvisitus 1, 2 og 3 allerede under deres ansættelse hos rekvirent 1 etablerede og tilret-
            telagde deres konkurrerende virksomhed og udførte konkurrencehandlinger, herunder
            gennem benyttelse af rekvirent 1's erhvervshemmeligheder,

at          rekvisitus 1, 2 og 3 under deres ansættelse hos rekvirent 1 optrådte yderst illoyalt og
            på væsentlig vis tilsidesatte rekvirenternes interesser,

- 17 -

DE    COUR

020

at          forpligtelsen til ikke at benytte eller viderebringe erhvervshemmeligheder er og vil blive
            overtrådt gennem driften af rekvisitus 4.

at          driften af rekvisitus 4 vil indebære dels en overtrædelse af de i rekvisitii ansættelses-
            kontrakter indeholdte tavshedsforpligtelsesbestemmelser, og dels af markedsføringslo-
            vens § 19.

at          driften af rekvisitus 4 desuden vil indebære en overtrædelse af markedsføringslovens §
            1 om god markedsføringsskik, idet rekvisitus 4 i sin markedsføring snylter på rekviren-
            ternes goodwill,

at          betingelserne for nedlæggelse af fogedforbud er opfyldte, idet

            -          de handlinger, der søges forbudt, strider mod rekvirenternes ret,
            -          rekvisitus 1, 2, 3 og 4 vil foretage de handlinger, der søges forbudt,
            -          formålet vil være forspildt, såfremt rekvirenterne henvises til at gøre sin
                       ret gældende ved almindelig rettergang
            -          lovens almindelige regler om straf og erstatning og eventuelt en af rekvi-
                       siti tilbudt sikkerhed ikke yder rekvirenten tilstrækkeligt værn,
            -          et fogedforbud ikke vil påføre rekvisiti skade eller ulempe, der står i
                       åbenbart misforhold til rekvirenternes interesse i forbudets nedlæggelse.

Århus, den 6. juli 2007

advokat Anders Hedetoft
v/advokat Lene Lange Gammelgaard

- 18 -

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SPECTRONIC DENMARK A/S, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | No. 1:05-CV-00590 (PLF) |
| ) | |
| v. ) | |
| ) | |
| JIMMI M. HANSEN, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF JIMMI M. HANSEN

I, Jimmy M. Hansen, hereby declare as follows:

1.      I am the Chief Executive Officer of Defendant Covidence A/S ("Covidence"), a Danish company with its principal place of business in Ronde Denmark.  Covidence develops, markets, and sells high quality miniature video surveillance equipment to police forces, intelligence agencies, military organizations and other law enforcement agencies worldwide.  I have been the Chief Executive Officer of Covidence since its founding in April 2007.  I am a Danish citizen resident in Denmark, as are my co-Defendants Kent Messerschmidt and Henrik Klebaek.

2.      Prior to the founding of Covidence, I was the Director of Development for Plaintiff Spectronic Denmark A/S ("Spectronic").  In that position, I had oversight for Spectronic's research and development of surveillance products.  Along with Kent Messerschmidt and Henrik Klebaek, I resigned from Spectronic on February 26, 2007 and formed Covidence on April 2, 2007.

**Exhibit C**

3.      Plaintiffs' Verified Complaint in this action accuses the Defendants of stealing Plaintiffs' trade secrets.  This is not true.  The Defendants have not taken anything from Plaintiffs nor have they used knowledge of trade secrets from their prior employment at Spectronic to develop, market, or sell Covidence products.  In fact, in the Denmark lawsuit that I will discuss below, Spectronic's Chief Executive Officer, Kim Lehmann, testified under oath that he did not have any knowledge of anything that had been stolen from Spectronic by the Defendants.

4.      Paragraph 92 of Plaintiffs' Verified Complaint alleges that "[o]ne of the knock-off and/or stolen products unlawfully marketed in this jurisdiction by the defendants is the so-called "Oculus" video recorder."  This allegation is false.  The Oculus product developed by Covidence is a miniature video recorder (8x52x27 millimeters) for body-worn applications.  At the time Defendants left Spectronic, none of the Plaintiffs had a product on the market similar to Oculus, or even such a product in development.  Indeed, it had been Spectronic's strategic business decision to limit its product range to audio products.

5.      The Oculus recorder is the first Covidence product ready for worldwide distribution.  Therefore, Covidence has, as of the date of this Declaration, not sold any video recorders in the United States.

6.      Plaintiffs' Verified Complaint alleges at Paragraph 33 that Spectronic had a strategic plan, prior to Defendants' departure from Spectronic, to develop video recording equipment.  This is not true.  The document relied on by Spectronic for this contention is a proposed strategy plan that represented the wishes of Spectronic's engineering department, and was not approved by Spectronic's board of directors.  No actions toward developing video recording products were initiated by Spectronic until after Defendants left Spectronic's employ.

7.      In the Danish lawsuit that will be discussed in detail below, Spectronic's Chief
Executive Officer, Kim Lehmann testified under oath that Spectronic launched its first video
recorder development program in July/August 2007, several months after Defendants left
Spectronic, and that Spectronic expected to begin selling its new product in the first quarter of
2008. I have since been advised from persons in the marketplace that Spectronic's development
of a video recorder is delayed and that Spectronic will not be ready to sell its own video recorder
product until December 2008.

8.      Thus, it is my belief that Spectronic has sought a temporary restraining order and
preliminary injunction against Covidence in this Court in the hope of delaying Covidence's entry
into the United States market with its Oculus device until Spectronic can complete its
development of its own competing video recording device.

9.      Defendants have not used any trade secrets Plaintiffs might have in developing
any of Covidence's other products either.

10.     Plaintiffs' Verified Complaint alleges, solely on information and belief, that
Defendants misappropriated information from Spectronic's computer systems. This allegation is
false. Plaintiffs identify two computer systems to which they allege Defendants were granted
access by Spectronic: the Axapta system and the SuperOffice system. Defendants Klebaek and
Messerschmidt did not have access to SuperOffice, and their access to Axapta was the same
access enjoyed by Spectronic's other employees. Defendants have not used customer
information or any other information obtained through the authorized use of Spectronic's
computer systems at Covidence, nor did Defendants engage take any information from
Spectronic's computer systems without authority.

11.    It is unclear to me why Plaintiffs DTC Communications, Inc., and Domo, Ltd., are parties to this case.  None of the Defendants ever worked for these entities.  None of the Defendants had access to either company's computer systems.  None of the Defendants have used or disclosed any information relating to either of these companies.  The business of these two companies is to develop and sell wireless video products, and Covidence does not develop or sell wireless video products, a fact to which Defendants testified under oath in the Danish proceeding.  Plaintiffs have presented the Court with an outdated page from Covidence's website to suggest that Covidence is in the business of developing and selling wireless video solutions.  The statement on Covidence's website has been amended to make clear that Covidence does not develop and sell wireless video solutions.

12.    The three individual Defendants had employment contracts with Spectronic. These contracts were the same types of contracts entered into by Spectronic's approximately 80 other employees.  As the plain language in Paragraphs 63-64, 75-76, and 85-86 of the Verified Complaint makes clear, the provisions in Defendants' employment contracts did not impose post-employment restrictions on Defendants in terms of covenants not to compete or a customer limitation provision.  Indeed, in the Danish case, the Danish court did not find that Defendants had breached their employment contracts in any way during the proceedings on the Danish temporary restraining order, and Defendants have not done anything in forming and operating Covidence that is a breach of our employment contracts.

13.    Paragraph 94 of the Verified Complaint alleges that Covidence "has begun a campaign to raid the plaintiffs of their employees."  This statement is false.  In the year that Covidence has existed, a total of three Spectronic employees have left that company and joined

Covidence. During that same time period, Spectronic has lost more than twenty employees to other companies. Covidence is not embarked on a campaign to raid Spectronic's employees.

14.    Paragraph 129 of the Verified Complaint discusses the lawsuit filed in Denmark by this same set of Plaintiffs against this same set of Defendants, but the discussion is incomplete. Plaintiffs sought an injunction that would have entirely prohibited Defendants from competing against Defendants for a period of five years. Plaintiffs did not get that relief. The court granted a preliminary injunction that prohibited Defendants from doing business for a three-year period with a specified list of companies, a list that includes just two (2) companies located in the United States: Brimtek Inc. and Ganz & Pugh. Defendants continue to contest the Danish case continues and the court ultimately will either confirm the preliminary injunction entered against Defendants or enter judgment in Defendants' favor. Although the preliminary injunction sought by Plaintiffs was narrowed by the Danish court to an injunction solely restricting Defendants from doing business with specified companies, Plaintiffs did not appeal the injunction order. Defendants did not appeal the preliminary injunction because they could live with the restrictions imposed by the Danish court. The two United States companies covered by the Danish preliminary injunction, Brimtek Inc. and Ganz & Pugh, are not expected to attend the trade show in Washington, D.C.

15.    It is Defendants' intention to comply with the terms of the Danish injunction until such time as it expires or is dissolved.

16.    In the Danish case, Plaintiffs are making essentially the same claims that they are making in this case. Plaintiffs' principal claim in the Danish case is that Defendants have stolen Plaintiffs' trade secrets. As I have noted above, however, Spectronic's Chief Executive Officer

was constrained to admit during the preliminary injunction proceedings that he could not identify any trade secret that Defendants supposedly stole.

17.      It also bears mention that Covidence has participated in four major trade shows in Europe during the last six months, three of which were held after the Danish case issued its limited preliminary injunction, and Spectronic did not attempt to enjoin Covidence from appearing at any of these trade shows.  These trade shows include the Milipol show in Paris in October 2007, the SICUR show in Madrid in February 2008, the HMGCC show in London in February 2008, and the HOSDB show in London in March 2008.  The preliminary injunction issued by the Danish court does not prohibit Covidence from attending trade shows anywhere in the world, so long as Covidence complies with the terms of that injunction in terms of the entities with which it does business.

18.      Plaintiffs filed temporary restraining order/preliminary injunction papers against Defendants one other time in the United States.  Covidence was planning to attend a trade show in Philadelphia, Pennsylvania, and Defendants filed a motion seeking to enjoin Covidence from attending the Philadelphia trade show.  As it turned out, the Philadelphia trade show was fully booked so Covidence was not able to attend the show.

19.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 19th, 2008.

_____

Jimmi M. Hansen

# EXHIBIT D

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SPECTRONIC DENMARK A/S, *et al.*, ) | |
| ) | |
| Plaintiffs ) | No. 1:05-CV-00590 (PLF) |
| ) | |
| v. ) | |
| ) | |
| JIMMI M. HANSEN, *et al.*, ) | |
| ) | |
| Defendants. ) | |

### DECLARATION OF PETER ZACHER SØRENSEN

I, Peter Zacher Andersen, herby declare as follows:

1.    I am an attorney admitted to practice in Denmark. I have been an attorney for 25 years and can appear in the Danish Supreme Court. I received my law degree from the University of Airbus (Master of Law)

2.    In Denmark, I am counsel to Covidence A/S and to Messrs. Hansen, Messer-schmidt and Klebaek in a case brought against them by Spectronic Denmark, A/S, DTC Communications, Inc. and Domo Ltd. ("the Danish Case").

3.    The Danish Case was instituted on July 9, 2007. The Danish case has the same parties as does this action. In the Danish Case, the Plaintiffs sought broad, interim relief against the Defendants. Plaintiffs sought to restrain Defendants from competing against them in any capacity. Plaintiffs tried to stop the Defendants' production, sale and rental of audio and video surveillance equipment. Plaintiffs claimed that the Defendants had used

**Exhibit D**

business secrets that they obtained through their employment at the Spectronic Denmark A/S. As such, the allegations in this action are virtually identical to those raised in the Danish Case.

4.    The Danish Case was brought before the court on July 9, 2007. A hearing was held over four days in December 2007. Live testimony was heard and the witnesses were cross examined by the parties and by the court.

5.    The Danish Court concluded, in an order issued on January 7, 2008, that the only restriction to be imposed upon Defendants was to limit Defendants from soliciting certain suppliers and potential customers ("the Danish Court Order"). Nothing in the Danish Court Order prevents the Defendant from conducting their business except as to doing business with certain suppliers and potential customers. The Danish Court Order does not in any way prevent the Defendant from participating in a trade show to be held in the District of Columbia.

6.    The Danish Case remains ongoing and it is expected that the case will be concluded in 10 – 12 months.

7.    Under Danish law, Plaintiffs could have appealed the Danish Court Order. They choose not to appeal.

8.    The relief the Plaintiffs to this action are seeking (to prohibit defendants from participating in a trade show to be held in the District of Columbia) could have been sought in the Danish Case. Although theoretically available, the prospects of obtaining such relief

in the Danish court are small because such relief would be inconsistent with the Danish Court Order.

9.    The provisions in Defendants' employment contracts did not impose post-employment restrictions on Defendants in terms of covenants not to compete or a customer limitation provision.  Under Danish law, if a company in Denmark wants to limit an employee's ability to compete or solicit customers post-employment, those restrictions must be included in a special contract and the contract must include a separate payment schedule to account for the value of these post-employment restrictions.  Indeed, in the Danish Case, the Danish court did not find that Defendants had breached their employment contracts in any way during the proceedings on the Danish temporary restraining order, and Defendants have not done anything in forming and operating Covidence that is a breach of their employment contracts.

4.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 21-4, 2008.

Peter Zacher Sørensen

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| SPECTRONIC DENMARK A/S, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | No. 1:05-CV-00590 (PLF) |
| ) | |
| v. ) | |
| ) | |
| JIMMI M. HANSEN, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**[PROPOSED] ORDER**

The Court, having considered Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, as well as Defendants' opposition thereto, and having hard the argument of counsel on April 22, 2008, finds that Plaintiffs' motion is not well taken. The Court also finds that Plaintiffs have proceeded in bad faith in providing the Court with an incomplete and misleading characterization of the proceedings in the first-filed suit Plaintiffs filed in Denmark and in filing a duplicative and vexatious action in this Court. Accordingly, the Court:

**ORDERS** that Plaintiffs' motion is **DENIED**; and

**ORDERS** that Plaintiffs, jointly and severally, shall reimburse Defendants for the reasonable attorney's fees and costs Defendants have incurred in defending against Plaintiffs' motion, with Defendants to file a pleading setting forth the amount and nature of the attorney's fees and expenses incurred within ten (10) days of the date of this order.

**SO ORDERED** this _____ day of April, 2008.

_____
PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE