IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                    )
SPECTRONIC DENMARK A/S, et al.,     )
                                    )
                Plaintiffs,         )        No. 1:08-CV-00590 (PLF)
                                    )
        v.                          )
                                    )
JIMMI M. HANSEN, et al.,            )
                                    )
                Defendants.         )
_____)
```

## DEFENDANTS' MOTION FOR SANCTIONS

Defendants respectfully request that the Court sanction Plaintiffs by ordering them, jointly and severally, to reimburse Defendants for the legal fees and costs incurred in defending against Plaintiffs' motion for temporary restraining order or preliminary injunction.  Sanctions are appropriate because: (1) Plaintiffs' motion provided the Court with an incomplete and misleading description of the proceedings in a parallel action filed in Denmark; (2) Plaintiffs' motion had no plausible basis in law; and (3) Plaintiffs' motion had no plausible basis in fact. The grounds for Defendants' motion are set forth in greater detail in the accompanying Memorandum.

Wherefore, Defendants respectfully request that the Court grant Defendants' motion.  A proposed order is attached.

Respectfully submitted,

/s/  John F. O'Connor

_____
Steven K. Davidson (D.D.C. Bar No. 407137)
John F. O'Connor (D.D.C. Bar No. 460688)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
sdavidson@steptoe.com
joconnor@steptoe.com

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SPECTRONIC DENMARK A/S, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| JIMMI M. HANSEN, *et al.*, | ) |
| | ) |
| Defendants. | ) |

No. 1:08-CV-00590 (PLF)

**DEFENDANTS' MEMORANDUM IN SUPPORT**
**OF THEIR MOTION FOR SANCTIONS**

Steven K. Davidson (D.D.C. Bar No. 407137)
John F. O'Connor (D.D.C. Bar No. 460688)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
sdavidson@steptoe.com
joconnor@steptoe.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND ..................................................................................................3

III.    ANALYSIS ...........................................................................................................8

    A.    The Standard for the Imposition of Sanctions ....................................8

    B.    The Claims Asserted in Plaintiffs' Motion Were Utterly Lacking in
       Legal Merit .........................................................................................11

    C.    Plaintiffs' Motion Is Utterly Lacking in Factual Merit ....................15

    D.    Plaintiffs' Description of the Danish Proceedings Is Incomplete and
       Misleading ..........................................................................................17

IV.     CONCLUSION ..................................................................................................18

# TABLE OF AUTHORITIES

Page(s)

CASES

*Alexander v. FBI*,
192 F.R.D. 25 (D.D.C. 2000)....................9

*Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*,
10 F.3d 425 (7th Cir. 1993)....................11

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
421 U.S. 240 (1975)....................9

*Assassination Archives & Research Ctr. v. CIA*,
48 F. Supp. 2d 1 (D.D.C. 1999)....................9

* *Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991)....................9, 18

* *Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003)....................13

*Decatur Liquors, Inc. v. District of Columbia*,
478 F.3d 360 (D.C. Cir. 2007)....................12

*Dresser Indus., Inc. v. Underwriters at Lloyd's of London*,
106 F.3d 494 (3d Cir. 1997)....................11

*Gilson v. Republic of Ireland*,
606 F. Supp. 38 (D.D.C. 1984)....................14

*Hagans v. Lavine*,
415 U.S. 528 (1974)....................12

*Hutto v. Finney*,
437 U.S. 678 (1978)....................9

*Newburyport Water Co. v. Newburyport*,
193 U.S. 561 (1904)....................12

*Roadway Express, Inc. v. Piper*,
447 U.S. 752 (1980)....................9

*Shepherd v. Am. Broadcasting Co.*,
62 F.3d 1469 (D.C. Cir. 1995)....................9

*U.S. Motors v. Gen. Motors Europe*,
    519 F. Supp. 2d 671 (E.D. Mich. 2007)..................................................................12

*Universal Oil Prods. Co. v. Root Refining Co.*,
    328 U.S. 575 (1946)...................................................................................................9

*Westech Gear Corp. v. Dep't of Navy*,
    No. 87-2609, 1988 WL 170558 (D.D.C. May 9, 1988)..........................................14

*Willy v. Coastal Corp.*,
    503 U.S. 131, 136 (1992).........................................................................................12


STATUTES

28 U.S.C. § 1332........................................................................................................12


RULES

Federal Rule of Civil Procedure 44.1 .......................................................................14

Federal Rule of Civil Procedure 11 ............................................................................8


BOOKS AND ARTICLES

Charles A. Wright, et al., *Federal Practice & Procedure* § 1336, at 617-19 (3d ed. 2004) ...........8

Charles A. Wright, et al., *Federal Practice & Procedure* § 3564, at 66-67 (2d ed. 1984) ...........12

## I.    INTRODUCTION

Plaintiffs' motion for a temporary restraining order or preliminary injunction, which this Court denied from the bench on April 22, 2008, was an abuse of process, the picture of bad faith litigation. The only reasonable conclusion is that Plaintiffs never intended that their motion be litigated, but instead intended to use that motion to bully a fledgling business competitor[1] into abandoning the United States market or suffer the considerable legal expense of defending against a frivolous preliminary injunction motion. In short, Plaintiffs have saddled Defendants with a "litigation tax" in excess of $50,000 in order to do business in the United States even though Plaintiffs had already litigated and lost a motion in Denmark that would have barred Defendants from competing in the United States market, a fact Plaintiffs curiously failed to disclose to the Court. As set forth herein, Plaintiffs should be required to reimburse Defendants for these costs.

That Plaintiffs' motion was vexatious and in bad faith is apparent from the papers themselves. While Plaintiffs repeatedly accused Defendants of stealing trade secrets, Plaintiffs presented the Court with no evidence to support these false accusations, nor did they even bother to identify what trade secrets were supposedly stolen. Plaintiffs argued that there was a legal basis to support their requested injunction, but there was in fact no diversity jurisdiction, Plaintiffs failed to advise the Court of binding Supreme Court precedent foreclosing their Lanham Act claim, and relied on language from the Computer Fraud and Abuse Act ("CFAA") that Congress had superseded by amendment some six years ago. Eleven of the thirty-two

---

[1] Covidence A/S has seven employees. By contrast, Spectronic Denmark A/S has about 120 employees, and Spectronic's ultimate parent, Cobham plc, has about 9500 employees.

exhibits filed by Plaintiffs in support of their motion were either substantially or entirely in Danish with no English translation provided.[2]

Perhaps most egregious, Plaintiffs advised the Court that they had successfully obtained a preliminary injunction against Defendants in Denmark, but Plaintiffs' description of the Danish proceedings was both incomplete and misleading. Plaintiffs' motion papers failed to disclose that Plaintiffs had asked the Danish court to issue an injunction that would have prohibited Defendants from competing in the audio and video recorder market worldwide, and that the Danish court had refused to grant that requested relief. Thus, without disclosing it, the relief sought by Plaintiffs from this Court was a subset of the very relief Plaintiffs had sought and were denied in the Danish case.[3]

An award of sanctions here would serve the interests of restitution and deterrence. Given the frivolous nature of Plaintiffs' motion, and its duplication of a request for relief already denied in the parties' home forum, it is not fair that Defendants should suffer the costs incurred in defending against Plaintiffs' motion in this Court. In a sense, Plaintiffs "won" their motion the

---

[2] The exhibits filed by Plaintiffs that were substantially or entirely in Danish are Exhibits 6, 7, 13, 14, 15, 16, 18, 20, 29, 31, and 32)

[3] As the Court noted at the hearing on Plaintiffs' motion, Plaintiffs' papers were inconsistent in terms of the relief they sought. The only proposed order submitted by Plaintiffs sought a temporary restraining order that would have barred Defendants from "displaying or offering for sale its 'Oculus' recorder device in the United States" until such time as the Court could hold a hearing on Defendants' preliminary injunction motion. Pl. Proposed TRO at 2. Plaintiffs' motion papers, however, sought relief that would have prohibited Defendants from attending an April 23-24, 2008 trade show in the District of Columbia, relief that is in some ways narrower, and in other ways broader, than the temporary restraining order Plaintiffs sought. Perhaps because of these inconsistencies, the Court's April 17, 2008 order directed Plaintiffs to file, by April 21, 2008, a proposed order setting forth the preliminary injunction Plaintiffs sought. Plaintiffs never filed this proposed order as directed by the Court. In any event, however, all of the relief sought in this Court by Plaintiffs would have prevented Defendants from conducting business in the United States with customers not covered by the Danish injunction, and thus was a subset of the relief sought and denied in Denmark.

2

minute Defendants had to retain American counsel, as Plaintiffs, a larger and more established company, forced Defendants to incur substantial legal expenses in order to vindicate their right to do business in the United States.  Sanctions also would serve a deterrent purpose, as it would discourage Defendants from attempting the same tactic the next time Defendants intend to appear at a United States trade show.[4]

Upon receiving an English translation of Plaintiffs' untranslated excerpt from the Danish preliminary injunction decision, undersigned counsel left a voicemail message for Plaintiffs' lead counsel at about 12:15 p.m. on April 21, 2008.  In that message, undersigned counsel conveyed: (1) Defendants' view that Plaintiffs' motion was "sanctionable" and that Plaintiffs' description of the Danish proceedings was misleading; (2) Defendants' intention to seek sanctions; and (3) Defendants' willingness to forgo or withdraw their request for sanctions if Plaintiffs would agree to withdraw their preliminary injunction motion and dismiss this action.  Plaintiffs never responded.  Having been offered a reprieve from the consequences of their litigation misconduct, and having chosen to press on with their bad faith claims, Plaintiffs are fully deserving of sanctions from the Court.  Therefore, the Court should order Plaintiffs, jointly and severally, to reimburse Defendants for the legal fees and costs incurred in defending against Plaintiffs' motion.

## II.    BACKGROUND

The individual Defendants are Danish citizens, resident in Denmark.  In April 2007, the individual Defendants formed Covidence A/S, a Danish company that develops, markets, and sells high quality miniature video surveillance equipment to police forces, intelligence agencies,

---

[4] Indeed, the biggest United States trade show in the parties' business is in San Jose in July 2008.  If Plaintiffs are not sanctioned here, the parties may well end up litigating these same issues in state or federal court in San Jose, with Plaintiffs once again imposing legal fees as a barrier to Defendants' entry into the United States market.

military organizations and other law enforcement agencies worldwide.  Prior to the founding of

Covidence, the individual Defendants were employed by Plaintiff Spectronic Denmark A/S

("Spectronic").  The three individual Defendants resigned from Spectronic on February 26, 2007.

Hansen Decl. ¶¶ 1-2.[5]

       Shortly after the individual Defendants formed Covidence, the same three Plaintiffs in

this action filed suit against the same four Defendants in this action in Denmark.  In that first-

filed lawsuit, Plaintiffs alleged that Defendants stole trade secrets from Spectronic and that

Defendants were using those trade secrets to compete against Plaintiffs.  In that lawsuit,

Plaintiffs sought monetary damages and injunctive relief.  Hansen Decl. ¶¶ 14-16.  Plaintiffs'

claims in Denmark are essentially the same as their claims in this action.  Sorenson Decl. ¶ 3.[6]

       In the Denmark action, Plaintiffs filed a motion seeking a preliminary injunction against

Defendants.  Plaintiffs' motion papers in Denmark identify the primary injunctive relief

requested by Plaintiffs as follows:

> [That Defendants be] separately, together or partially together, in a
> period of five years starting April 1, 2007 . . . prohibited from
> directly or indirectly supplying, selling, renting out or delivering
> sound- and video-recording equipment as well as wireless sound-
> and video-recording products to police-, military-, or intelligence-
> authorities domestically and abroad.

O'Connor Decl., Ex. B at 2; Sorenson Decl. ¶ 3.  Only as subsidiary and alternative relief did

Plaintiffs seek a preliminary injunction that would have preliminarily barred Defendants from

doing business with certain specified distributors.  O'Connor Decl., Ex. B at 3.

---

[5] The Hansen Declaration is attached as an exhibit to the Declaration of John F.
O'Connor.

[6] Peter Sorenson is the lawyer who represents Defendants in the Danish action.  His
Declaration is attached as an exhibit to the O'Connor Declaration.  Plaintiffs not only provided
an incomplete and misleading description of the Danish proceedings, but offered no evidence
from Danish counsel concerning these proceedings.

The Danish court similarly understood Plaintiffs' principal request for interim relief to be an injunction that would have barred Defendants from competing generally in the audio and video recording device market.  In its preliminary injunction decision, the Danish court described Plaintiffs' main request for relief as follows:

> [That Defendants be] prohibited as individuals and as a whole or partial group for a period of 5 years starting April 1, 2007 . . . to direct[ly] or indirectly provide, sell, rent, lease, or supply sound and video recording products as well as wireless sound and video surveillance products to police, military or governmental intelligence agencies in Denmark or abroad.

O'Connor Decl., Ex. A at 2.

After a four-day contested hearing with live witnesses cross-examined by the parties and the court, the Danish court refused to grant Plaintiffs the principal relief they sought, requested relief that would have precluded Defendants from competing altogether and, for example, would have barred Defendants from attending trade shows to market and sell their goods.  Instead, the Danish court issued a far narrower preliminary injunction that permitted Defendants to compete worldwide so long as they refrained from doing business with a specified list of distributors and suppliers.  The list of distributors with which Defendants were preliminarily enjoined from doing business included only two United States companies: Brimtek Inc. and Ganz & Pugh.  Hansen Decl. ¶ 14; Sorenson Decl. ¶ 4; O'Connor Decl., Ex. A at 3.

In an effort to develop their business, Defendants purchased a booth at the "GovSec, U.S. Law and Ready 2008" trade show taking place in the District of Columbia on April 23-24, 2008, and made plans to attend the trade show.  Defendants' attendance at the trade show is not prohibited by the Danish preliminary injunction, though Defendants' participation would have been prohibited if the Danish court had issued the much broader preliminary injunction that Plaintiffs sought in Denmark.  Sorenson Decl. ¶¶ 5, 8.

In response to Defendants' decision to attend the trade show, Plaintiffs filed the present action, asserting misappropriation of trade secret claims similar to those being litigated in the first-filed Denmark action. Plaintiffs' Verified Complaint in the present action references the preliminary injunction issued in the Denmark case at Paragraphs 129-30, but does not disclose that the case remains active and that Plaintiffs are asserting claims for money damages and injunctive relief in that action for alleged misappropriation of trade secrets by Defendants.

With respect to the preliminary injunction issued by the Danish court, Plaintiffs attached three pages from the forty-five page decision, which is in Danish, as Exhibit 32 to their Verified Complaint. Along with the Danish version of these three pages, Plaintiffs attached to Exhibit 32 an English translation of less than one page of the decision, the part that sets forth the relief granted. Plaintiffs did not provide the Court or Defendants with an English translation of the rest of the Danish court's preliminary injunction decision, or even a translation of all three pages of the decision Plaintiffs submitted as an exhibit. The part of the preliminary injunction decision that Plaintiffs did not translate makes clear that Plaintiffs sought a preliminary injunction barring Defendants from competing in the audio and video recording device market for five years and that the Danish court had refused to issue this requested relief. *See* O'Connor Decl., Ex. A at 3.

In addition to filing their Verified Complaint in this action, Plaintiffs filed a motion for a temporary restraining order or preliminary injunction. The temporary restraining order proposed by Plaintiffs would have barred Defendants from displaying or offering for sale their "Oculus" video recording device anywhere in the United States until the Court could hear Plaintiffs' preliminary injunction motion. Although they never filed a proposed preliminary injunction order, despite the Court's order that they do so, Plaintiffs' papers appear to have sought a preliminary injunction that would have enjoined Defendants from participating in any way in the

April 23-24, 2008 trade show in Washington, D.C.  As with their Verified Complaint, Plaintiffs'

preliminary injunction papers do not disclose that Plaintiffs had already asked the Danish court

to issue a preliminary injunction that would have barred Defendants from competing with

Plaintiffs generally (as opposed to precluding Defendants from doing business with specified

distributors) and that the Danish court had refused to grant that relief.

Defendants retained Steptoe & Johnson LLP to defend them in this action on April 17,

2008.  At approximately 12:30 p.m. on April 17, undersigned counsel left a voicemail with

Plaintiffs' lead counsel, B. Kevin Burke, Esq., to advise that Steptoe & Johnson LLP would be

representing Defendants.  Shortly thereafter on the same date, the Court entered an order setting

Plaintiffs' motion for hearing on April 22, 2008.  That order directed the parties that there would

be no live witnesses at the hearing, directed the parties to file any Declarations bearing on  the

motion by April 21, 2008, and directed Plaintiffs to file by April 21, 2008 a proposed order

setting forth the precise injunctive relief sought by Plaintiffs.  Or. of 4/17/08.  Undersigned

counsel spoke with Plaintiffs' lead counsel late in the day on April 17.  During that call,

undersigned counsel advised Mr. Burke (who at the time was not on the Court's ECF service list)

of the Court's entry of an order setting a hearing date.  Mr. Burke, who was not in his office,

advised that he was aware an order had issued.  O'Connor Decl. ¶¶ 2-3.

On the evening of Sunday, April 20, 2008, undersigned counsel received an English

translation of the three pages filed by Plaintiffs from the Danish preliminary injunction decision.

That translation confirmed that Plaintiffs had asked the Danish court for a preliminary injunction

that would have barred Defendants from selling sound and video recording products to police,

military or governmental intelligence agencies anywhere in the world, and that the Danish court

had refused to award that relief.  As a result, at about 12:15 p.m. on April 21, 2008, undersigned

counsel called Plaintiffs' lead counsel and left a voicemail stating that Plaintiffs' description of the Danish proceedings was misleading, that Defendants viewed Plaintiffs' motion as sanctionable and would be seeking an award of attorney's fees and costs, and that Defendants would withdraw their request for sanctions if Plaintiffs agreed to withdraw their preliminary injunction motion and dismiss the present action.  O'Connor Decl. ¶ 4.

Defendants filed their opposition, with exhibits, to Plaintiffs' preliminary injunction motion at about 2:45 p.m. on April 21, 2008.  Undersigned counsel also sent all of Defendants' pleadings to Plaintiffs' lead counsel and local counsel by email at 2:50 p.m. on the same day. O'Connor Decl. ¶ 5.  Although the Court's April 17, 2008 order permitted it, Plaintiffs did not file any additional Declarations in support of their preliminary injunction motion.  Plaintiffs also never filed the proposed preliminary injunction order they were directed to file in the Court's order.  Plaintiffs never responded to Defendants offer to forgo or withdraw their request for sanctions if Plaintiffs would agree to withdraw their preliminary injunction motion and dismiss the present action.  O'Connor Decl. ¶ 5.

## III.    ANALYSIS

### A.    The Standard for the Imposition of Sanctions

A federal district court has an "historic and frequently invoked inherent power to impose sanctions"[7] on parties for inappropriate litigation conduct.  As the Supreme Court explained, federal district courts have the inherent power, not displaced by Rule 11, to assess attorney's fees as a sanction "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (internal quotations omitted) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975)).

---

[7] 5A Charles A. Wright, et al., *Federal Practice & Procedure* § 1336, at 617-19 (3d ed. 2004)

"In this regard, if a court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled,' it may assess attorney's fees against the responsible party, as it may when a party 'shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.'" *Id.* (quoting *Universal Oil Prods. Co. v. Root Refining Co.*, 328 U.S. 575, 580 (1946), and *Hutto v. Finney*, 437 U.S. 678, 689 n.14 (1978)); *see also Shepherd v. Am. Broadcasting Co.*, 62 F.3d 1469, 1478 (D.C. Cir. 1995) (recognizing district court's inherent power to impose sanctions, including an award of attorney's fees, for litigation misconduct); *Assassination Archives & Research Ctr. v. CIA*, 48 F. Supp. 2d 1, 9 (D.D.C. 1999); *Alexander v. FBI*, 192 F.R.D. 25, 31 (D.D.C. 2000).

In order to exercise its inherent power to impose sanctions, a district court must make an explicit finding that the sanctioned party acted in bad faith. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764-65 (1980). Here, such a finding is justified on three bases. *First*, Plaintiffs' bad faith is evidenced by the utter lack of legal merit to Plaintiffs' claims. Plaintiffs either did not bother to conduct the most cursory bit of legal research or did conduct such research and neglected to advise the Court of binding precedent contrary to the positions they were asserting in this action. *Second*, Plaintiffs sought a preliminary injunction without any factual support for their claims. Plaintiffs made a series of serious allegations of misconduct on the part of Defendants, but offered no supporting evidence and did not even challenge Defendants' evidence demonstrating their innocence of these charges. *Third*, Plaintiffs based their motion on a false premise, relying on the Danish preliminary injunction proceedings while withholding from the Court the fact that the Danish court had denied the very relief Plaintiffs were now seeking in this forum.

9

Indeed, Plaintiffs' conduct is all the more indefensible given its context. Plaintiffs submitted misleading materials in the course of litigating a motion for a temporary restraining order, where Defendants and the Court would be operating under considerable time pressure and most of the relevant documents are in Danish. Under these circumstances, Plaintiffs' obligation of candor to the tribunal takes on an even greater importance, as the Defendants had a limited ability to refute false and misleading statements given the short period of time in which Plaintiffs' motion had to be resolved.

Moreover, because Plaintiffs' motion *had* to be resolved less then twenty-one days after it was filed, Plaintiffs were essentially insulated from the strictures of Rule 11, as Defendants could never meet the twenty-one-day safe harbor allowed by that rule. *See* Fed. R. Civ. P. 11(c)(2). However, the Court's inherent power to sanction exists for the very purpose of dealing with sanctionable conduct that, by its nature, cannot be addressed pursuant to Rule 11. *Chambers*, 501 U.S. at 46 ("[W]hereas each of the other [sanctions] mechanisms reaches only certain individuals or conduct, the inherent power extends to the full range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices."); *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1224 (3d Cir. 1995) (""[W]e have previously rejected the position that once a claim is held not to violate Rule 11, the court is prevented from imposing sanctions under its inherent powers.") (citation and internal quotations omitted); *see also In re DeVille*, 361 F.3d 539, 550-51 (9th Cir. 2004) (court's inherent powers govern conduct not meeting requirements for Rule 11 sanctions); *Clark v. Mortenson*, 93 Fed. Appx. 643, 652 (5th Cir. 2004) (Rule 11's 21-day safe harbor does not apply to sanctions imposed under court's inherent powers).

B.    **The Claims Asserted in Plaintiffs' Motion Were Utterly Lacking in Legal Merit**

The most favorable conclusion that can be drawn with respect to the claims asserted in Plaintiffs' motion is that Plaintiffs made no effort whatsoever to determine whether there was a legal basis for those claims.  In asking this Court is issue a temporary restraining order or preliminary injunction, Plaintiffs claimed in their motion that they were likely to prevail on three claims against Defendants: (1) a claim under § 43(a) of the Lanham Act; (2) a claim under the Computer Fraud and Abuse Act; and (3) a claim under the District of Columbia Trade Secrets Act.  While Plaintiffs' motion claims a likelihood of success on their claim under the District of Columbia Trade Secrets Act, Plaintiffs did not even assert such a claim in their Verified Complaint.  Regardless, all three of these identified claims are on their face self-defeating, and the only possible conclusions is that Plaintiffs either conducted no legal analysis of their claims, or did conduct such research and concealed the applicable authorities from the Court.  Either possibility evinces bad faith and would warrant sanctions.

As an initial matter, however, there is no basis for concluding that this Court would even have subject-matter over the action Plaintiffs filed.  Plaintiffs' Verified Complaint asserts that the Court has diversity jurisdiction.  Compl. ¶ 17.  However, both the plain language of the statute and a long line of case law makes clear that diversity jurisdiction does not exist when one side of a case is populated solely by foreigners and the other side of the case is comprised of a mixture of American citizens and foreigners.  *See* 28 U.S.C. § 1332(a); *Universal Licensing Corp. v. Paola del Lungo S.p.A.*, 293 F.3d 579, 580 (2d Cir. 2002); *Dresser Indus., Inc. v. Underwriters at Lloyd's of London*, 106 F.3d 494, 499 (3d Cir. 1997); *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 428 (7th Cir. 1993); *U.S. Motors v. Gen. Motors Europe*, 519 F. Supp. 2d 671, 673-74 (E.D. Mich. 2007) (collecting additional cases).

Moreover, for federal question to exist, the claim asserted by the plaintiff under a federal statute must be a "substantial" one.  As a leading commentator has explained: "The requirement for substantiality does not refer to the value of the interests that are at stake, but to whether there is any legal substance to the position the plaintiff is presenting."  13B Charles A. Wright, et al., *Federal Practice & Procedure* § 3564, at 66-67 (2d ed. 1984).  Claims asserted under federal law do not trigger federal question jurisdiction where the claims are "so attenuated and unsubstantial as to be absolutely devoid of merit."  *Hagans v. Lavine*, 415 U.S. 528, 536-37 (1974) (quoting *Newburyport Water Co. v. Newburyport*, 193 U.S. 561, 579 (1904)); *see also Decatur Liquors, Inc. v. District of Columbia*, 478 F.3d 360, 362-63 (D.C. Cir. 2007).  As discussed in greater detail below, the two claims asserted by Plaintiffs under federal statutes – their Lanham Act and CFAA claims – are so clearly barred by the plain language of those statutes, reinforced by applicable case law, that they have no plausible legal merit whatsoever.  Thus, it appears that Plaintiffs filed this action, and asserted a right to preliminary relief, without having made any effort to determine whether there even exists an arguable basis for concluding that this Court has subject-matter jurisdiction.[8]

As for Plaintiffs' Lanham Act claim, Plaintiffs' motion claims a likelihood of success on that claim, but merely quotes § 43(a) of the Lanham Act and, with essentially no explanation, asserts that Plaintiffs meet the requirements for a § 43(a) claim.  Pl. Mot. at 10.  But the plain language of § 43(a) makes clear that the statute concerns only false statements with a tendency to deceive as to a product's origin, sponsorship, or approval, and does not cover claims that a party has incorporated another party's trade secrets into its product.  15 U.S.C. § 1125(a).  Plaintiffs

---

[8] The apparent absence of subject-matter jurisdiction does not deprive the Court of the power to sanction parties for conduct occurring while the case remained before the Court.  *See Willy v. Coastal Corp.*, 503 U.S. 131, 136 (1992)

12

cite no case law for the proposition that § 43(a) of the Lanham Act creates a federal cause of action for alleged theft of trade secrets, nor could they, as even cursory legal research would have disclosed a unanimous Supreme Court decision from 2003 rejects the precise argument urged by Plaintiffs in this action. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003). Thus, it appears Plaintiffs sought to invoke this Court's jurisdiction through a Lanham Act claim where they either conducted no legal assessment of that claim or failed to disclose the contrary authority that is directly on point.

Plaintiffs' CFAA claim fares no better. Plaintiffs argued in their motion that Spectronic's computers in Denmark are "protected computers" for a United States computer hacking statute, but do not even cite the correct statutory definition of "protected computer," instead quoting a definition that was amended out of existence in 2002. The applicable version of the CFAA defines a protected computer as reaching computers located in foreign countries when the computer "is used in a manner that affects interstate or foreign commerce or communication of the United States." 18 U.S.C. § 1030(e)(2)(B). Plaintiffs offered no argument in their papers or at oral argument as to how a Spectronic computer located in Denmark could possibly meet this requirement. Moreover, Plaintiffs' own supporting affidavit admits that Defendants, while employed at Spectronic, had authorized access to the computer systems that form the basis of Plaintiffs' CFAA claim. Compl. ¶ 147; Moestrup Aff. ¶¶ 11-12. But the statute, and the case law construing it, requires that access either be unauthorized or that the defendant accessed materials he was not permitted to access. It does not cover claims that an employee was authorized access to information but then used it in an unauthorized way. 18 U.S.C. § 1030(e)(6); *Diamond Power Int'l, Inc. v. Davidson*, ___ F. Supp. 2d ___, 2007 WL 2904119, at *14 (N.D. Ga. 2007); *Secureinfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 609 (E.D. Va.

13

2005).  Finally, Plaintiffs' claim was fatally flawed from the start because Plaintiffs had no

claimed injury relating to supposed damage to a computer relating to whatever Defendants were

alleged to have done.  *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 474-76

(S.D.N.Y. 2004).

  As noted above, while Plaintiffs' motion asserted a likelihood of success on their District

of Columbia Trade Secrets Act claim, they in fact asserted no such claim.  If they had, that claim

also would be facially lacking in legal merit.  It is difficult to conceive of any theory as to how a

District of Columbia trade secrets act would supply the governing law for claims that

Defendants, all Danes, misappropriated trade secrets while employed by a Danish company in

Denmark, and then used those purloined trade secrets to form a competing Danish company.  *See*

*Drs. Groover, Christie & Merritt, P.C. v. Burke*, 917 A.2d 1110, 1117 (D.C. 2007) (District of

Columbia courts consider the interests of various jurisdictions is selecting the law to govern tort

claims); *see also Westech Gear Corp. v. Dep't of Navy*, No. 87-2609, 1988 WL 170558, at *5 n.2

(D.D.C. May 9, 1988) (applying interest analysis to determine governing law for trade secrets

claim); *Gilson v. Republic of Ireland*, 606 F. Supp. 38, 42 (D.D.C. 1984) (holding that the

District of Columbia's choice of law rules would dictate application of Irish law to a

misappropriation of trade secrets claim where the defendants were Irish citizens and the alleged

misappropriation occurred in Ireland.).[9]  Therefore, even if it were true that Defendants had

misappropriated trade secrets from Plaintiffs – something Defendants have denied under oath –

the District of Columbia Trade Secrets Act has no conceivable role in supplying the cause of

action for such a claim.

---

  [9] While the Court concluded that District of Columbia choice of law rules would point to
the application of Irish law, the Court applied domestic law because no party had given notice of
an intent to rely on foreign law under Federal Rule of Civil Procedure 44.1.  *See Gilson*, 606 F.
Supp. at 42.

14

C.    **Plaintiffs' Motion Is Utterly Lacking in Factual Merit**

Even if basic legal research would not have revealed the legal flaws in Plaintiffs' claims, Plaintiffs filed and prosecuted their preliminary injunction motion without the slightest factual support for their claims. Plaintiffs' factual allegations are twofold: (1) that Defendants stole trade secrets from Plaintiffs; and (2) that Defendants stole computerized information from Plaintiffs. But Plaintiffs have no facts to support these reckless and defamatory accusations. Plaintiffs did not even bother to translate the Danish portions of eleven of their exhibits. When Defendants served their opposition papers at 2:45 p.m. on April 21, 2008, Plaintiffs did not bother to file affidavits (even though the Court's prior order permitted Plaintiffs to do so) contesting Defendants' sworn denial of Plaintiffs' allegations. The only reasonable conclusion is that Plaintiffs never intended to actually litigate their motion, but filed it in an effort to intimidate Defendants into abandoning their efforts to do business in the United States.

Sifting through Plaintiffs' papers, one cannot identify what trade secrets Plaintiffs allege were misappropriated by Defendants. Plaintiffs never identify the technology that Defendants supposedly stole from Spectronic, nor do they explain how that technology is incorporated, or suspected to be incorporated, into Defendants' products. In fact, Plaintiffs' motion papers, while casually hurling accusations of the theft of trade secrets, never compare any product produced by Covidence with any product produced by Plaintiffs. Plaintiffs claim, without explanation, that Defendants' Oculus video recording device is a "knock off" product, Compl. ¶ 92, but Plaintiffs' affidavits are carefully crafted to avoid disclosing that Spectronic does not even have a video recording device on the market. Hansen Decl. ¶ 4. Essentially, then, Plaintiffs are alleging that Oculus is a "knock off" of a product that does not even exist, and Plaintiffs never explain what

15

trade secrets or technology Defendants supposedly stole from Spectronic or how such technology is incorporated into Oculus.[10]

Plaintiffs' factual basis for alleging their CFAA claim is even more flimsy. At pages 7-8 of Plaintiffs' brief, they claim a likelihood of success on a CFAA claim, but only identify two facts as supposedly supporting Plaintiffs' claim that Defendants violated the CFAA: (1) that the individual Defendants, while employed by Spectronic, had access to Spectronic's computer systems; and (2) Spectronic's computer systems contained proprietary business information. Pl. Mem. at 8. As for the evidence supporting a conclusion that Defendants actually misappropriated something from Spectronic's computer systems, Plaintiffs' brief states that the facts demonstrating this theft, and violation of a federal criminal statute, are "set forth in the Verified Complaint." *Id.*

But when one turns to the Verified Complaint, there is no evidence to support Plaintiffs' claims. As in Plaintiffs' brief, the Verified Complaint alleges that Defendants were granted access to Spectronic's computer systems and that these systems contained proprietary data. Compl. ¶¶ 58-60, 70-72, 81-82. But all the Verified Complaint contains concerning Defendants' supposed theft of computerized data are unsupported claims "upon information and belief" that Defendants misappropriated computerized data. Compl. ¶¶ 148-49, 151-52. Nowhere do Plaintiffs identify the "information" that supposedly supports their claim of criminal conduct by Defendants, nor do Plaintiffs describe the basis for their "belief" that such criminal conduct occurred. Thus, it appears that Plaintiffs took the fact that Defendants had authorized access to Plaintiffs' computer systems and made up a claim that Defendants therefore criminally stole

---

[10] Plaintiffs also did not disclose that, in the Danish case, Spectronic's own Chief Executive Officer was unable to identify one trade secret that Defendants supposedly misappropriated. Hansen Decl. ¶ 3.

proprietary information, shielding their lack of any basis for such a claim behind a series of

"upon information and belief" allegations.

D.    **Plaintiffs' Description of the Danish Proceedings Is Incomplete and Misleading**

Plaintiffs disclosed that the Danish court had issued a preliminary injunction that

restricted Defendants from doing business with certain distributors, and then proceeded as if their

requested preliminary injunction in this Court was a natural extension of the Danish injunction.

Compl. ¶¶ 129-30. Plaintiffs created this false perception by supplying the Court with the text of

three pages of the Danish preliminary injunction, in Danish, and then providing the Court with a

translation of one-half page of that material, the part that supported what Plaintiffs wanted to say.

However, even the three pages of the decision filed by Plaintiffs, once translated, show

that Plaintiffs actually asked the Danish court to issue an injunction that would have

encompassed the relief Plaintiffs sought from this Court, but that the Danish court had refused to

grant that relief. The Danish court described the relief sought by Plaintiffs as follows:

> [That Defendants be] prohibited as individuals and as a whole or
> partial group for a period of 5 years starting April 1, 2007 . . . to
> direct[ly] or indirectly provide, sell, rent, lease, or supply sound
> and video recording products as well as wireless sound and video
> surveillance products to police, military or governmental
> intelligence agencies in Denmark or abroad.

O'Connor Decl., Ex. A at 2. Indeed, Plaintiffs' own motion in the Danish case makes clear the

principal relief sought by Plaintiffs:

> [That Defendants be] separately, together or partially together, in a
> period of five years starting April 1, 2007 . . . prohibited from
> directly or indirectly supplying, selling, renting out or delivering
> sound- and video-recording equipment as well as wireless sound-
> and video-recording products to police-, military-, or intelligence-
> authorities domestically and abroad.

O'Connor Decl., Ex. B at 2; Sorenson Decl. ¶ 3.

But Plaintiffs never disclosed any of this to the Court.  Rather, Plaintiffs described the Danish proceedings in a way to leave the Court with the false impression that Plaintiffs had gotten exactly the interim relief they sought in the Danish case, and that Plaintiffs' motion before this Court was the first time Plaintiffs had sought to enjoin Defendants from competing generally in the United States.  Compl. ¶¶ 129-30.  Only after Defendants were able to obtain "rush" translations of materials from the Danish proceedings did the Court learn that Plaintiffs were seeking in this Court preliminary relief they had been denied in Denmark.  Plaintiffs' lack of candor is particularly egregious given that the parties and the Court had extremely limited time to collect the facts and get to the bottom of the issues.  Plaintiffs' misconduct essentially sought to take advantage of the limited time available for consideration of their motion and the fact that the relevant documents were all in Danish.

## IV.    CONCLUSION

"[I]f a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order."  *Chambers*, 501 U.S. at 45-46 (citations and internal quotations omitted).  Plaintiffs forced their fledgling business competitor to incur more than $50,000 in legal fees and costs in defending against a preliminary injunction motion that was based on a misleading description of parallel Danish proceedings.  As for the merits of Plaintiffs' claims, the most favorable conclusion that could be reached is that Plaintiffs conducted no legal research to determine if their claims had any basis in law, as Plaintiffs' motion papers inexplicably fail to cite binding authority that defeats Plaintiffs' claims, and rely on log-superseded statutory language.  Moreover, Plaintiffs' allegations have no basis in fact, as Plaintiffs have failed to identify any

trade secret allegedly misappropriated, or articulate any basis for "information and belief" that Defendants misappropriated Spectronic's computerized data.

This action, and Plaintiffs' preliminary injunction motion, have all the characteristics of a strike suit, a suit filed not for its legal merit but in order to inflict costs on a business competitor in order to intimidate it into abandoning its right to do business in this country. There is no sound reason why Plaintiffs should be able to inflict the legal fees and costs associated with the defense of Plaintiffs' motion on Defendants, when Defendants already prevailed with respect to the same requested relief in Denmark. This is particularly true where, as here, Defendants gave Plaintiffs an opportunity to avoid a sanctions motion by withdrawing their preliminary injunction motion and dismissing this action, an offer to which Plaintiffs did not even respond. For all of these reasons, the Court should order Plaintiffs to reimburse Defendants for the legal fees and costs incurred in defending this action, with Defendants being directed to submit a statement of fees and expenses within ten days of the date of the Court's order.

Respectfully submitted,

/s/  John F. O'Connor
_____
Steven K. Davidson (D.D.C. Bar No. 407137)
John F. O'Connor (D.D.C. Bar No. 460688)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
(202) 429-3902 – facsimile
sdavidson@steptoe.com
joconnor@steptoe.com

*Attorneys for Defendants*

19

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SPECTRONIC DENMARK A/S, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:08-CV-00590 (PLF) |
| | ) | |
| v. | ) | |
| | ) | |
| JIMMI M. HANSEN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF JOHN F. O'CONNOR

I, John F. O'Connor, hereby declare as follows:

1.     I am a partner in the law firm of Steptoe & Johnson LLP.  I am one of the counsel of record for Defendants in this action.

2.     Defendants retained Steptoe & Johnson LLP to represent them in this action on Thursday, April 17, 2008.  At approximately 12:30 p.m., I left a voicemail message for Plaintiffs' lead counsel, B. Kevin Burke, Esq., to advise him that my firm would be representing defendants and to request copies of the exhibits that Plaintiffs had filed under seal.  Sometime on April 17, 2008, after I left the aforementioned voicemail message for Mr. Burke, the Court entered an order setting Plaintiffs' temporary restraining order/preliminary injunction motion for hearing on April 22, 2008.

3.     I spoke with Mr. Burke late in the day on April 17, 2008, when he returned the voicemail message I had left for him earlier that afternoon.  Mr. Burke advised that he would ensure that we received the sealed exhibits by the next morning.  Because Mr. Burke indicated he

was out of his office, I advised him that the Court had entered an order setting a hearing on April 22. Mr. Burke advised that he had heard that an order had been entered.

4.    On the evening of Sunday, April 20, 2008, I received from the translation service my firm retained an English translation of the three pages filed by Plaintiffs from the Danish preliminary injunction decision. That translation confirmed that Plaintiffs had asked the Danish court for a preliminary injunction that would have barred Defendants from selling sound and video recording products to police, military or governmental intelligence agencies anywhere in the world, and that the Danish court had refused to award that relief. As a result, at about 12:15 p.m. on April 21, 2008, I called Plaintiffs' lead counsel and left a voicemail stating that Plaintiffs' description of the Danish proceedings was misleading, that Defendants viewed Plaintiffs' motion as sanctionable and would be seeking an award of attorney's fees and costs, and that Defendants would withdraw their request for sanctions if Plaintiffs agreed to withdraw their preliminary injunction motion and dismiss the present action.

5.    Defendants filed their opposition, with exhibits, to Plaintiffs' preliminary injunction motion at about 2:45 p.m. on April 21, 2008. I also sent all of Defendants' pleadings to Plaintiffs' lead counsel and local counsel by email at 2:50 p.m. on the same day. Plaintiffs never responded to Defendants offer to forgo or withdraw their request for sanctions if Plaintiffs would agree to withdraw their preliminary injunction motion and dismiss the present action.

6.    Attached as Exhibit A hereto is a true copy of an English translation we obtained of the three pages of the Danish preliminary injunction decision submitted as Exhibit 32 to Plaintiffs' Verified Complaint, with the Danish version of those same three pages directly behind it.

7.      Attached as Exhibit B hereto is a true copy of an English translation we obtained of the motion filed by Plaintiffs for a preliminary injunction in Denmark, with the Danish version of this document directly behind it.

8.      Attached as Exhibit C hereto is a true copy of the Declaration of Defendant Jimmi M. Hansen.

9.      Attached as Exhibit D hereto is a true copy of the Declaration of Peter Zacher Sorenson.

10.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 2, 2008.

_____
John F. O'Connor

# EXHIBIT A



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

AFFIDAVIT OF ACCURACY

I, Brian McCormick, hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of the accompanying documents from Danish into English.

Brian McCormick
TransPerfect
601 Thirteenth, Street, NW
Suite 370 South
Washington, DC 20005

Sworn to before me this
21st Day of April, 2008

Signature, Notary Public

**Lisa Chan**
**Notary Public, District of Columbia**
**My Commission Expires 1/1/2013**
_____
Stamp, Notary Public

Washington, DC

**Exhibit A**

601 THIRTEENTH STREET, NW, SUITE 370 SOUTH, WASHINGTON, DC 20005   T 202.347.2300   F 202.347.6861   WWW.TRANSPERFECT.COM

RANDERS COURT

[stamp:] RANDERS COURT, DENMARK'S COURT OF LAW

Transcript of the Records of the Court

On January 7, 2008 at 1.00 p.m. the courts ruled in the case

FS 40-556/2007

Spectronic Denmark A/S
Skindbjergvej 44
8500 Grenaa
(hereafter referred to as Distrainor 1)
and

DTC Communications Inc.
486 Amherst Street
Nashua, NH 03063
USA
(hereafter referred to as Distrainor 2)
and

Domo Ltd
Manor Court, Barnes Wallis Road
Segensworth, Hampshire, PO 15 5 TH
United Kingdom
(hereafter referred to as Distrainor 3)

Versus

Jimmi Møgelvang Hansen
Lyngdalvej 56
8500 Grenaa
(hereafter referred to as Distrainee 1)
and

Henrik Klebæk
Storegade 31
8500 Grenaa
(hereafter referred to as Distrainee 2)
and

Kent Messerschmidt
Parkvej 30
8900 Randers
(hereafter referred to as Distrainee 3)
and

Covidence A/S

[illegible]

[see source for English]

Åkærsvej 1
8410 Rønde
(hereafter referred to as Distrainee 4)
KENDELSE

(Page 2/45)

Judgment

The case was conducted behind closed doors in conjunction with Danish Law §29 Article 1, no. 3.

According to this prohibitive injunction brought before the court on July 9, 2007, the distrainor claimants have brought the following claims against the distrainees:

Primarily:
Distrainees 1, 2, 3 and 4 are prohibited as individuals and as a whole or partial group for a period of 5 years starting April 1, 2007, unless the bailiff's court has determined a shorter period, to direct or indirectly provide, sell, rent, lease, or supply sound and video recording products as well as wireless sound and video surveillance products to police, military or governmental intelligence agencies in Denmark or abroad.

Secondary (prohibitions):

1. Distrainees 1, 2, 3 and 4 are prohibited as individuals and as a whole or partial group for a period of 5 years starting April 1, 2007 unless the bailiff's court has determined a shorter period, to direct or indirectly provide, sell, rent, lease, or supply sound and video recording products as well as wireless sound and video surveillance products to clients named in Appendix 1.

2. Distrainees 1, 2, 3 and 4 prohibited as individuals and as a whole or partial group for a period of 5 years starting April 1, 2007 unless the bailiff's court has determined a shorter period, to direct or indirectly to work with those customers identified in Appendix 2 as suppliers or other commercial relationships to produce sound and video recording products as well as wireless sound and video surveillance products.

This ruling is handed down on principle without securities unless determined otherwise by the bailiff's court.

The distrainors claim the distrainees have denied the terms set forth by the prohibitive injunction.

This judgment does not include a complete case hearing according to laws § 218b, 218a article 2.

Brief Summary of the Case

Claimant 1, Spectronic Denmark A/S (hereafter SD) has supplied electronic surveillance equipment to police, military and intelligence agencies nationally and internationally since 1983.

[illegible]

[see source for English]

(Page 45/45)

[...] use and will misuse technical and commercial information regarding the claimants end-point of sale customers. The distrainors have chosen not to name said customers to protect their privacy. The bailiff's court has determined that this injunction in accordance with the stated principal claim will be continued due to the need for the distrainor's protection. As a consequence, the claimants' secondary claims will be granted to be continued for a total of three years, which is the time period determining relevance of commercial and industrial privacy after which technical development will have rendered them out of concurrence.

This prohibitive injunction is conditioned upon securities set for laws §644. Securities are determined with regard to the economic conditions and information provided and will be awarded at the amount of DKK 3,000,000. The security will be paid no later than the date and method stated hereunder.

The burden of legal fees for this case will be determined during the closing confirmation proceedings.

It has therefore been decided that:

Distrainees 1, 2, 3 and 4 are hereby prohibited together and as individuals for a period of 3 years, starting April 1, 2007, to directly or indirectly provide, sell, rent, lease, or supply sound and video recording products as well as wireless sound and video surveillance products to clients named in appendix 1.

Distrainees 1, 2, 3 and 4 prohibited as individuals and as a whole or partial group for a period of 3 years starting April 1, 2007, unless the bailiff's court has determined a shorter period, to direct or indirectly to work with those customers identified in Appendix 2 as suppliers or other commercial relationships to produce sound and video recording products as well as wireless sound and video surveillance products.

The injunction will be imposed after the distrainors have provided a security deposit of DKK 3,000,000 to the bailiff's court via bank guarantee or a notarized check. This security must be received no later than January 14, 2008 at 12:00 p.m. noon.

Astrid Lohmann Knudsen

Court transcript verified.
Rander District Court, January 8, 2008

Ulla O Jensen, Court Transcriber

[illegible]

[see source for English]

From: 87125178    Page: 1/45    Date: 08-01-2008 15:22:05

## RETTEN I RANDERS



Udskrift af retsbogen

Den 7. januar 2008 kl. 13:00 afsagdes i

FS 40-4556/2007

Spectronic Denmark A/S
Skindbjergvej 44
8500 Grenaa
(herefter kaldet rekvirent 1)

og

DTC Communications Inc.
486 Amherst Street
Nashua, NH 03063
USA
(herefter kaldet rekvirent 2)

og

Domo Ltd
Manor Court, Barnes Wallis Road
Segensworth, Hampshire, PO 15 5 TH
United Kingdom
(herefter kaldet rekvirent 3)

mod

Jimmi Møgelvang Hansen
Lyngdalvej 56
8500 Grenaa
(herefter kaldet rekvisitus 1)

og

Henrik Klebæk
Storegade 31
8500 Grenaa
(herefter kaldet rekvisitus 2)

og

Kent Messerschmidt
Parkvej 30
8900 Randers
(herefter kaldet rekvisitus 3)

og

Covidence A/S

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

From: 67125178        Page: 2/45    Date: 08-01-2008 15:22:05

Side 2/45

Åkærsvej 1
8410 Rønde
(herefter kaldet rekvisitus 4)
KENDELSE

Sagen er behandlet for lukkede døre i medfør af retsplejelovens § 29, stk. 1
nr. 3.

Under denne forbudssag, der er indbragt for fogedretten den 9. juli 2007, har
rekvirenterne over for rekvisiti nedlagt følgende påstande:

Principalt:

Rekvisitus 1, 2, 3 og 4 forbydes hver især og helt eller delvist i forening, i en
periode på 5 år fra den 1. april 2007, subsidiært i en af fogedretten fastsat
kortere periode, direkte eller indirekte at udbyde, sælge, udleje eller levere
lyd- og video optageprodukter samt trådløse lyd- og videoovervågningspro-
dukter til politi-, militær- eller efterretningsmyndigheder i ind- og udland.

Subsidiært (sideordnet):

1.    Rekvisitus 1, 2, 3 og 4 forbydes hver især og helt eller delvist i fore-
ning, i en periode på 5 år fra den 1. april 2007, subsidiært i en af fogedretten
fastsat kortere periode, direkte eller indirekte at udbyde, sælge, udleje eller
levere lyd- og video optageprodukter samt trådløse lyd- og videoovervåg-
ningsprodukter til de i bilag 1 opregnede kunder.

2.    Rekvisitus 1, 2, 3 og 4 forbydes hver især og helt eller delvist i fore-
ning, i en periode på 5 år fra den 1. april 2007, subsidiært i en af fogedretten
fastsat kortere periode, direkte eller indirekte at samarbejde med de i bilag 2
opregnede leverandører og samarbejdspartnere med henblik på fremstilling
af lyd og video optagere samt trådløse lyd- og videoovervågningsprodukter
til brug for elektronisk overvågning.

Forbudet begæres nedlagt principalt uden sikkerhedsstillelse, subsidiært
mod en af fogedretten fastsat sikkerhedsstillelse.

Rekvisiti har påstået forbudsbegæringen nægtet fremme.

Kendelsen indeholder ikke en fuldstændig sagsfremstilling, jf. retspleje-
lovens § 218 b, jf. § 218 a, stk. 2.

Kort sagsfremstilling

Rekvirent 1, Spectronic Denmark A/S (herefter SD) har siden 1983 natio-
nalt og internationalt drevet virksomhed med levering elektronisk overvåg-
ningsudstyr til politimyndigheder, militære myndigheder og andre regerings-

# EXHIBIT B



# TRANSPERFECT

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

AFFIDAVIT OF ACCURACY

I, Brian McCormick, hereby certify that the following is, to the best of my knowledge and
belief, a true and accurate translation of the accompanying documents from Danish into
English.

Brian McCormick
TransPerfect
601 Thirteenth, Street, NW
Suite 370 South
Washington, DC 20005

Sworn to before me this
21st Day of April, 2008

Signature, Notary Public

**Lisa Chan**
Notary Public, District of Columbia
My Commission Expires 1/1/2013

Stamp, Notary Public

Washington, DC

**Exhibit B**

601 THIRTEENTH STREET, NW, SUITE 370 SOUTH, WASHINGTON, DC 20005   T 202.347.2300   F 202.347.6861   WWW.TRANSPERFECT.COM

003

**D E L A C O U R**

J.no. 172563/LLG/SLU

REQUEST

FOR INJUNCTION

As the attorney for

Spectronic Denmark A/S
CVR-no. 13 44 98 48
Skindbjergvej 44
8500 Grenaa
(hereinafter called "plaintiff 1")

and

DTC Communications Inc.
486 Amherst Street
Nashua, NH 03063
USA
(hereinafter called "plaintiff 2")

and

Domo Ltd
Manor Court, Barnes Wallis Road
Segensworth, Hampshire
PO15 5 TH
United Kingdom
(hereinafter called "plaintiff 3")

(by/attorney-at-law Anders Hedetoft)

**DELACOUR Advokatfirma**
Tel. (+45) 70 11 11 22
Fax (+45) 70 11 11 33
www.delacour.dk
CVR-no. 88 18 31 16

**Copenhagen**
Hammerensgade 1
DK-1267 København K

**Aarhus**
Lille Torv 6, Box 505
DK-8100 Århus C

Member of [logo]

· an international network
of independent attorney firms

DELACOUR

00‹

I will hereby request
the bailiff's court ("Fogedretten") in Randers in regards to

> Jimmi Megelvang Hansen
> Lyngdalvej 56
> 8500 Grenaa
> hereinafter called "defendant 1")

> and

> Henrik Klebæk
> Storegade 31
> 3500 Grenaa
> hereinafter called "defendant 2")

> and

> Kent Messerschmidt
> Parkvej 30
> 8900 Randers
> (hereinafter called "defendant 3")

> and

> Covidence A/S
> CVR-no. 30 49 27 65
> Akærsvej 1
> 8410 Rønde
> (hereinafter called "defendant 4")

to impose an injunction in accordance with the following.

**CLAIMS:**

Principal claim.

> Defendant1, 2, 3, and 4 are separately, together or partially together, in a period of 5 years starting April 1, 2007, (subsidiary in by the court determined shorter period) prohibited from directly or indirectly supplying, selling, renting out or delivering sound- and video-recording equipment as well as wireless sound- and video-surveillance products to police-, military-, or intelligence-authorities domestically and abroad.

DELACOUR

005

Subsidiary claim (coordinated):

1. Defendant 1, 2, 3 and 4 are separately, together or partially together, in a period of 5 years starting April 1, 2007, (subsidiary in by the court determined shorter period) prohibited from directly or indirectly supplying, selling, renting out or delivering sound- and video-recording equipment as well as wireless sound- and video-surveillance products to the in appendix 1 listed customers.

2. Defendant 1, 2, 3 and 4 are separately, together or partially together, in a period of 5 years starting April 1, 2007, (subsidiary in by the court determined shorter period) prohibited from directly or indirectly collaborating with exhibit 2 listed vendors and partners with the intention of producing sound- and video-recorders as well as wireless sound- and video-surveillance products to be used for electronic surveillance.

The injunction is requested imposed without indemnity, subsidiary against by the court determined indemnity.

**MOTION FOR CLOSED DOORS:**

The plaintiffs motion that the case will be presented behind closed doors, cf. The Administration of Justice Act ("retsplejeloven") § 29, no. 3, since the case involves commercial secrets and since the case exhibited material to a substantial degree contains confidential data.

**CASE MOTIVATION:**

*Introduction*

This case concerns plaintiff 1's former employees, defendant 1's, 2's and 3's start-up of a business competing with plaintiffs (in the form of defendant 4), a business focused on development and delivery of products to the intelligence community. The three former employees have through defendant 4 hired another 3 employees, who also left plaintiff 1 to seek employment with defendant 4.

Defendant 4 markets – or intends to market – products completely equivalent to plaintiff 1's existing products or products that the plaintiff has under development. Furthermore, defendant 4 intends to promote products completely similar to plaintiff 2's and 3's existing products.

The case, therefore, involves breach of the Danish Marketing Practices Act § 1 regarding bona fide and established marketing practices as well as abuse of commercial secrets, cf. The Danish Marketing Practices Act § 19 and the agreed secrecy obligations.

The case, therefore, involves abuse of Spectronic's commercial secrets consisting of knowledge about customers' needs and experiences with the usage of electronic surveillance equipment as well as knowledge about

# DELACOUR

how technologies are combined and components are assembled to meet customers' needs, hereunder knowledge about how and to which effect surveillance equipment is implemented secretly.

### Plaintiffs' commercial activity

Since 1983, plaintiff 1 has operated enterprise with delivery of products and services in electronic surveillance equipment for police authorities, military authorities and other agencies within the intelligence service.

For more than two decades, plaintiff 1 has operated with governments and government-approved investigative- and intelligence-services as well as government approved vendors all over the world, and plaintiff 1 is today one of the industries top leading producers of sound surveillance equipment as well as supplier of internet and telecommunications monitoring solutions.

Plaintiff 1 is in many regards the market leader within its niche oriented product area. Plaintiff 1 has achieved this position by, throughout 24 years, building a very close cooperation with its customers, in which connection it is referred to in the section below regarding market barriers.

Plaintiff 1 has since November 2004 been a part of the English Cobham plc. with plaintiff 2 as plaintiff 1's direct parent company and plaintiff 3 as a sister company. The Cobham Group is an international group engaged in the development, delivery and support of advanced aerospace and defense systems, including surveillance systems. Plaintiff 2 and 3 primarily operates activities of development and promotion of surveillance systems.

The plaintiffs' enterprise is based partially on the sale of self-developed products, partially on the promotion rights for supplier products. The plaintiffs' development enterprise is based on user-oriented innovation, based on a detailed knowledge of the customers and customers' needs as well as knowledge about the usage of the newest thoroughly tested technology.

The plaintiffs are all part of the Cobham Group's LENS-group (Law Enforcement and National Security). The LENS-group is a very limited group of companies that operates in surveillance equipment for police authorities, military authorities and other agencies within intelligence service.

### Plaintiff's products and strategy

Plaintiff 1's brochures regarding the plaintiffs' operations as well as current product assortment are presented as the case's exhibit 3 and 4. As it appears, plaintiff 1's sound surveillance products consists of:

- "Solid State Recorders" (SSR), meaning recorders without moving parts (no tape), i.e. "Beowulf,"
- "Wireless," meaning wireless sound surveillance products (both analog and digital), i.e. Inka, Loke and Thor,
- Wired sound surveillance products, i.e. Heimdahl, ACC, RFM, RMM and AWM

DELACOUR

As well as hybrids of above mentioned products.

Following circumstances – described by outline – separates plaintiff 1 and plaintiff 1's products from the competitors:

- The newest technology is used. Plaintiff 1 has thereby achieved to minimize the size of the electronic hardware to the smallest in the world without compromising either sound quality or technical/mechanical quality. Plaintiff 1 has furthermore achieved the possibility of, in any situation, to be able to offer customers to further transmit the collected evidence by using the newest technology.

- The recording products are characterized by containing an encrypted watermark to validate the accuracy of the recordings. Plaintiff 1 keeps this encrypted watermark secret.

- Plaintiff 1 has, through the previous 24 years, built a very special relationship to the many customers and end-users, which plaintiff 1 has worldwide. The relationship to the customers and end-users is therefore characterized by a close dialogue that provides a unique insight into how the workday for the policeman, intelligence officer, soldier or undercover agent is. This close contact and dialogue furthermore means that plaintiff 1 to a very high degree has insight and understanding of which functionality and which features the customer needs. The close contact through the years has furthermore caused that plaintiff 1 in recent years receive specific development projects for new products.

- Plaintiff 1's products are characterized by very high user friendliness. Plaintiff 1 has therefore been able to create some of the most advanced within the industry but still preserve the simple and user friendly concept, which is critical in light of the training time that the users have available - often minutes and not hours or days. At the same time, the users are operating under immense psychological pressure, which requires that the equipment is simple and user-friendly for the operation to succeed.

- The design direction that plaintiff 1 follows today has hit the spot in the users' minds. The simple black and "ruggedized" design is appealing and, at the same time, fulfils the requirements for duration and the possibility of concealing the product. There is a recognition factor through the entire product program and a customer can therefore easily, through the design, set apart plaintiff 1's products from the competitors.

As the case's exhibit 5 is presented a copy of an excerpt from plaintiff 1's strategy plan for 2007-2011, which is being implemented. From the excerpt it appears that the launch of a "digital video recorder" is part of plaintiff 1's strategy plan. This excerpt from the strategy plan is authored by plaintiff 1.

As the case's exhibit 6 is presented a "power point presentation" developed by plaintiff 1 in February 2006 regarding the development of a digital video recorder based on the so-called "Thor SSR" platform, which is under development at plaintiff 1. Defendant 1 and 3 has participated in this development. As the case's exhibit 7 is presented a presentation developed by defendant 1 regarding possible routes to substantial revenue increases within the surveillance area. From exhibit 7 it appears that plaintiff 1 must market

**DELACOUR**

video products – both in the form of a SSR as a wireless version, hereunder that the SSR version can be based on "Thor spin off," i.e. on technologies, knowledge and experience form the Thor project. As the case's exhibit 8 is presented a "white paper" developed by defendant 1, containing a technical description as well as a description of the development project regarding the plaintiffs "Beowulf Digital Video Recorder."

Plaintiff 1 has thereby, through a longer period, both through strategic, operational, as well as technical studies and considerations worked on launching video surveillance products.

Plaintiffs' know-how, i.e. knowledge of usage of technologies on the market for electronic surveillance equipment for use for mission-critical situations, is a critical pre-requisite to enter the video surveillance market, and plaintiff 1's know-how concerning sound surveillance products is directly applicable for the development of electronic video surveillance products. The difference between the two types of surveillance equipment is only that both a video camera and a microphone are connected to the recorder on the video surveillance product, while only a microphone is connected to the recorder on the sound-only surveillance product, and that the data compression format is different.

Plaintiff 1's direct parent company, DTC Communications (plaintiff 2) and plaintiff 1's sister company , Domo (plaintiff 3) has through many years developed and marketed wireless video surveillance products. Plaintiff 2 markets one of the leading video recording products available on the market. As the case's exhibit 9 and 10 is presented a copy of plaintiff 2's product brochure and as the case's exhibit 11 is presented a copy of plaintiff 3's product brochure. Substantial knowledge and experience therefore exists regarding video products in the Group's LENS-group.

*The plaintiffs' commercial secrets and the protection thereof*

A substantial portion of the information and the knowledge that the plaintiffs are in possession of are either militarily or nationally classified information with the consequently stringent demands for handling, storage and transmission.

For other materials and other data from customers, suppliers and other collaborators, it applies almost without exception that there are confidentiality agreements, which obligate Spectronic to keep secret received information and solely use them for the confidentiality agreement's specified purpose.

It is a condition for employment at the plaintiffs that the employee can gain security clearance for Confidential and Secret level respectively.

The knowledge of plaintiff 1's products and their functionality, etc., is reserved to customers and the plaintiffs, since the products otherwise would lose their value. Plaintiff 1's website therefore does not contain information regarding the individual products' functionality, etc., just like the brochure materials for use at trade fairs, etc. only contain a brief and very perfunctory description of the products, cf. also exhibit 3 and 4.

Plaintiff 1's recording products are characterized by containing an encrypted watermark to validate the accuracy of the recordings. This encrypted watermark is kept secret by plaintiff 1.

DELACOUR

009

*Defendant*

On February 25$^t$, 2007 defendant 1 and 2 quit their positions and on February 26, 2007 defendant 3 quit his position at plaintiff 1 to start his own enterprise through defendant 4.

Defendant 1 (Jimmi Megelvang Hansen):

Defendant 1 commenced the position of leader of the surveillance area on January 1, 2003. Defendant 1 functioned later as development director reporting to CEO, Kim Lehmann.

Defendant 1 was, in his job, responsible for the development of electronic products (hardware and software) in the area of wireless as well as non-wireless surveillance equipment, including recorders.

Defendant 1 received through his employment a very considerable insight in plaintiff's know-how, including the assembly of components for surveillance products on the market for mission-critical surveillance and the market for recorders.

Defendant 1 secured a close relationship to some of plaintiff 1's most important customers and partners and a close knowledge of the customers' experiences and thereof derived needs.

Defendant 1 had, through his position as development director, complete insight in plaintiff 1's strategy, business plans and pricing. Defendant 1 participated in this way in strategic considerations regarding internal development of a video recorder contra acquiring existing company, cf. above as well as exhibit 6-9 and below regarding defendant 1's studies of a competing American company and recommendations for use in the plaintiff's decision regarding acquiring the company.

Defendant 1 has thoroughly followed the technological development in the Group and he had full access to the Group's technology, product development and commercial relations. As an example can be mentioned that defendant 1 participated in technology meetings in the Group's LENS-group, which primarily works with "Law Enforcement and National Security." Defendant 1 examined in 2006 in this way plaintiff 2's and plaintiff 3's surveillance products with the intention of gaining synergy effects by being member of the LENS-group. From the minutes of technology meeting in the LENS-group on September 19 and 20, 2006, which is presented as the case's exhibit 12 it appears on page 9 that plaintiff 1, represented by defendant 1, among other things should share information about protocols with the other LENS-members. In exhibit 13 it appears that defendant 1 confirms his participation in the meeting. From exhibit 14 it appears that defendant 1 had follow-up tasks after his participation in the meeting.

In regards to systems, defendant 1, as part of his position as Director, had access to plaintiff 1's customer system (Superoffice). All customer correspondence appears in the customer system. He, furthermore, had access to plaintiff 1's accounting system (Axapta) wherein customer order and other information can be found, like he had access to the customer database containing master data and contact information of the customers.

DELACOUR

010

Defendant 1 therefore had unlimited read-access in, as well as insight in, the most critical part of the plaintiffs' commercial secrets including, technical, financial, commercial and customer-related commercial secrets.

The development department consisted - at the time of defendant 1's resignation -- of 16 employees.

The employment contract is presented as the case's exhibit 15. The employment contracts article 9.3 has the following wording:

"The employee has duty of confidentiality, both during the employment as well as after it is terminated, with regards to the company's business and operations circumstances, its technical experiences, working methods, production efforts or similar and not for own or others advantage to use your knowledge of the company's circumstances in general."

The employment contracts article 9.5, 2nd period, has the following wording:

"It is not consistent with the employment relationship that the employee has economical, commercial- or work related interests in or with another competing company without prior written permission from the company."

Defendant 2 (Henrik Klæbæk):

Defendant 2 commenced employment with plaintiff on January 1, 2005, as Senior Engineer, Hardware, reporting to defendant 1.

Defendant 2's work consisted in the substantial of development and launch as well as subsequent maintenance of the platform for plaintiff's "Beowulf recorder" – a miniature SSR. Furthermore, the work consisted of project management, contact with suppliers, development of customer specifications, conducting customer adjustments, diagram drawings and print layout.

As part of the maintenance of the platform, defendant 2 covered customers' needs for changes and further developments of existing products as well as development of new products within the recording area. To illustrate defendant 2's tasks in this regard, the case's exhibit 16 is presented as a copy of defendant 2's travel report from his visit at plaintiff 1's American distributor November 6-11, 2006.

Defendant 2 had, due to his function, the contact to and the responsibility for Michael Gjern's development of the "Beowulf recorder," cf. below regarding defendants negotiations with Michael Gjern.

The technology that is behind the "Beowulf recorder" shaped the basis for the development, by plaintiff 1, of the planned video recorder.

DELACOUR

011

Defendant 2 participated in strategic considerations regarding internal development of a video recorder contra acquiring existing company, cf. below regarding defendant 2's studies of a competing American company for use in plaintiff 1's decision regarding acquiring the company.

Defendant 2 gained through his employment a thorough knowledge of plaintiff 1's know-how, including plaintiff 1's way of collecting data, encryption and compression factors as well as customer and competitor circumstances and pricing of development projects at plaintiff 1.

Regarding systems, defendant 2 had read-access to plaintiff 1's accounting system.

Defendant 2 had in this way both access to and insight in a very critical part of plaintiff 1's commercial secrets, at least not regarding the customers' needs and experiences, plaintiff 1's recorder products as well as plaintiff 1's strategic and business related considerations and studies regarding the marketing of video surveillance products.

The employment contract is presented as the case's exhibit 17. The employment contracts article 13.3 is worded as follows:

"The employee has duty of confidentiality, both during the employment as well as after it is terminated, with regards to the company's business and operations circumstances, its technical experiences, working methods, production efforts or similar and not for own or others advantage to use your knowledge of the company's circumstances in general."

The employment contracts article 13.5, 2nd period, has the following wording:

"It is not consistent with the employment relationship that the employee has economical, commercial- or work related interests in or with another competing company without prior written permission from the company."

Defendant 3 (Kent Messerschmidt):

Defendant 3 commenced at plaintiff 1 on November 13, 2006, as software project leader reporting to defendant 1. Defendant 3 was hired by recommendation from defendant 1, since defendant 1 had a close and private relationship with defendant 3 and previously had worked with defendant 3.

Defendant 3's work consisted of software project management. Defendant 3 was therefore project manager on one of plaintiff 1's major development projects. It was also defendant 3's task to systemize and create structure in plaintiff 1's software development generally.

Regarding systems, defendant 3 had read-access to the accounting system.

Despite defendant 3's short employment period, it must be assumed that defendant 3 gained insight into plaintiff 1's commercial secrets, at least not when it is considered that defendant 3 during at least

DELACOUR

the latter half of his employment has known that he was to start a competing business and therefore has had an obvious interest to obtain insight in circumstances of use to the operation of defendant 4.

The employment contract is presented as the case's exhibit 18. The employment contracts article 13.3 is worded as follows:

"The employee has duty of confidentiality, both during the employment as well as after it is terminated, with regards to the company's business and operations circumstances, its technical experiences, working methods, production efforts or similar and not for own or others advantage to use your knowledge of the company's circumstances in general."

The employment contract's article 13.5. 2. period, is worded as follows:

"It is not consistent with the employment relationship that the employee has economical, commercial or work-related interests in or with another competing company without prior written permission from the company."

—oOo—

Defendant 1, 2 as well as 3, were by plaintiff 1 suspended from duty on February 28, 2007 and were subsequently not present at the workplace hereafter. Formally they all resigned on March 31, 2007 in accordance with their applicable notices.

By identical letters of March 5, 2007, addressed to defendants 1, 2 and 3 respectively, plaintiff 1 repeated the for the defendants applicable secrecy and confidentiality obligations, cf. copy of the letter to defendant 1, which is presented as the case's exhibit 19.

Defendant 4 (Covidence A/S):

As the case's exhibit 20 is presented copy of printout from the Danish Commerce and Companies Agency, where it appears that defendant 1, 2 and 3 with start date of April 2, 2007 established defendant 4, Covidence A/S.

From defendant 4's website on the Internet (www.covidence.dk) it appears that defendant 4 designs, develops and produces miniature video surveillance equipment for police, intelligence services, special forces and other government approved organizations. Furthermore, it appears that defendant 4 offers the miniature video solution "Miniature Solid State Video Recorders" and "Miniature Wireless Video" for use for surveillance as well as other development of customer specific products and solutions.

Copy of printout from defendant 4's website is presented as the case's exhibit 21.

As the case's exhibit 22 is presented copy of updated budget for defendant 4. From the budget it appears that defendant 4, apart from the above-mentioned video recorder also budgets with income from sale of sound surveillance products, cf. account item "Audio recorder."

DELACOUR.

Defendant 4 therefore promotes – or intends to promote – products completely equivalent to plaintiff 1's existing products or products that the plaintiff has under development. Furthermore, defendant 4 intends to promote products completely similar to plaintiff 2's and 3's existing products.

Defendant 4 has in April, 2007, hired additional 3 of plaintiff 1's employees. Defendant has in this way hired:

1) Niels-Ole Pedersen, who has been employed as development engineer at plaintiff 1 since December 1, 1994 and who also in recent years reported to defendant 1. Niels-Ole Petersen was, through his many years of employment at plaintiff 1, tasked with developing hardware, especially including products within radio communication. Niels-Ole Pedersen gained, through his employment at plaintiff 1, thorough knowledge of and experience regarding plaintiff 1's products, including the way in which plaintiff 1 assembles the various components. Niels-Ole Pedersen has furthermore, throughout his entire employment, regularly had extensive customer contact, since he has been involved in defining customer demands and development from the concept phase to presentation of the finished design, as well as spending time with customers to solve technical problems.

2) Ulrich Sørensen commenced employment, reporting to defendant 1, as development engineer May 1, 2004. Ulrich Sørensen functioned as programmer for recorders and protocols for the wireless products. He gained, through his employment at plaintiff 1, detailed knowledge of and experience regarding plaintiff 1's products, including regarding the way plaintiff 1 assembles the various components, as well as of the by plaintiff 1 utilized encryption and compression algorithms, as well as not least detailed knowledge of the unique industry related demands that are stipulated for verification of evidence.

The employment contract is presented as the case's exhibit 23. The employment contract's article 13.7 (3rd paragraph under "13. Other regulations ("Øvrige bestemmelser)") is worded as follows:

"The employee has duty of confidentiality, both during the employment as well as after it is terminated, with regards to the company's business and operations circumstances, its technical experiences, working methods, production efforts or similar and not for own or others advantage to use your knowledge of the company's circumstances in general."

The employment contract's article 13.5, 2nd period is worded as follows:

"It is not consistent with the employment relationship that the employee has economical, commercial- or work-related interests in or with another competing company without prior written permission from the company."

3) Kim Torbjørn Schjødt, who, reporting to defendant 1, commenced employment at plaintiff 1 as development engineer on September 11, 2006. Kim Torbjørn Schjødt was at plaintiff 1 tasked with microprocessor programming with the intention of producing a software tool to

DELACOUR

014

establish a configurations program as well as interface for one of plaintiff 1's major development projects.

The employment contract is presented as the case's exhibit 24. The employment contracts article 13.3 is worded as follows:

"The employee has duty of confidentiality, both during the employment as well as after it is terminated, with regards to the company's business and operations circumstances, its technical experiences, working methods, production efforts or similar and not for its own or others advantage to use your knowledge of the company's circumstances in general."

The employment contracts article 13.5. 2. period, is worded as follows:

"It is not consistent with the employment relationship that the employee has economical, commercial- or work related interests in or with another competing company without prior written permission from the company."

On March 12, 2007 Ulrich Sørensen and Kim Torbjørn Schjødt participated in a highly confidential meeting with two specialists representing plaintiff 1's largest and most important end-user. The purpose of the meeting was that the two specialists would provide confidential information about this most important end-users completely unique demands for the method that is used for gathering, storage and presentation of sound and video, in order for the legal system to accept specific evidence as being 100% correct. ts exhibit 25 is presented the minutes of the meeting. Prior to the meeting, the representatives' boss, Terry Andersen, presented demands for the technical circumstances of substantial importance for the future usage of miniature "undercover" surveillance equipment, which demands defendant 2 commented on in the non-dated document that is presented as the case's exhibit 26.

A few days before their resignation, Ulrich Sørensen and Kim Torbjørn Schjødt also participated in a seminar with two previous "undercover" agents – a police agent and a military agent. The two previous "undercover" agents represented plaintiff 1's most professional collaborator/end-user, regarding the usage of the type of equipment produced by plaintiff 1. The seminar in this way provided vital knowledge of miniature "undercover" surveillance equipment in relation to current experiences and needs in relation to subsequent presentation of evidence. A knowledge the relevant parties could not, under any circumstances, have gained had they not been employed by a company that was well established in the market for mission-critical surveillance equipment. As the case's exhibit 27 is attached copy of e-mail from April 20, 2007, with the heading "applikationstræning" containing the program of the meeting.

The 3 employees in question all resigned their positions with plaintiff 1 on May 31, 2007, and commenced employment with defendant 4 on June 1, 2007.

Defendant 4 today, with defendant 1, 2 and 3 as well as the named additional 3 employees, commands a total of 6 employees. All these employees came directly from plaintiff 1. With the subsequent three employments, defendant 4 commands an almost complete insight into all functions both on the

DELACOUR

015

technical and functional areas of plaintiff 1's business. That means an insight that is beyond regularly obtainable professional knowledge.

As mentioned above, the knowledge of usage of technologies on the market for electronic surveillance equipment for use in mission critical situations is critical to enter and sustain market shares on the market for surveillance equipment for use in mission critical situations, and plaintiff 1's and 2's know-how concerning sound surveillance products as well as plaintiff 2's and 3's know-how regarding video surveillance products are directly applicable to the development of electronic video surveillance products.

Since defendant 4 commands an – at least approximately – complete knowledge of both technology as well as business-related and commercial circumstances regarding both plaintiff 1's and 2's sound surveillance products as well as the upcoming video surveillance as well as plaintiff 2's and plaintiff 3's existing video surveillance products, and since the usage of plaintiff 1's, 2's and 3's know-how as well as other commercial secrets is critical for defendant 4's entrance to the relevant market, the plaintiff's commercial secrets will surely or at least most likely be abused in defendant 4's enterprise.

**Market barriers**

The market is characterized by unusually high market barriers.

The customers are characterized by operating in a very closed and extremely secret dominated environment. Access to the market requires the creation of a trust relationship through documentation of knowledge of customer needs and documentation of technical ability and quality.

The market is therefore characterized by everything depending on trust. Trust in that the products function when intelligence people put their life at risk to prevent terror and reveal organized crime. Trust in that the suppliers understand to treat information regarding its customers at a high confidentiality level as well as trust in that the needed support immediately is extended when the specific mission demands it. To obtain this trust demands many years of concentrated and dedicated effort, and there is no room for mistakes.

Inside the industry the unwritten "law" applies that you in no way use references. Even though it therefore could be a considerable factor for sales that the plaintiffs could refer to sales to several important intelligence organizations in North America, the plaintiffs – like the other market players – do not utilize this, since the plaintiffs would then break the trust-code that is the premise for being a successful player in the industry.

The industry can be described as a sort of "club" – a club where membership depends on goodwill achieved through many years of good specialist, technical and professional efforts as well as personal trust relationships.

DELACOUR

016

Knowledge of customers' needs and experiences is of critical importance to the presence on the surveillance market. It is the customers' experiences from surveillance operations that trigger new ideas, improvements and changes in existing products.

Access to the market, therefore, requires that you have been part of the "club," for example as a former chief of an intelligence organization, or as a former leading employee at a recognized company within the industry. To start a company within the plaintiffs' industry without possessing the above-mentioned qualifications or without exuberant financial means would therefore be doomed to fail.

*Defendants' initiatives towards customers and suppliers, etc., with relevance to this case.*

<u>ELSY</u>

ELSY, a check developer and producer of surveillance systems is one of plaintiff 1's important suppliers. Shortly before defendant 1 commenced employment, ELSY had developed digital systems – called "Loke," which plaintiff 1 gained worldwide exclusive marketing rights for. Jiri Krcmar is ELSY's most important product developer and is as such a very central person in relation to "Loke."

In 2006 defendant 1 was tasked with negotiating an agreement with ELSY with the content that plaintiff 1 should have exclusive marketing rights for all the products that ELSY had developed and might develop in the future.

Defendant 1 in this connection expressed that it was critical that Jiri Krcmar was part of the agreement and therefore that the agreement was conditioned on his continued employment at ELSY, since the right in the opposite case would not be of interest.

The negotiations between defendant 1 and ELSY failed in November, 2006. CFO Poul Reinholdt thereafter took over the responsibility for the negotiations. In connection with the transfer of the negotiations, Poul Reinholdt asked defendant 1 what the status in relation to Jiri's involvement in the agreement was, whereto defendant 1 surprisingly replied that Jiri was not crucial for the value of the rights.

Plaintiff 1 would later realize that this "U-turn" in relation to Jiri Krcmar's importance to the collaboration with ELSY was caused by defendant 1's interest in – through defendant 4 – to attach close relations to Jiri Krcmar

<u>Jiri Krcmar's "Omega"</u>

Jiri Krcmar has at own accord developed a analog video surveillance system. The product is called "Omega." Plaintiff 1 was in the fall of 2006 offered worldwide marketing rights for "Omega" with a "first right of refusal," which expired on December 24, 2006. Defendant 1 was tasked with compiling a brief on Omega. The brief "Omega Video Background" is compiled by defendant 1 in November, 2006. The brief is attached as <u>exhibit 28.</u> The brief shows, among other things, how the product will fit into the Group's product portfolio in the area defendant 1 had full knowledge of. At the "Surveillance Management

# DELACOUR

017

Team" meeting on December 4, 2006 defendant 1 expressed that there was not among his staff time to test the "Omega" product. Copy of the meeting minutes from the specific meeting is presented as the case's exhibit 29. Plaintiff 1's Managing Director, Kim Lehmann, insisted however that the product should be purchased, the reason the topic on the agenda for the board meeting on December 12, 2006. The agenda is put together on December 8, 2006 and has been attached as exhibit 30. Defendant 1 was made aware that the brief regarding Omega and its place in the Group's product portfolio in the area was on the agenda for the above mentioned board meeting. Defendant 1 hereafter contacted Kim Lehmann by telephone and informed him that it was now his opinion that the quality of the product was now too poor, causing him to recommend that plaintiff 1 should not purchase the rights for Omega. This resulted in that plaintiff 1 lost its "first right of refusal."

Plaintiff 1 has, after defendant 1's resignation, found that defendant 1 on behalf of defendant 4 in March, 2007 had negotiations with Jiri Krcmar regarding worldwide rights for "Omega."

It appears in "Working document between Jiri Krcmar and Spectronic" of May 2, 2007, which is presented as the case's exhibit 31, that defendant 1 on behalf of defendant 4 in April, 2007 asked Jiri Krcmar about the possibility of purchasing up to 30 systems. Furthermore, it appears from the document that has been signed by Jiri Krcmar that all communication was in writing and that defendant 1 and Jiri Krcmar agreed to delete all e-mails.

As the case's exhibit 32 is also presented copy of e-mail correspondence of June 11, 2007 between sales Director, Steen Gammelgaard, to Dave Tilton. The latter was previously employed at the plaintiffs' vendor in the USA, Gans & Pugh, but has now established his own trading company, Brimtek. According to the correspondence, defendant 1 has contacted Dave Tilton regarding Dave Tilton's possible negotiation of "Omega" for defendant 4.

<u>Knowledge of American business in connection with plaintiff 1's purchase of the specific company.</u>

In the fall of 2006 plaintiff 1 initiated the purchase of an American company. Adaptive Digital Systems Inc. (ADS) – a privately held company that delivers video surveillance equipment primarily to the American investigative and intelligence services.

On September 26, 2006, ADS and plaintiff 1 signed a Non-Disclosure Agreement with the purpose that plaintiff 1 could undertake investigations of ADS regarding the company's circumstances. Copy of the agreement is presented as exhibit 33. Defendant 1 and defendant 2 hereafter separately visited the company in September and December, 2006, to gain detailed knowledge of their technologies, products, competencies, strategies, customer relations, pricing, etc.

Defendant 1 visited together with managing director, Kim Lehmann, ADS at the end of September, 2006. In October 2006, Kim Lehmann together with defendant 1 compiled an "Executive Brief" containing facts, evaluations and recommendations for use for the Group's decision regarding a possible purchase of the company. Copy of the document is presented as the case's exhibit 34. As exhibit 35 is presented copy of mail correspondence, which documents defendant 1's active participation in the evaluation.

DELACOUR

After defendant 2's visit at ADS on December 5th and 6th, 2006, defendant 2 developed a report that is presented as the case's <u>exhibit 36</u>. The report contains a detailed technical description of ADS' digital video recorder.

Both defendant 1 as well as defendant 2 therefore gained insight in highly sensitive information regarding ADS' products and business. As mentioned above, defendant 4 today markets products similar to ADS'.

<u>MiTek Elektronics (hereafter MiTek) by/Michael Gjern</u>

The owner of MiTek, Michael Gjern, was an employee of plaintiff 1 in the period from August, 1999, when he commenced employment as a newly educated electronics engineer, until July 31, 2004. During his employment he developed a concept for a digital recorder, which plaintiff 1 took over the rights for in the beginning of 2004. Michael Gjern resigned right after this his position to initially take other employment and later establish the consultant company MiTek. In his role as consultant for plaintiff 1, he developed in collaboration with plaintiff 1's development team managed by defendant 2 the digital recorder that has since 2006 been marketed and sold as the "Beowulf recorder."

As previously mentioned the plaintiffs' know-how is directly applicable to the development of video products for the surveillance market and Michael Gjern, on the basis of his knowledge of the existing digital recorder, developed a video recorder – the so-called Solid State Video Recorder, which plaintiff 1 was first made aware of in March 2007, when Michael Gjern himself contacted plaintiff 1 about this.

Defendant 1, 2 and 3, meanwhile, knew about Michael Gjern's development at a far earlier stage.

Defendant 1, 2 and 3 already contacted Michael Gjern in February 2007, meaning before their resignations, with the intention of including him in defendant 4 – as a consultant or otherwise. Defendant 4 negotiated hereafter primo February 2007, with Michael Gjern/MiTek regarding the rights for the video recorder. The negotiations failed due to disagreements. As <u>exhibit 37</u> is presented copy of e-mail sent from Michael Gjern to Kim Lehmann on June 13th, 2007. In the e-mail Michael Gjern confirms that he, in the period from January 19th to February 21st, 2007, has received about 50 e-mails from and sent about 40 e-mails to defendant 1, 2 or 3.

Defendant 1, 2 and 3 therefore concealed – during their employment with plaintiff 1 and therefore while still under loyalty obligation to plaintiff 1 – highly relevant information regarding Michael Gjern's development of the video recorder. Information that had it been in the possession of plaintiff 1, would have naturally resulted in plaintiff 1 would have started negotiations with Michael Gjern regarding the rights for the video recorder. The failure to disclose – as it appeared from the above mentioned – was caused by defendant 1's, 2's and 3's wish to use Michael Gjern's invention for own gain.

**DELACOUR**

The NATIA and MILIPOL trade fairs

Plaintiff 1, 2 and 3 have been made aware that defendant 4 is intending to be present at or in connection with the trade fairs NATIA and MILIPOL, which take place in July 2007 in USA and in October in Paris, respectively. Exhibit 38 is presented a printout of the participant list at MILIPOL, where it appears that defendant 4 is intending to participate. The plaintiffs are therefore aware that defendant 4 will primarily try to participate at the fairs themselves, and alternatively – in case this is not possible – to set up in the area around the fairs, including, for example, nearby hotels.

The specific fairs are definitely the most important trade fairs in the industry and constitute a considerable "display window." The plaintiffs, therefore, also for this reason have a clear interest in imposing an expedient end to the defendant's business.

**ALLEGATIONS:**

To support the claims it is asserted,

that     defendant 1, 2 and 3 by their employment has assumed a non-limited duty to keep secret those circumstances around the plaintiffs' operations that are not available to the public.

that     defendant 1, 2 and 3, through their employment at plaintiff 1 have gained detailed knowledge of and expertise about elements that can be characterized as commercial secrets, in particular commercial secrets regarding the customers' needs and experiences as well as the subsequent knowledge about how technologies are assembled to fill customers' needs,

that     defendant 1 and 2, through their employment, gained detailed knowledge of the strategy, technology and products within video Solid State Recorders and that they, during their employment at plaintiff 1, were the people who knew the most about this.

that     it is similarly applicable that Niels-Ole Pedersen, Ulrich Sørensen and Kim Torbjørn Schjødt through their employment at plaintiff 1 have gained detailed knowledge of and expertise regarding circumstances that can be characterized as commercial secrets,

that     at least all defendants' total knowledge regarding plaintiff 1, 2 and 3 constitute a commercial secret.

that     defendant 1, 2 and 3 already during their employment at plaintiff 1 established and planned their competing business and carried out competitive actions, including through utilizing plaintiff 1's commercial secrets,

that     defendant 1, 2 and 3 during their employment at plaintiff 1 behaved most disloyal and in substantial ways disregarded plaintiffs' interests,

# DELACOUR

that — the obligation to not use or transmit commercial secrets is and will be violated through the operation of defendant 4,

that — the operation of defendant 4 will constitute both a violation of the duties of confidentiality contained in the employment contracts and of the Danish Marketing Practices Act's § 19,

that — the operation of defendant 4 furthermore will constitute a violation to the Danish Marketing Practices Act § 1 regarding bona fide and established marketing practices, since defendant 4 in its marketing is piggybacking on the plaintiffs' goodwill,

that — the conditions for imposing injunction are fulfilled, since

- the actions that are sought prohibited are against the rights of the plaintiffs,
- defendant 1, 2, 3 and 4, will execute actions that are sought prohibited,
- the purpose will be wasted in case the plaintiffs are referred to claim their rights at regular court
- the law's regular rules regarding punishment and compensation and a possible defendant offer indemnity will not sufficiently protect the plaintiff,
- an injunction will not cause defendants damage or inconvenience that is in clear disproportion to the plaintiffs' interest in the injunction being imposed

Aarhus, July 6, 2007

Attorney Anders Hedetoft

by/attorney Lene Lange Gammelgaard

# DELACOUR

003

J.nr  172560/LLG/SLU

## BEGÆRING
## OM
## FOGEDFORBUD

Som advokat for

Spectronic Denmark A/S
CVR-nr  13 44 98 48
Skindbjergvej 44
8500 Grenaa
(herefter kaldet rekvirent 1)

og

DTC Communications Inc
486 Amherst Street
Nashua, NH 03063
USA
(herefter kaldet rekvirent 2)

og

Domo Ltd
Manor Court, Barnes Wallis Road
Segensworth, Hampshire
PO15 5 TH
United Kingdom
(herefter kaldet rekvirent 3)

(v/advokat Anders Hedetoft)

DELACOUR Advokatfirma
Tel  +45) 70 11 11 22
Fax  +45) 70 11 11 33
www.delacour.dk
CVR-nr  48 15 31 18

København
Hammerensgade 1
DK-1267 København K

Århus
Lille Torv 6, Box 505
DK-8100 Århus C

Medlem af 
- et internationalt netværk
af uafhængige advokatfirmaer

# DE  COUR

004

skal jeg herved anmode
Fogedretten i Randers om overfor

Jimmi Mogelvang Hansen
Lyngdalvej 56
8500 Grenaa
(herefter kaldet rekvisitus 1)

og

Henrik Klebæk
Storegade 31
8500 Grenaa
(herefter kaldet rekvisitus 2)

og

Kent Messerschmidt
Parkvej 30
8900 Randers
(herefter kaldet rekvisitus 3)

og

Covidence A/S
CVR-nr 30 49 27 65
Åkærsvej 1
8410 Rønde
(herefter kaldet rekvisitus 4)

at nedlægge fogedforbud i henhold til følgende:

## PÅSTANDE:

Principalt:

Rekvisitus 1, 2, 3 og 4 forbydes hver især og helt eller delvist i forening, i en periode på 5 år
fra den 1. april 2007, subsidiært i en af fogedretten fastsat kortere periode, direkte eller indi-
rekte at udbyde, sælge, udleje eller levere lyd- og video optagerprodukter samt trådløse lyd-
og videoovervågningsprodukter til politi-, militær- eller efterretningsmyndigheder i ind- og ud-
land;

- 2 -

# DE  COUR

005

Subsidiært (sideordnet):

1.  Rekvisitus 1, 2, 3 og 4 forbydes hver især og helt eller delvist i forening, i en periode på 5 år fra den 1. april 2007, subsidiært i en af fogedretten fastsat kortere periode, direkte eller indirekte at udbyde, sælge, udleje eller levere lyd- og video optagerprodukter samt trådløse lyd- og videoovervågningsprodukter til de i bilag 1 opregnede kunder.

2.  Rekvisitus 1, 2, 3 og 4 forbydes hver især og helt eller delvist i forening, i en periode på 5 år fra den 1. april 2007, subsidiært i en af fogedretten fastsat kortere periode, direkte eller indirekte at samarbejde med de i bilag 2 opregnede leverandører og samarbejdspartnere med henblik på fremstilling af lyd og video optagere samt trådløse lyd- og videoovervågningsprodukter til brug for elektronisk overvågning.

Forbudet begæres nedlagt principalt uden sikkerhedsstillelse, subsidiært mod en af fogedretten fastsat sikkerhedsstillelse.

## ANMODNING OM LUKKEDE DØRE:

Rekvirenterne anmoder om, at sagen føres for lukkede døre, jf. retsplejelovens § 29, nr. 3, idet sagen omhandler erhvervshemmeligheder, og idet det i sagen fremlagte materiale i betydeligt omfang indeholder fortrolige data.

## SAGSFREMSTILLING:

### Indledning

Denne sag handler om rekvirent 1's tidligere medarbejdere, rekvisitus 1, 2 og 3's opstart af en med rekvirenterne konkurrerende virksomhed (i form af rekvisitus 4) med udvikling og leverance af produkter til efterretningsmarkedet. De tre tidligere medarbejdere har i rekvisitus 4 ansat yderligere 3 medarbejdere, der ligeledes forlod rekvirent 1 for at tage ansættelse hos rekvisitus 4.

Rekvisitus 4 markedsfører -- eller agter at markedsføre -- produkter fuldstændig svarende til rekvirent 1's eksisterende produkter eller produkter, som rekvirent 1 har under forberedelse. Endvidere agter rekvisitus 4 at markedsføre produkter fuldstændig svarende til rekvirent 2's og 3's eksisterende produkter.

Sagen handler som følge heraf om overtrædelse af markedsføringslovens § 1 om god markedsføringsskik samt misbrug af erhvervshemmeligheder, jf. markedsføringslovens § 19 og de aftalte hemmeligholdelsesforpligtelser.

Sagen handler således om misbrug af Spectronics erhvervshemmeligheder bestående i viden om kundernes behov og erfaringer med anvendelse af elektronisk overvågningsudstyr samt viden om,

- 3 -

# DE  COUR

006

hvordan teknologier kombineres og komponenter sammensættes for at opfylde kundernes behov, herunder også viden om, hvordan og i hvilke affekter overvågningsudstyret indbygges på skjult vis.

### Rekvirenternes virksomhed

Siden 1983 har rekvirent 1 drevet virksomhed med levering af produkter og ydelser inden for elektro-nisk overvågningsudstyr til politimyndigheder, militære myndigheder og andre organer indenfor efter-retningstjeneste.

I mere end to årtier har rekvirent 1 således opereret med regeringer og regerings-godkendte efter-forsknings- og efterretningstjenester samt regeringsgodkendte forhandlere over hele verden, og rekvi-rent 1 udgør i dag en af branchens absolut førende producenter af lydovervågningsudstyr samt leve-randør af internet- og telekommunikations monitorerings-løsninger.

Rekvirent 1 er i mange henseender markedsleder indenfor for sit meget niche orienterede produktom-råde. Rekvirent 1 har opnået denne position ved gennem 24 år at have opbygget et meget tæt samar-bejde med sine kunder, i hvilken forbindelse der henvises til afsnittet nedenfor vedrørende markeds-barrierer.

Rekvirent 1 har siden november 2004 været en del af den engelske Cobham koncern med rekvirent 2 som rekvirent 1 s umiddelbare moderselskab og rekvirent 3 som søsterselskab. Cobham koncernen er en international koncern engageret i udvikling, levering og supportering af avanceret luftrums- og for-svarssystemer, herunder overvågningssystemer. Rekvirent 2 og 3 driver primært virksomhed med ud-vikling og markedsføring af videovervågningsprodukter.

Rekvirenternes virksomhed er baseret dels på salg af egenudviklede produkter, dels på markedsfø-ringsrettigheder til leverandørprodukter. Rekvirenternes udviklingsvirksomhed er baseret på brugerori-enteret innovation, der bygger på et indgående kendskab til kunderne og kundernes behov samt ind-sigt i anvendelsen af den nyeste gennemprøvede teknologi.

Rekvirenterne indgår alle i Cobham koncernens LENS-gruppe (Law Enforcement and National Securi-ty). LENS-gruppen er en meget afgrænset gruppe af selskaber, som opererer indenfor overvågnings-udstyr til politimyndigheder, militære myndigheder og andre organer indenfor efterretningstjeneste.

### Rekvirenternes produkter og strategi

Rekvirent 1 s pjecer vedrørende rekvirentens virksomhed samt nuværende produktspektrum fremlæg-ges som sagens bilag 3 og 4. Som det fremgår, består rekvirent 1 s lyd-overvågningsudstyrsprodukter af:

- "Solid State Recordere" (forkortes SSR), dvs. optagere uden bevægelige dele (uden bånd), eksempelvis Beowulf.
- "Wireless" dvs. trådløse lydovervågningsprodukter (såvel analog som digital), eksempelvis Inka, Loke og Thor.
- Wired lydovervågningsprodukter, eksempelvis Heimdahl, ACC, RFM, RMM og AWM

DE · COUR

007

- Samt hybrider af ovennævnte produkter

Følgende forhold – beskrevet i hovedtræk – adskiller rekvirent 1 og rekvirent 1's produkter fra konkurrenterne:

- Den nyeste teknologi anvendes. Rekvirent 1 har herved opnået at minimere størrelsen på den elektroniske hardware til den mindste i verden uden at gå på kompromis med hverken lydkvalitet eller teknisk/mekanisk kvalitet. Rekvirent 1 har endvidere herved opnået mulighed for i enhver situation at kunne tilbyde kunder at videre transmittere det opsamlede bevismateriale ved brug af den nyeste teknologi.

- Recorder produkterne er kendetegnede ved, at de har et krypteret vandmærke til validering af optagelsens ægthed. Dette krypterede vandmærke holdes hemmeligt af rekvirent 1.

- Rekvirent 1 har gennem de forgangne 24 år opbygget et helt specielt forhold til de mange kunder og slutbrugere, som rekvirent 1 har på verdensplan. Forholdet til kunderne og slutbrugerne er således kendetegnet ved en tæt dialog, der giver et unikt indblik i, hvordan hverdagen for politimanden, efterretningsmanden, soldaten eller undercover agenten forløber. Den tætte kontakt og dialog betyder endvidere, at rekvirent 1 i meget høj grad har indsigt i og forståelse for, hvilken funktionalitet og hvilke features, kunderne har brug for. Den tætte kontakt gennem årene har tillige affødt så stor tillid, at rekvirent 1 de senere år i stigende grad har modtaget specifikke udviklingsopgaver på nye produkter.

- Rekvirent 1's produkter er kendetegnet ved meget høj brugervenlighed. Rekvirent 1 har således formået at skabe noget af det mest avancerede inden for branchen, men samtidig at bevare det simple og brugervenlige koncept, hvilket er helt centralt i lyset af at træningstiden, som brugerne har til rådighed, ofte kan tælles i minutter og ikke timer eller dage. Samtidig opererer brugerne under et stort psykisk pres, som fordrer, at udstyret er simpelt og brugervenligt, for at operationen skal lykkes.

- Den design linje, som rekvirent 1 følger i dag, har ramt plet i brugernes bevidsthed. Det enkle sorte og "ruggedized" design virker appellerende, og opfylder samtidig kravene til holdbarhed og muligheden for at kunne skjule produktet. Der er en genkendelighed i hele produktprogrammet, og en kunde kan således umiddelbart via designet adskille rekvirent 1's design fra konkurrenternes.

Som sagens bilag 5 fremlægges kopi af uddrag af rekvirent 1's strategiplan for 2007-2011, der er under implementering. Af uddraget fremgår, at lanceringen af en "digital video recorder" udgør en del af rekvirent 1's strategiplan. Det pågældende uddrag af strategiplanen er forfattet af rekvisitus 1.

Som sagens bilag 6 fremlægges "power point presentation" udarbejdet af rekvisitus 1 i februar 2006 vedrørende udviklingen af en digital video recorder baseret på den såkaldte "Thor SSR" platform, som er under udvikling hos rekvirent 1. Rekvisitus 1 og 3 har deltaget i denne udvikling. Som sagens bilag 7 fremlægges en af rekvisitus 1 udarbejdet præsentation vedrørende mulige veje til betydelige omsætningsstigninger indenfor overvågningsområdet. Af bilag 7 fremgår, at rekvirent 1 skal markedsføre

- 5 -

# DE _ COUR

008

video-produkter – såvel i form af en SSR som en trådløs version, herunder at SSR versionen kan ba-
seres på "Thor spin off", dvs. på teknologier, viden og erfaring fra Thor-projektet. Som sagens bilag 8
fremlægges et af rekvisitus 1 udarbejdet "white paper" indeholdende en teknisk beskrivelse samt en
beskrivelse af udviklingsprojektet vedrørende rekvirentens "Beowulf Digital Video Recorder".

Rekvirent 1 har således gennem længere tid såvel i form af strategiske, forretningsmæssige som tek-
niske undersøgelser og overvejelser arbejdet på lanceringen af video-overvågningsprodukter.

Rekvirenternes knowhow, dvs. viden om anvendelse af teknologier på markedet for elektronisk over-
vågningsudstyr til brug for missionskritiske situationer, er en afgørende forudsætning for at entrere vi-
deo-overvågningsmarkedet, og rekvirent 1's knowhow vedrørende lydovervågnings-produkterne er di-
rekte anvendelig på udviklingen af elektroniske videoovervågningsprodukter. Forskellen mellem de to
typer overvågningsudstyr er alene, at både et videokamera og en mikrofon er tilkoblet recorderen på
video-overvågningsproduktet, mens alene en mikrofon er tilkoblet recorderen på det rene lydovervåg-
nings-produkt, samt at datakomprimeringsformen er forskellig.

Rekvirent 1's umiddelbare moderselskab, DTC Communications (rekvirent 2) og rekvirent 1's søster-
selskab, Domo (rekvirent 3), har gennem mange år udviklet og markedsført trådløse videoovervåg-
ningsprodukter. Rekvirent 2 markedsfører er af de førende video recorder produkter, der er tilgænge-
ge på markedet. Som sagens bilag 9 og 10 fremlægges kopi af rekvirent 2's produkthæfte og som sa-
gens bilag 11 fremlægges kopi af rekvirent 3's produkthæfte. Der eksisterer således betydelig viden
og erfaring omkring video produkterne i koncernens LENS-gruppe.

### Rekvirenternes erhvervshemmeligheder og beskyttelsen heraf

En væsentlig del af de informationer og den viden, som rekvirenterne er i besiddelse af, er enten mili-
tært eller nationalt klassificerede information med de heraf følgende strenge krav til håndtering, opbe-
varing og videregivelse.

For øvrigt materiale og øvrige data fra kunder, leverandører og andre samarbejdspartnere gælder det,
at der stort set uden undtagelse foreligger fortrolighedsaftaler, der forpligter Spectronic til at hemme-
ligholde modtagne informationer og alene anvende dem til det i fortrolighedsaftalen specificerede for-
mål.

Det er en betingelse for ansættelse hos rekvirenterne, at medarbejderen kan sikkerhedsgodkendes til
henholdsvis Fortroligt og Hemmeligt niveau.

Kendskabet til rekvirent 1's produkter og deres funktionalitet mv. er forbeholdt kunderne og rekviren-
terne, da produkterne ellers ville miste deres værdi. Rekvirent 1's hjemmeside indeholder således hel-
ler ikke information omkring de enkelte produkters funktionalitet mv., ligesom pjecemateriale til brug for
messer og lignende alene indeholder en kort og meget overordnet beskrivelse af produkterne, jf. såle-
des også bilag 3 og 4.

Rekvirent 1's recorder produkter er kendetegnede ved, at de har et krypteret vandmærke til validering
at optagelsens ægthed. Dette krypterede vandmærke holdes hemmeligt af rekvirent 1.

# DE  COUR

009

*Rekvisiti*

Den 25. februar 2007 opsagde rekvisitus 1 og 2 deres stillinger og den 26. februar 2007 rekvisitus 3 sin stilling hos rekvirent 1 for at påbegynde egen virksomhed - rekvisitus 4.

Rekvisitus 1 (Jimmi Møgelvang Hansen):

Rekvisitus 1 tiltrådte stillingen som leder af overvågningsområdet den 1. januar 2003. Rekvisitus 1 fungerede senere som udviklingsdirektør med reference til den administrerende direktør, Kim Lehmann.

Rekvisitus 1 var i sit job ansvarlig for udviklingen af elektroniske produkter (hardware og software) indenfor området for såvel trådløst som ikke-trådløst overvågningsudstyr, herunder recordere.

Rekvisitus 1 fik under sin ansættelse et meget betydeligt indblik i rekvirentens knowhow, herunder i sammensætning af komponenter til overvågningsprodukter på markedet for missionskritisk overvågning og markedet for recordere.

Rekvisitus 1 fik et nært forhold til nogle af de vigtigste af rekvirent 1's kunder og samarbejdspartnere og et indgående kendskab til kundernes erfaringer og heraf afledte behov.

Rekvisitus 1 havde via sin stilling som udviklingsdirektør fuldstændigt indblik i rekvirent 1's strategi, forretningsplaner og prisforhold. Rekvisitus 1 deltog således blandt andet i strategiske overvejelser om egenudvikling af en video recorder contra opkøb af bestående virksomhed, jf. ovenfor samt bilag 6-9 og nedenfor vedrørende rekvisitus 1's undersøgelser af en konkurrerende amerikansk virksomhed og anbefalinger til brug for rekvirentens beslutning om køb af virksomheden.

Rekvisitus 1 har indgående fulgt den teknologiske udvikling i koncernen, og han havde fuld adgang til koncernens teknologi, produktudviklinger og kommercielle forhold. Til eksempel kan nævnes, at rekvisitus 1 deltog i teknologimøder i koncernens LENS-gruppe, der primært arbeder med "Law Enforcement and National Security". Rekvisitus 1 gennemgik i 2006 således rekvirent 2 og rekvirent 3's overvågnings-produkter med henblik på opnåelse af synergieffekt ved at være medlem af LENS-gruppen. Af referat fra teknologimøde i LENS-gruppen den 19. og 20. september 2006, der fremlægges som sagens bilag 12, fremgår det af side 9, at rekvirent 1, der var repræsenteret ved rekvisitus 1 blandt andet skulle dele information omkring protokoller med de øvrige LENS-medlemmer. Af bilag 13 fremgår det, at rekvisitus 1 bekræfter sin deltagelse i mødet. Af bilag 14 fremgår det, at rekvisitus 1 har haft opfølgende arbejdsopgaver efter sin deltagelse i mødet.

Systemmæssigt havde rekvisitus 1 som led i sin direktørstilling adgang til rekvirent 1's kundesystem (Superoffice). I kundesystemet findes al korrespondance med kunder. Han havde desuden adgang til rekvirent 1's regnskabssystem (Axapta), hvori blandt andet kundeordrer forefindes, ligesom han havde adgang til kundedatabasen, indeholdende stamoplysninger og kontaktinformationer på kunderne.

**DE  COUR**

010

Rekvisitus 1 havde således såvel ubegrænset læseadgang til som indsigt i den væsentligste del af rekvirentens erhvervshemmeligheder, herunder tekniske, økonomiske, kommercielle og kunderelaterede erhvervshemmeligheder.

Udviklingsafdelingen bestod - på tidspunktet for rekvisitus 1's opsigelse - af 16 medarbejdere.

Ansættelseskontrakten fremlægges som sagens bilag 15. Ansættelseskontraktens pkt. 9.3 har følgende ordlyd:

"Medarbejderen har tavshedspligt, såvel under ansættelsen som efter dens ophør, med hensyn til firmaets forretnings- og driftsforhold, dets tekniske erfaringer, arbejdsmetoder, fabrikationsforsøg eller lignende og hverken til egen eller udenforståendes fordel at benytte dit kendskab til firmaets forhold i det hele taget"

Ansættelseskontraktens pkt. 9.5, 2. punktum, har følgende ordlyd:

"Det er ikke foreneligt med ansættelsesforholdet, at medarbejderen har økonomiske, erhvervs- eller arbejdsmæssige interesser i eller med anden konkurrerende virksomhed uden forudgående skriftlig tilladelse fra virksomheden."

Rekvisitus 2 (Henrik Kiæbæk):

Rekvisitus 2 tiltrådte hos rekvirent 1 den 1. januar 2005 som Senior Engineer, Hardware, med reference til rekvisitus 1.

Rekvisitus 2's arbejde bestod i det væsentlige i udvikling og lancering samt efterfølgende vedligeholdelse af platformen til rekvirentens "Beowulf recorder" – en miniature SSR. Endvidere bestod arbejdet i projektledelse, kontakt til leverandører, udarbejdelse af kundespecifikationer, udførelse af kundetilpasninger, diagramtegning og printudlægning.

Som led i vedligeholdelsen af platformen afdækkede rekvisitus 2 kundernes behov for ændringer og videreudviklinger af bestående produkter samt udvikling af nye produkter indenfor recorderområdet. Til illustration af rekvisitus 2's arbejde i den henseende fremlægges som sagens bilag 16 kopi af rekvisitus 2's rejserapport fra dennes besøg hos rekvirent 1's amerikanske distributør den 6 – 11. november 2006.

Rekvisitus 2 havde i kraft af sin funktion kontakten til og ansvaret for Michael Gjerns udvikling af "Beowulf recorderen", jf. nedenfor om rekvisiti forhandlinger med Michael Gjern.

Den teknologi, der ligger bag "Beowulf recorderen", danner grundlag for udviklingen af den af rekvirent 1 planlagte video recorder.

# DE   COUR

011

Rekvisitus 2 var involveret i strategiske overvejelser om egenudvikling af en video recorder contra op-
køb af bestående virksomhed, jf. nedenfor vedrørende rekvisitus 2's undersøgelser omkring konkurre-
rende amerikansk virksomhed til brug for rekvirent 1's beslutning om køb af virksomheden.

Rekvisitus 2 opnåede under sin ansættelse et indgående kendskab til rekvirent 1's knowhow, herun-
der rekvirent 1's måde at opsamle data på, krypterings- og komprimeringsfaktorer samt til kunde- og
konkurrentforhold og prissætning af udviklingsprojekter hos rekvirent 1.

Systemmæssigt havde rekvisitus 2 læseadgang til rekvirent 1's regnskabssystem.

Rekvisitus 2 havde således både adgang til og indsigt i en meget væsentlig del af rekvirent 1's er-
hvervshemmeligheder, ikke mindst vedrørende kundernes behov og erfaringer, rekvirent 1's recorder-
produkter samt rekvirent 1's strategiske og forretningsmæssige overvejelser og undersøgelser vedrø-
rende markedsføringen af videoovervågningsprodukter.

Ansættelseskontrakten fremlægges som sagens bilag  17. Ansættelseskontraktens pkt. 13.3 har føl-
gende ordlyd:

"Medarbejderen har tavshedspligt, såvel under ansættelsen som efter dens ophør, med hensyn til fir-
maets forretnings- og driftsforhold, dets tekniske erfaringer, arbejdsmetoder, fabrikationsforsøg eller
lignende og hverken til egen eller udenforståendes fordel at benytte dit kendskab til firmaets forhold i
det hele taget"

Ansættelseskontraktens pkt. 13.5. 2. punktum har følgende ordlyd:

"Det er ikke foreneligt med ansættelsesforholdet, at medarbejderen har økonomiske, erhvervs- eller
arbejdsmæssige interesser i eller med anden konkurrerende virksomhed uden forudgående skriftlig til-
ladelse fra virksomheden."

Rekvisitus 3 (Kent Messerschmidt)

Rekvisitus 3 tiltrådte hos rekvirent 1 den 13. november 2006 som software projektleder med reference
til rekvisitus 1. Rekvisitus 3 blev ansat på rekvisitus 1's anbefaling, da rekvisitus 1 havde et nært og
privat forhold til rekvisitus 3 og tidligere havde arbejdet sammen med rekvisitus 3.

Rekvisitus 3's arbejde bestod i software projektledelse. Rekvisitus 3 var således projektleder på et af
rekvirent 1's store udviklingsprojekter. Det var ligeledes rekvisitus 3's opgave at skabe systematik og
struktur i rekvirent 1's softwareudvikling generelt.

Systemmæssigt havde rekvisitus 3 læseadgang til regnskabssystemet.

På trods af rekvisitus 3's kortvarige ansættelse må det antages, at rekvisitus 3 har fået indsigt i rekvi-
rent 1's erhvervshemmeligheder, ikke mindst, når der henses til, at rekvisitus 3 i løbet af i hvert fald

- 9 -

## DE ... COUR

012

den sidste halvdel af sin ansættelse har vist, at han skulle starte konkurrerende virksomhed og derfor har haft en oplagt interesse i at opnå indsigt i forhold af betydning for driften af rekvisitus 4.

Ansættelseskontrakten fremlægges som sagens bilag 18. Ansættelseskontraktens pkt. 13.3 har følgende ordlyd:

"Medarbejderen har tavshedspligt, såvel under ansættelsen som efter dens ophør, med hensyn til firmaets forretnings- og driftsforhold, dets tekniske erfaringer, arbejdsmetoder, fabrikationsforsøg eller lignende og hverken til egen eller udenforståendes fordel benytte sit kendskab til firmaets forhold i det hele taget."

Ansættelseskontraktens pkt. 13.5, 2. punktum har følgende ordlyd:

"Det er ikke foreneligt med ansættelsesforholdet, at medarbejderen har økonomiske, erhvervs- eller arbejdsmæssige interesser i eller med anden konkurrerende virksomhed uden forudgående skriftlig tilladelse fra virksomheden."

--oOo--

Såvel rekvisitus 1, 2 og 3 blev af rekvirent 1 den 28. februar 2007 suspenderet fra tjenesten og var følgelig ikke til stede på arbejdspladsen herefter. Formelt fratrådte de alle først den 31. marts 2007 i henhold til deres gældende opsigelsesvarsler.

Ved ensidende breve af 5. marts 2007 til henholdsvis rekvisitus 1, 2 og 3 gengav rekvirent 1 de for rekvisiti gældende hemmeligholdelses- og fortrolighedsforpligtelser, jf. således kopi af brevet til rekvisitus 1, der fremlægges som sagens bilag 19.

Rekvisitus 4 (Covidence A/S)

Som sagens bilag 20 fremlægges kopi af udskrift fra Erhvervs- og Selskabsstyrelsen, hvoraf fremgår, at rekvisitus 1, 2 og 3 med stiftelsesdato den 2. april 2007 etablerede rekvisitus 4 Covidence A/S.

Af rekvisitus 4's hjemmeside på Internettet (www.covidence.dk) fremgår det, at rekvisitus 4 designer, udvikler og producerer miniature video overvågningsudstyr til politi, efterretningstjenester, specialstyrker og andre regeringsgodkendte organisationer. Det fremgår endvidere, at rekvisitus 4 tilbyder miniature video løsninger; "miniature Solid State Video Recorders" og "miniature Wireless Video" til brug for overvågning samt i øvrigt udvikling af kundespecifikke produkter og løsninger.

Kopi af udskrift fra rekvisitus 4's hjemmeside fremlægges som sagens bilag 21.

Som sagens bilag 22 fremlægges kopi af udateret budget for rekvisitus 4. Af budgettet fremgår, at rekvisitus 4 udover den ovenfor beskrevne video recorder tillige budgetterer med indtægter ved salg af lydovervågningsprodukter, jf. regnskabsposten "Audio recorder".

# DE  COUR

013

Rekvisitus 4 markedsfører således – eller agter at markedsføre – produkter fuldstændig svarende til rekvirent 1's eksisterende produkter eller produkter, som rekvirent 1 har under forberedelse. Endvidere agter rekvisitus 4 at markedsføre produkter fuldstændig svarende til rekvirent 2's og 3's eksisterende produkter.

Rekvisitus 4 har i april 2007 ansat yderligere 3 af rekvirent 1's medarbejdere. Rekvisitus 4 har således ansat:

1) Niels-Ole Pedersen, der har været ansat som udviklingsingeniør hos rekvirent 1 siden 1. december 1994 og har ligeledes de seneste år refereret til rekvisitus 1. Niels-Ole Pedersen var gennem sin mangeårige ansættelse hos rekvirent 1 beskæftiget med udvikling af hardware, herunder i særdeleshed produkter indenfor radiokommunikation. Niels-Ole Pedersen opnåede gennem sin ansættelse hos rekvirent 1 indgående kendskab til og erfaring vedrørende rekvirent 1's produkter, herunder til måden, hvorpå man hos rekvirent 1 sammensætter de enkelte komponenter. Niels-Ole Pedersen har desuden gennem hele sit ansættelsesforløb løbende haft stor kundekontakt, idet han har været involveret i definering af kundekrav og udvikling fra konceptfasen til præsentation af det færdige design, ligesom han har opholdt sig hos kunder for at løse tekniske problemer.

2) Ulrich Sørensen tiltrådte, med reference til rekvisitus 1, som udviklingsingeniør den 1. maj 2004. Ulrich Sørensen fungerede som programmør til recordere og protokoller til de trådløse produkter. Han opnåede gennem sin ansættelse hos rekvirent 1 indgående kendskab til og erfaring vedrørende rekvirent 1's produkter, herunder vedrørende måden, hvorpå man hos rekvirent 1 sammensætter de enkelte komponenter samt til de af rekvirent 1 anvendte krypterings- og komprimeringsalgoritmer samt ikke mindst indgående kendskab til de unikke branchemæssige krav der stilles til verifikation af bevismateriale.

Ansættelseskontrakten fremlægges som sagens bilag 23. Ansættelseskontraktens pkt. 13.7 (3. afsnit under "13. Øvrige bestemmelser") har følgende ordlyd:

"Medarbejderen har tavshedspligt, såvel under ansættelsen som efter dens ophør, med hensyn til firmaets forretnings- og driftsforhold, dets tekniske erfaringer, arbejdsmetoder, fabrikationsforsøg eller lignende og hverken til egen eller udenforståendes fordel at benytte sit kendskab til firmaets forhold i det hele taget."

Ansættelseskontraktens pkt. 13.5. 2. punktum, har følgende ordlyd:

"Det er ikke foreneligt med ansættelsesforholdet, at medarbejderen har økonomiske erhvervs- eller arbejdsmæssige interesser i eller med anden konkurrerende virksomhed uden forudgående skriftlig tilladelse fra virksomheden."

3) Kim Torbjørn Schjødt, der med reference til rekvisitus 1 tiltrådte hos rekvirent 1 som udviklingsingeniør den 11. september 2006. Kim Torbjørn Schjødt var hos rekvirent 1 beskæftiget med mikroprocessor programmering med henblik på tilvejebringelse af software værktøj til

DE  COUR

014

etablering af et konfigurationsprogram, samt brugerinterface til et af rekvirent 1's store udviklingsprojekter

Ansættelseskontrakten fremlægges som sagens bilag 24. Ansættelseskontraktens pkt. 13.3 har følgende ordlyd:

"Medarbejderen har tavshedspligt såvel under ansættelsen som efter dens ophør, med hensyn til firmaets forretnings- og driftsforhold, dets tekniske erfaringer, arbejdsmetoder, fabrikationsforsøg eller lignende og hverken til egen eller uderforståendes fordel at benytte dit kendskab til firmaets forhold i det hele taget"

Ansættelseskontraktens pkt. 13.5. 2. punktum, har følgende ordlyd:

"Det er ikke foreneligt med ansættelsesforholdet, at medarbejderen har økonomiske, erhvervs- eller arbejdsmæssige interesser i eller mod anden konkurrerende virksomhed uden forudgående skriftlig tilladelse fra virksomheden."

Den 12. marts 2007 deltog Ulrich Sørensen og Kim Torbjørn Schjødt i et meget fortroligt møde med to specialister repræsenterende rekvirent 1's største og vigtigste slutbruger. Mødets formål var at de to specialister skulle komme med fortrolige informationer om denne vigtigste slutbrugers helt unikke krav til den metode, der benyttes til indsamling, lagring og præsentation af lyd (audio) og video, for at retssystemet accepterer de pågældende beviser som værende 100% korrekte. Som bilag 25 fremlægges referat fra mødet. Forud for mødet havde repræsentanternes chef, Terry Andersen, præsenteret krav til de tekniske forhold af væsentlig betydning for den fremtidige anvendelse af miniature "undercover" overvågningsudstyr, hvilke krav rekvisitus 2 kommenterede på i det udaterede dokument, der fremlægges som sagens bilag 26.

Få dage forinden deres opsigelse deltog Ulrich Sørensen og Kim Torbjørn Schjødt endvidere i et seminar med to forhenværende "undercover" agenter – en politiagent og en militæragent. De to forhenværende "undercover" agenter repræsenterede rekvirent 1's mest professionelle samarbejdspartner/slutbruger, når det drejer sig om brugen af den type udstyr, der fremstilles af rekvirent 1. Seminaret gav således vital viden om anvendelse af miniature "undercover" overvågningsudstyr i relation til aktuelle erfaringer og behov i relation til efterfølgende bevisførelse. En viden, som de pågældende under ingen omstændigheder ville kunne have opnået, hvis ikke de havde været ansat i virksomheden, der var veletableret på markedet for missionskritisk overvågningsudstyr. Som sagens bilag 27 vedlægges kopi i e-mail af 20. april 2007 med overskriften "applikationstræning", indeholdende program for mødet.

De pågældende 3 medarbejdere fratrådte alle hos rekvirent 1 den 31. maj 2007 og tiltrådte hos rekvisitus 4 den 1. juni 2007

Rekvisitus 4 råder i dag med rekvisitus 1, 2 og 3 samt de nævnte yderligere 3 ansatte over i sit 6 medarbejdere. Alle disse medarbejdere kommer direkte fra rekvirent 1. Med de efterfølgende tre ansættelser råder rekvirent 4 over en tilnærmelsesvis komplet indsigt i samtlige funktioner både på den

DE   COUR

015

tekniske og funktionelle side af rekvirent 1's virksomhed. Det vil sige en indsigt der rækker langt ud over almindelig tilgængelig faglig viden.

Som nævnt ovenfor er viden om anvendelse af teknologier på markedet for elektronisk overvågnings-udstyr til brug for missionskritiske situationer en afgørende forudsætning for at entrere og opretholde markedsandele på markedet for overvågningsudstyr til brug for missionskritiske situationer, og rekvirent 1 og 2's knowhow vedrørende lydovervågnings-produkterne samt rekvirent 2 og rekvirent 3's knowhow vedrørende videoovervågnings-produkter er direkte anvendelig på udviklingen af elektroniske videoovervågningsprodukter.

Idet rekvisitus 4 råder over en – i hvert fald tilnærmelsesvis - komplet viden om såvel teknologi som forretningsmæssige og kommercielle forhold vedrørende såvel rekvirent 1 og 2's lydovervågningspro-dukter som de forestående videoovervågningsprodukter samt rekvirent 2 og rekvirent 3's eksisterende videoovervågningsprodukter, og idet anvendelse af rekvirent 1, 2 og 3's knowhow samt andre er-hvervshemmeligheder er afgørende for rekvisitus 4's entre på det relevante marked, vil rekvirenternes erhvervshemmeligheder med en til vished grænsende sandsynlighed blive misbrugt i rekvisitus 4's virksomhed.

*Markedsbarrierer*

Markedet er kendetegnet ved usædvanligt høje markedsbarrierer.

Kunderne er kendetegnede ved at operere i et meget lukket og yderst hemmelighedspræget miljø. Adgang til markedet forudsætter skabelse af et tillidsforhold gennem dokumentation af kendskab til kundebehov og dokumentation af teknisk kunnen og kvalitet.

Markedet er således kendetegnet ved, at alt afhænger af tillid. Tillid til at produkterne fungerer, når ef-terretningsfolk sætter deres liv på spil for at forhindre terror og afsløre organiseret kriminalitet. Tillid til at leverandørerne forstår at behandle informationer vedrørende sine kunder på et højt fortrolighedsni-veau, samt tillid til at den fornødne support omgående bliver ydet, når den pågældende mission kræ-ver det. At opnå denne tillid kræver mange års koncentreret og dedikeret indsats, og der er ikke plads til fejltagelser.

Inden for branchen gælder den klare uskrevne "lov", at man på ingen måder bruger referencer. Selv-om det således kunne være en betydende faktor for salg, at rekvirenterne kunne referere til salg til fle-re betydende efterretnings-organisationer i Nordamerika, gør rekvirenterne – ligesom de øvrige mar-kedsaktører – ikke brug heraf, da rekvirenterne i så fald ville bryde det tillidskodeks, der er forudsæt-ningen for at være succesfuld aktør i branchen.

Branchen kan karakteriseres som værende en form for 'klub' - en klub hvor medlemskabet afhænger af goodwill opnået gennem mange års god faglig, teknisk og professionel indsats samt personligt til-lidsforhold.

# DE · COUR

Indsigt i kundernes behov og erfaringer er af afgørende betydning for tilstedeværelsen på overvågningsmarkedet. Det er således kundernes erfaringer fra overvågningsoperationer, der afstedkommer nye ideer, forbedringer og ændringer af bestående produkter.

Adgang til markedet forudsætter derfor, at man har været en del af "klubben", eventuelt som tidligere chef for en efterretningsorganisation, eller som tidligere ledende medarbejder for en anerkendt virksomhed indenfor branchen. At starte virksomhed indenfor rekvirenternes branche uden at være i besiddelse af ovenstående kvalifikationer eller uden eksorbitante økonomiske midler vil således være dømt til at mislykkes.

*Rekvisiti tiltag overfor kunder og leverandører mv. med relevans for denne sag*

ELSY

ELSY, en tjekkisk udvikler og producent af overvågningssystemer, er en af rekvirent 1's betydende leverandører. Kort forinden rekvisitus 1 tiltrådte, havde ELSY udviklet digitale systemer – kaldet "Loke" som rekvirent 1 opnåede verdensomspændende eksklusive markedsføringsrettigheder til. Jiri Kromar er ELSY's mest betydende produktudvikler og som sådan en meget central person i forhold til "Loke".

I 2006 fik rekvisitus 1 til opgave at forhandle en aftale med ELSY på plads med det indhold, at rekvirent 1 skulle have eksklusive markedsføringsrettigheder til samtlige de produkter, som ELSY havde udviklet og måtte udvikle i fremtiden.

Rekvisitus 1 gav i den forbindelse udtryk for, at det var afgørende, at Jiri Kromar var en del af aftalen og dermed at aftalen betingedes af hans fortsatte ansættelse hos ELSY, da rettighederne, modsat fald ikke ville være interessante.

Forhandlingerne mellem rekvisitus 1 og ELSY kulminerede i november 2006. Økonomichef Poul Reinholdt overtog herefter ansvaret for forhandlingerne. I forbindelse med overdragelsen af forhandlingerne spurgte Poul Reinholdt rekvisitus 1 hvad status i forhold til Jiris involvering, aftalen var, hvortil rekvisitus 1 overrraskende svarede, at Jiri ikke var afgørende for værdien af rettighederne.

Rekvirent 1 måtte senere indse, at denne "kovending" i forhold til Jiri Kromars betydning for samarbejdet med ELSY skyldtes rekvisitus 1's interesse i – gennem rekvisitus 4 – at knytte tætte bånd til Jiri Kromar

Jiri Kromars "Omega"

Jiri Kromar har i eget regi udviklet et analogt video surveillance system. Produktet kaldes 'Omega' Rekvirent 1 fik i efteråret 2006 tilbudt world wide markedsføringsrettigheder til "Omega" med en "first right of refusal" som udløb den 24. december 2006. Rekvisitus 1 blev sat til at udarbejde et notat om Omega. Notatet "Omega Video Background" er udarbejdet af rekvisitus 1 i november 2006. Notatet er vedlagt som bilag 28. Notatet viser blandt andet, hvorledes produktet vil passe ind i koncernes produktportefølje på området, som rekvisitus 1 havde fuldt kendskab til. På "Surveillance Management

# DE   COUR

017

"Team"-mødet den 4. december 2006 gav rekvisitus 1 udtryk for, at der ikke blandt hans medarbejdere var tid til at teste "Omega"-produktet. Kopi af mødereferatet fra det pågældende møde fremlægges som sagens bilag 29. Rekvirent 1's administrerende direktør Kim Lehmann insisterede imidlertid på at produktet burde købes, hvorfor emnet var på dagsordenen til bestyrelsesmødet den 12. december 2006. Dagsordenen er udarbejdet den 8. december 2006 og er vedlagt som bilag 30. Rekvisitus 1 blev gjort bekendt med, at notatet omkring Omega og dets indplacering i koncernens produktportefølje på området, var på dagsordenen for det pågældende bestyrelsesmøde. Rekvisitus 1 kontaktede herefter telefonisk Kim Lehmann og meddelte nu, at han mente, at kvaliteten af produktet var for dårlig, hvorfor han anbefalede, at rekvirent 1 ikke skulle købe rettighederne til Omega. Dette resulterede i, at rekvirent 1 mistede sin "first right of refusal".

Rekvirent 1 har efter rekvisitus 1's fratrædelse konstateret, at rekvisitus 1 på vegne af rekvisitus 4 i marts 2007 havde forhandlinger med Jiri Kromar om verdensomspændende rettigheder til "Omega".

Det fremgår således af "Working document between Jiri Kromar og Spectronic" af 2. maj 2007, der fremlægges som sagens bilag 31, at rekvisitus 1 på vegne af rekvisitus 4 i april 2007 forespurgte Jiri Kromar om mulighed for at købe op til 30 systemer. Det fremgår endvidere af dokumentet, der er underskrevet af Jiri Kromar, at al kommunikation var på skrift, og at rekvisitus 1 og Jiri Kromar blev enige om at slette alle e-mails.

Som sagens bilag 32 fremlægges endvidere kopi af e-mail korrespondance af 11. juni 2007 mellem salgsdirektør Steen Gammelgaard til Dave Tilton. Sidstnævnte var tidligere ansat hos rekvirentens forhandler i USA, Gans & Pugh, men har nu etableret sin egen forhandlervirksomhed, Brimtek. Ifølge e-mail korrespondancen har rekvisitus 1 kontaktet Dave Tilton vedrørende Dave Tiltons mulige forhandling af "Omega" for rekvisitus 4.

Indsigt i amerikansk virksomhed i forbindelse med rekvirent 1's køb af den pågældende virksomhed

I efteråret 2006 indledte rekvirent 1 købet af et amerikansk selskab, Adaptive Digital Systems Inc. (ADS) - en privatejet virksomhed, der leverer videoovervågningsudstyr primært til de amerikanske efterforsknings- og efterretningstjenester.

Den 26. september 2006 underskrev ADS og rekvirent 1 en Non-disclosure Agreement med henblik på, at rekvirent 1 kunne foretage undersøgelse af ADS omkring virksomhedens forhold. Kopi af aftalen fremlægges som bilag 33. Rekvisitus 1 og rekvisitus 2 besøgte herefter hver især i september og december 2006 selskabet for at få indgående indsigt i deres teknologier, produkter, kompetencer, strategier, kundeforhold, prissætning mv.

Rekvisitus 1 besøgte således sammen med administrerende direktør Kim Lehmann ADS i slutningen af september 2006. I oktober 2006 udarbejdede Kim Lehmann i samarbejde med rekvisitus 1 et Executive Brief indeholdende fakta, vurderinger og anbefalinger til brug for koncernens afgørelse omkring et eventuelt køb af selskabet. Kopi af dokumentet fremlægges som sagens bilag 34. Som bilag 35 fremlægges kopi af mailkorrespondance, der dokumenterer rekvisitus 1's aktive deltagelse i vurderingen.

# DE COUR

018

Efter rekvisitus 2's besøg hos ADS den 5. og 6. december 2006 udarbejdede rekvisitus 2 en rapport, der fremlægges som sagens bilag 36. Rapporten indeholder en udførlig teknisk beskrivelse af ADS' digitale video recorder.

Såvel rekvisitus 1 som rekvisitus 2 fik således indsigt i særdeles sensitiv information vedrørende ADS' produkter og forretning. Som nævnt ovenfor, markedsfører rekvisitus 4 i dag produkter svarende til ADS'.

## MiTek Elektronics (herefter MiTek) v/Michael Gjern

Indehaveren af MiTek, Michael Gjern, var ansat hos rekvirent 1 i perioden fra august 1999, hvor han tiltrådte som nyuddannet elektronikingeniør til den 31. juli 2004. Under sin ansættelse udviklede han et koncept for en digital recorder, som rekvirent 1 overtog rettighederne til i begyndelsen af 2004. Michael Gjern opsagde umiddelbart herefter sin stilling, for først at tage anden ansættelse og siden at etablere konsulentvirksomheden MiTek. I sin egenskab af konsulent for rekvirent 1 færdigudviklede han i samarbejde med rekvirent 1's udviklingsteam ledet af rekvisitus 2 den digitale recorder, der siden 2006 er blevet markedsført og solgt som 'Beowulf recorderen'.

Som nævnt tidligere er rekvirenternes knownow direkte anvendelig på udviklingen af videoprodukter til overvågningsmarkedet, og Michael Gjern udviklede på baggrund af sin viden om den eksisterende digitale recorder en video recorder – den såkaldte Solid State Video Recorder, hvilket rekvirent 1 først blev bekendt med i marts 2007, da Michael Gjern selv henvendte sig til rekvirent 1 herom.

Rekvisitus 1, 2 og 3 var imidlertid bekendte med Michael Gjerns seneste udvikling på et langt tidligere tidspunkt.

Rekvisitus 1, 2 og 3 kontaktede således allerede i februar 2007, dvs. forinden deres opsigelser, Michael Gjern med henblik på at inddrage ham i rekvisitus 4 – som konsulent eller på anden vis. Rekvisitus 4 forhandlede herefter primo februar 2007 med Michael Gjern/MiTek om rettighederne til video recorderen. Forhandlingerne kuldsejlede imidlertid på grund af uenighed. Som bilag 37 fremlægges kopi af e-mail sendt fra Michael Gjern den 13. juni 2007 til Kim Lehmann. I mailen bekræfter Michael Gjern, at han i perioden fra 19. januar til 21. februar 2007 har modtaget ca. 50 e-mails fra og sendt ca. 40 e-mails til rekvisitus 1, 2 eller 3.

Rekvisitus 1, 2 og 3 fortiede således – under deres ansættelse hos rekvirent 1, og således mens deres loyalitetsforpligtelse overfor rekvirent 1 fortsat bestod - yderst væsentlig information omkring Michael Gjerns udvikling af video recorderen. En information som, hvis den havde været i rekvirent 1's besiddelse, helt naturligt ville have resulteret i, at rekvirent 1 ville påbegynde forhandlinger med Michael Gjern om rettighederne til video recorderen. Fortielsen skyldtes – som det vil være fremgået af det ovenstående – at rekvisitus 1, 2 og 3 ønskede at udnytte Michael Gjerns opfindelse til egen vinding.

# DE  COUR

NATIA og MILIPOL messerne

Rekvirent 1, 2 og 3 er blevet gjort bekendt med, at rekvisitus 4 agter at være til stede på eller i tilknytning til messerne NATIA og MILIPOL, der afholdes i, henholdsvis juli 2007 i USA og i oktober i Paris. Som bilag 38 fremlægges udskrift af deltagerliste på MILIPOL, hvoraf fremgår, at rekvisitus 4 agter at deltage. Rekvirenterne er således bekendt med, at rekvisitus 4 primært vil forsøge at deltage på selve messerne, og subsidiært – såfremt dette ikke måtte være muligt – at tage opstilling i området omkring messerne, herunder eksempelvis på de nærliggende hoteller.

De pågældende messer er de absolut vigtigste messer indenfor branchen og udgør et væsentligt "udstillingsvindue". Rekvirenterne har således også af denne grund en oplagt interesse i hurtigt at få rekvisiti virksomhed stoppet.

## ANBRINGENDER:

Til støtte for de nedlagte påstande gøres det gældende,

at       rekvisitus 1, 2 og 3 ved deres ansættelse har påtaget sig en tidsubegrænset pligt til at hemmeligholde forhold omkring rekvirenternes virksomhed, der ikke er offentligt tilgængelige,

at       rekvisitus 1, 2 og 3 gennem deres ansættelse hos rekvirent 1 har fået indgående kendskab til og viden om forhold, der kan karakteriseres som erhvervshemmeligheder, herunder i særdeleshed erhvervshemmeligheder vedrørende kundernes behov og erfaringer samt den heraf følgende viden om, hvordan teknologier sammensættes for at opfylde kundernes behov.

at       rekvisitus 1 og 2 gennem deres ansættelse opnåede dyb indsigt i strategien, teknologien og produkterne indenfor video Solid State Recorders, og at de under deres ansættelse hos rekvirent 1 var de personer, der vidste mest herom.

at       det tilsvarende gælder, at Niels-Ole Pedersen, Ulrich Sørensen og Kim Torbjørn Schjødt gennem deres ansættelse hos rekvirent 1 har fået indgående kendskab til og viden om forhold, der kan karakteriseres som erhvervshemmeligheder.

at       i hvert fald rekvisiti samlede sum af viden omkring rekvirent 1, 2 og 3 udgør en erhvervshemmelighed,

at       rekvisitus 1, 2 og 3 allerede under deres ansættelse hos rekvirent 1 etablerede og tilrettelagde deres konkurrerende virksomhed og udførte konkurrencehandlinger, herunder gennem benyttelse af rekvirent 1's erhvervshemmeligheder,

at       rekvisitus 1, 2 og 3 under deres ansættelses hos rekvirent 1 optrådte yderst illoyalt og på væsentlig vis tilsidesatte rekvirenternes interesser.

- 17 -

# DE  COUR

020

at  forpligtelsen til ikke at benytte eller viderebringe erhvervshemmeligheder er og vil blive overtrådt gennem driften af rekvisitus 4,

at  driften af rekvisitus 4 vil indebære dels en overtrædelse af de i rekvisiti ansættelseskontrakter indeholdte tavshedsforpligtelsesbestemmelser, og dels af markedsføringslovens § 19,

at  driften af rekvisitus 4 desuden vil indebære en overtrædelse af markedsføringslovens § 1 om god markedsføringsskik, idet rekvisitus 4 i sin markedsføring snylter på rekvirenternes goodwill,

at  betingelserne for nedlæggelse af fogedforbud er opfyldte, idet

- de handlinger, der søges forbudt, strider mod rekvirenternes ret,
- rekvisitus 1, 2, 3 og 4 vil foretage de handlinger, der søges forbudt,
- formålet vil være forspildt, såfremt rekvirenterne henvises til at gøre sin ret gældende ved almindelig rettergang
- lovens almindelige regler om straf og erstatning og eventuelt en af rekvisiti tilbudt sikkerhed ikke yder rekvirenten tilstrækkeligt værn
- et fogedforbud ikke vil påføre rekvisiti skade eller ulempe, der står i åbenbart misforhold til rekvirenternes interesse i forbudets nedlæggelse.

Århus, den 6. juli 2007

advokat Anders Hedetoft
v/advokat Lene Lange Gammelgaard

- 18 -

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SPECTRONIC DENMARK A/S, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | No. 1:05-CV-00590 (PLF) |
| ) | |
| v. ) | |
| ) | |
| JIMMI M. HANSEN, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF JIMMI M. HANSEN

I, Jimmy M. Hansen, hereby declare as follows:

1.      I am the Chief Executive Officer of Defendant Covidence A/S ("Covidence"), a Danish company with its principal place of business in Ronde Denmark.  Covidence develops, markets, and sells high quality miniature video surveillance equipment to police forces, intelligence agencies, military organizations and other law enforcement agencies worldwide.  I have been the Chief Executive Officer of Covidence since its founding in April 2007.  I am a Danish citizen resident in Denmark, as are my co-Defendants Kent Messerschmidt and Henrik Klebaek.

2.      Prior to the founding of Covidence, I was the Director of Development for Plaintiff Spectronic Denmark A/S ("Spectronic").  In that position, I had oversight for Spectronic's research and development of surveillance products.  Along with Kent Messerschmidt and Henrik Klebaek, I resigned from Spectronic on February 26, 2007 and formed Covidence on April 2, 2007.

**Exhibit C**

3.     Plaintiffs' Verified Complaint in this action accuses the Defendants of stealing Plaintiffs' trade secrets. This is not true. The Defendants have not taken anything from Plaintiffs nor have they used knowledge of trade secrets from their prior employment at Spectronic to develop, market, or sell Covidence products. In fact, in the Denmark lawsuit that I will discuss below, Spectronic's Chief Executive Officer, Kim Lehmann, testified under oath that he did not have any knowledge of anything that had been stolen from Spectronic by the Defendants.

4.     Paragraph 92 of Plaintiffs' Verified Complaint alleges that "[o]ne of the knock-off and/or stolen products unlawfully marketed in this jurisdiction by the defendants is the so-called "Oculus" video recorder." This allegation is false. The Oculus product developed by Covidence is a miniature video recorder (8x52x27 millimeters) for body-worn applications. At the time Defendants left Spectronic, none of the Plaintiffs had a product on the market similar to Oculus, or even such a product in development. Indeed, it had been Spectronic's strategic business decision to limit its product range to audio products.

5.     The Oculus recorder is the first Covidence product ready for worldwide distribution. Therefore, Covidence has, as of the date of this Declaration, not sold any video recorders in the United States.

6.     Plaintiffs' Verified Complaint alleges at Paragraph 33 that Spectronic had a strategic plan, prior to Defendants' departure from Spectronic, to develop video recording equipment. This is not true. The document relied on by Spectronic for this contention is a proposed strategy plan that represented the wishes of Spectronic's engineering department, and was not approved by Spectronic's board of directors. No actions toward developing video recording products were initiated by Spectronic until after Defendants left Spectronic's employ.

7.      In the Danish lawsuit that will be discussed in detail below, Spectronic's Chief Executive Officer, Kim Lehmann testified under oath that Spectronic launched its first video recorder development program in July/August 2007, several months after Defendants left Spectronic, and that Spectronic expected to begin selling its new product in the first quarter of 2008. I have since been advised from persons in the marketplace that Spectronic's development of a video recorder is delayed and that Spectronic will not be ready to sell its own video recorder product until December 2008.

8.      Thus, it is my belief that Spectronic has sought a temporary restraining order and preliminary injunction against Covidence in this Court in the hope of delaying Covidence's entry into the United States market with its Oculus device until Spectronic can complete its development of its own competing video recording device.

9.      Defendants have not used any trade secrets Plaintiffs might have in developing any of Covidence's other products either.

10.     Plaintiffs' Verified Complaint alleges, solely on information and belief, that Defendants misappropriated information from Spectronic's computer systems. This allegation is false. Plaintiffs identify two computer systems to which they allege Defendants were granted access by Spectronic: the Axapta system and the SuperOffice system. Defendants Klebaek and Messerschmidt did not have access to SuperOffice, and their access to Axapta was the same access enjoyed by Spectronic's other employees. Defendants have not used customer information or any other information obtained through the authorized use of Spectronic's computer systems at Covidence, nor did Defendants engage take any information from Spectronic's computer systems without authority.

11.    It is unclear to me why Plaintiffs DTC Communications, Inc., and Domo, Ltd., are parties to this case. None of the Defendants ever worked for these entities. None of the Defendants had access to either company's computer systems. None of the Defendants have used or disclosed any information relating to either of these companies. The business of these two companies is to develop and sell wireless video products, and Covidence does not develop or sell wireless video products, a fact to which Defendants testified under oath in the Danish proceeding. Plaintiffs have presented the Court with an outdated page from Covidence's website to suggest that Covidence is in the business of developing and selling wireless video solutions. The statement on Covidence's website has been amended to make clear that Covidence does not develop and sell wireless video solutions.

12.    The three individual Defendants had employment contracts with Spectronic. These contracts were the same types of contracts entered into by Spectronic's approximately 80 other employees. As the plain language in Paragraphs 63-64, 75-76, and 85-86 of the Verified Complaint makes clear, the provisions in Defendants' employment contracts did not impose post-employment restrictions on Defendants in terms of covenants not to compete or a customer limitation provision. Indeed, in the Danish case, the Danish court did not find that Defendants had breached their employment contracts in any way during the proceedings on the Danish temporary restraining order, and Defendants have not done anything in forming and operating Covidence that is a breach of our employment contracts.

13.    Paragraph 94 of the Verified Complaint alleges that Covidence "has begun a campaign to raid the plaintiffs of their employees." This statement is false. In the year that Covidence has existed, a total of three Spectronic employees have left that company and joined

Covidence. During that same time period, Spectronic has lost more than twenty employees to other companies. Covidence is not embarked on a campaign to raid Spectronic's employees.

14.     Paragraph 129 of the Verified Complaint discusses the lawsuit filed in Denmark by this same set of Plaintiffs against this same set of Defendants, but the discussion is incomplete. Plaintiffs sought an injunction that would have entirely prohibited Defendants from competing against Defendants for a period of five years. Plaintiffs did not get that relief. The court granted a preliminary injunction that prohibited Defendants from doing business for a three-year period with a specified list of companies, a list that includes just two (2) companies located in the United States: Brimtek Inc. and Ganz & Pugh. Defendants continue to contest the Danish case continues and the court ultimately will either confirm the preliminary injunction entered against Defendants or enter judgment in Defendants' favor. Although the preliminary injunction sought by Plaintiffs was narrowed by the Danish court to an injunction solely restricting Defendants from doing business with specified companies, Plaintiffs did not appeal the injunction order. Defendants did not appeal the preliminary injunction because they could live with the restrictions imposed by the Danish court. The two United States companies covered by the Danish preliminary injunction, Brimtek Inc. and Ganz & Pugh, are not expected to attend the trade show in Washington, D.C.

15.     It is Defendants' intention to comply with the terms of the Danish injunction until such time as it expires or is dissolved.

16.     In the Danish case, Plaintiffs are making essentially the same claims that they are making in this case. Plaintiffs' principal claim in the Danish case is that Defendants have stolen Plaintiffs' trade secrets. As I have noted above, however, Spectronic's Chief Executive Officer

was constrained to admit during the preliminary injunction proceedings that he could not identify any trade secret that Defendants supposedly stole.

17.    It also bears mention that Covidence has participated in four major trade shows in Europe during the last six months, three of which were held after the Danish case issued its limited preliminary injunction, and Spectronic did not attempt to enjoin Covidence from appearing at any of these trade shows. These trade shows include the Milipol show in Paris in October 2007, the SICUR show in Madrid in February 2008, the HMGCC show in London in February 2008, and the HOSDB show in London in March 2008. The preliminary injunction issued by the Danish court does not prohibit Covidence from attending trade shows anywhere in the world, so long as Covidence complies with the terms of that injunction in terms of the entities with which it does business.

18.    Plaintiffs filed temporary restraining order/preliminary injunction papers against Defendants one other time in the United States. Covidence was planning to attend a trade show in Philadelphia, Pennsylvania, and Defendants filed a motion seeking to enjoin Covidence from attending the Philadelphia trade show. As it turned out, the Philadelphia trade show was fully booked so Covidence was not able to attend the show.

19.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 19th, 2008.

_____
Jimmi M. Hansen

- 6 -

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SPECTRONIC DENMARK A/S, *et al.*, | ) | |
| | ) | |
| Plaintiffs | ) | No. 1:05-CV-00590 (PLF) |
| | ) | |
| v. | ) | |
| | ) | |
| JIMMI M. HANSEN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF PETER ZACHER SØRENSEN**

I, Peter Zacher Andersen, herby declare as follows:

1.     I am an attorney admitted to practice in Denmark. I have been an attorney for 25 years and can appear in the Danish Supreme Court.  I received my law degree from the University of Airbus (Master of Law)

2.     In Denmark, I am counsel to Covidence A/S and to Messrs. Hansen, Messer-schmidt and Klebaek in a case brought against them by Spectronic Denmark, A/S, DTC Communications, Inc. and Domo Ltd. ("the Danish Case").

3.     The Danish Case was instituted on July 9, 2007.  The Danish case has the same parties as does this action.  In the Danish Case, the Plaintiffs sought broad, interim relief against the Defendants.  Plaintiffs sought to restrain Defendants from competing against them in any capacity.  Plaintiffs tried to stop the Defendants' production, sale and rental of audio and video surveillance equipment. Plaintiffs claimed that the Defendants had used

**Exhibit D**

2.

business secrets that they obtained through their employment at the Spectronic Denmark A/S. As such, the allegations in this action are virtually identical to those raised in the Danish Case.

4.     The Danish Case was brought before the court on July 9, 2007. A hearing was held over four days in December 2007. Live testimony was heard and the witnesses were cross examined by the parties and by the court.

5.     The Danish Court concluded, in an order issued on January 7, 2008, that the only restriction to be imposed upon Defendants was to limit Defendants from soliciting certain suppliers and potential customers ("the Danish Court Order"). Nothing in the Danish Court Order prevents the Defendant from conducting their business except as to doing business with certain suppliers and potential customers. The Danish Court Order does not in any way prevent the Defendant from participating in a trade show to be held in the District of Columbia.

6.     The Danish Case remains ongoing and it is expected that the case will be concluded in 10 – 12 months.

7.     Under Danish law, Plaintiffs could have appealed the Danish Court Order. They choose not to appeal.

8.     The relief the Plaintiffs to this action are seeking (to prohibit defendants from participating in a trade show to be held in the District of Columbia) could have been sought in the Danish Case. Although theoretically available, the prospects of obtaining such relief

3.

in the Danish court are small because such relief would be inconsistent with the Danish Court Order.

9.    The provisions in Defendants' employment contracts did not impose post-employment restrictions on Defendants in terms of covenants not to compete or a customer limitation provision.  Under Danish law, if a company in Denmark wants to limit an employee's ability to compete or solicit customers post-employment, those restrictions must be included in a special contract and the contract must include a separate payment schedule to account for the value of these post-employment restrictions.  Indeed, in the Danish Case, the Danish court did not find that Defendants had breached their employment contracts in any way during the proceedings on the Danish temporary restraining order, and Defendants have not done anything in forming and operating Covidence that is a breach of their employment contracts.

21/04/2008  09:15    86327031              ZACHER & ANDERSEN                    SIDE  04/04

4.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 21-4, 2008.

Peter Zacher Sørensen

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| SPECTRONIC DENMARK A/S, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | No. 1:08-CV-00590 (PLF) |
| ) | |
| v. ) | |
| ) | |
| JIMMI M. HANSEN, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**[PROPOSED] ORDER**

The Court, having considered Defendants' Motion for Sanctions, as well as Plaintiffs' opposition thereto, and Defendants' reply in support thereof, finds that Plaintiffs have proceeded in bad faith in filing their Motion for Temporary Restraining Order or Preliminary Injunction.  In particular, Plaintiffs' motion papers provided the Court with an incomplete and misleading characterization of the proceedings in the first-filed suit Plaintiffs filed in Denmark and constituted a duplicative and vexatious action in this Court that was lacking a legal or factual basis.  Accordingly, the Court:

**ORDERS** that Plaintiffs, jointly and severally, shall reimburse Defendants for the reasonable attorney's fees and costs Defendants have incurred in defending against Plaintiffs' motion, with Defendants to file a pleading setting forth the amount and nature of the attorney's fees and expenses incurred within ten (10) days of the date of this order.

**SO ORDERED** this _____ day of May, 2008.

_____
PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE