# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SPECTRONIC DENMARK A/S, *et al.*,    ) | |
| ) | |
| Plaintiffs,    ) | No. 1:08-CV-00590 (PLF) |
| ) | |
| v.    ) | |
| ) | |
| JIMMI M. HANSEN, *et al.*,    ) | |
| ) | |
| Defendants.    ) | |

## PLAINTIFFS' MEMORANDUM OF LAW

**JAECKLE FLEISCHMANN & MUGEL, LLP**

B. Kevin Burke, Jr.
12 Fountain Plaza
Buffalo, New York 14202-2292
Telephone: 716.856.0600
Facsimile: 716.856.0600

**McKOOL SMITH LLP**

Michael G. McManus (Bar No. 493422)
1700 K Street, NW
Suite 740
Washington, D.C. 20006
Telephone: 202.370.8301
Facsimile: 202.370.8344

*Attorneys for Plaintiffs Spectronic Denmark A/S,*
*DTC COMMUNICATIONS, INC., and*
*DOMO, LTD.*

## I.    PRELIMINARY STATEMENT

Defendants Jimmi M. Hansen ("Hansen"), Henrik Klebaek ("Klebaek"), Kent Messerschmidt ("Messerschmidt") and Covidence A/S ("Covidence") (collectively "Defendants") have asked this Court to impose the harsh and inherently penal remedy of sanctions against Plaintiffs Spectronic Denmark A/S ("Spectronic"), DTC Communications, Inc. ("DTC") and Domo, Limited ("Domo") (collectively "Plaintiffs"). In requesting sanctions, Defendants claim that Plaintiffs have perpetuated a fraud upon this Court and have defiled the very temple of justice. The basis of this claim is that the Plaintiffs have allegedly misled this Court by suggesting that a preliminary injunction issued by a foreign court in Denmark did more than merely restrict Defendants from doing business with a few of Plaintiffs' distributors, only two of whom, Defendants say, are American companies.

Defendants advised this Court that the GovSec, U.S. Law and Ready Exhibition 2008 in Washington, D.C. from April 23-24, 2008 (the "Exposition") was unaffected by the Danish court's ruling. Specifically, Defendant Hansen averred in a sworn statement submitted to this Court that the Danish court held that he and his Co-Defendants were liable only to the extent that they were enjoined from dealing with two companies in the United States, neither of whom would appear at the Exposition. Defendants' motion further suggests that the Danish court has ruled against Plaintiffs in Denmark, and that the relief sought by Plaintiffs during a four day hearing in December, 2007 was denied, in whole or in large part. Without alerting this Court to recent precedent within this District confirming that the standard on this motion is a "clear and convincing," Defendants ask this Court to punish Plaintiffs based on the allegations put forth by Defendant Hansen and his Co-Defendants.

The unfortunate reality in this case is that a fraud *was* perpetuated upon this Court. Defendant Hansen, however, was the perpetrator.

Defendant Hansen knew that Plaintiffs obtained an injunction against the Defendants covering each and every of the 48 customers identified by name during the four day hearing in December, 2007. He knew that Plaintiffs obtained an injunction against the Defendants covering each and every of the seven suppliers identified by name during the four day hearing in December, 2007. He knew that this injunction covered Defendants' activities in over a dozen countries around the world, including their activities in the United States. Defendant Hansen knew that the injunction was not limited to two companies in the United States, but that it covered seven customers located in the United States, including once of Plaintiffs' largest and most important U.S. customers, Raytheon.

Although Defendant Hansen advised this Court that no companies in the United States covered by the Danish ruling would attend the Exposition, Defendant knew that Northern Virginia's own Raytheon has signed up for a booth even before the Danish court enjoined Defendants from doing any business, direct or indirect, with Raytheon. While Plaintiffs' counsel explained this factual inconsistency to the Court on April 22, 2008, Defendant Hansen sat silently. Even now, Defendants maintain that only two companies in the United States were subject to the court's January, 2008 order.

Defendants' present motion further fails to alert this Court that Plaintiffs narrowed the scope of the relief initially sought in July, 2007 by the time the court issued its ruling in January, 2008.

In sum, it was Defendants, not Plaintiffs, who misrepresented to this Court the proceedings in Denmark last winter. This fact alone precludes an award of sanctions in favor of a party who has irrefutably misrepresented material facts to the Court.

Defendants' present motion further claims that Defendants have satisfied their well-established duty to afford Plaintiffs a reasonable opportunity to cure any allegedly sanctionable defect in their underlying motion for a preliminary injunction. This was absolutely not the case. Although Defendants had both the time and the means to notify Plaintiffs' counsel in time for the parties to meaningfully discuss any dispute concerning the allegations or descriptions at issue in the underlying party, Defendants the only method conceivable to "notify" Plaintiffs' counsel of an "opportunity" to dismiss the entire action so as to ensure that Plaintiffs' counsel could not possibly respond prior to appearing in court Tuesday morning, April 22, 2008.

Defendants should not be rewarded with the rarely issued and inherently punitive sanction of attorney's fees where it appears that Defendants deliberately denied Plaintiffs an opportunity to avail themselves of any safe harbor from this Court's inherent authority to sanction.

Nor should this Court punish Plaintiffs for alleging viable causes of action under federal law. As the caselaw discussed below explains, there is a difference between meritless and sanctionable claims, and absent clear and convincing evidence of bad faith, a court must exercise heightened discretion. Even where a court finds that Rule 11 has been violated, a court need not sanction the non-moving party absent clear evidence of wanton misconduct. In the present action, each of Plaintiffs' federal claims was alleged in good faith and is supported with sworn testimony in the record. Although this Court may not agree that Plaintiffs presently have

enough proof in admissible form to sustain subject matter jurisdiction going forward, it cannot be said that Plaintiffs' claims are frivolous to point of requiring sanctions.

## II.    THE DANISH ACTION

Plaintiffs commenced the Danish Action in July, 2007 alleging that the three individual defendants violated Section 1 of the Danish Marketing Practices Act. Section 1 of the Danish Marketing Practices Act requires that all business persons "shall exercise good marketing practice with reference to consumers, other traders and public interests." (Gammelgaard Decl., ¶2). When Plaintiffs commenced the Danish Action in July, 2007, prior to submitting their proof, Plaintiffs' initial papers contained a request for preliminary and permanent injunctive relief enjoining Defendants from further violating Danish law. (*Id.,* ¶3). In Denmark, when a party seeks preliminary injunctive relief, the matter is referred to a "bailiff's court" before proceeding to a "civil court" for a full consideration of the entire case. (*Id.,* ¶4). In the Danish Action, Plaintiffs' request for a preliminary injunction was referred to the bailiff's court of Randers. The bailiff's court of Randers did not grant the parties a hearing until December, 2007. (*Id.,* ¶5).

In the interim between Plaintiffs' filing of the Danish Action in July, 2007 and the hearing in December, 2007, Plaintiffs sought assurances that all of the customer, supplier, and end-user information discussed during the hearing would remain sealed and confidential. (*Id.,* ¶6). Prior to the hearing in December, 2007, Plaintiffs did not receive such assurances and relayed this information to many of their customers and suppliers prior to the December, 2007 hearing. (*Id.,* ¶7). After learning that the hearing (and all written material produced in connection therewith) might not remain sealed or confidential, many of Plaintiffs' largest and most important customers (including several government agencies in the United States) advised

Plaintiffs that they preferred to conceal their identity and abstain from participating in the four day hearing to be held in December. This request was understandable given the highly secretive and confidential nature of the surveillance and security industry. (*Id.,* ¶8; Moestrup Aff., ¶24).

Although many of Plaintiffs' largest customers preferred to be excluded from the December, 2007 proceedings for reasons of confidentiality and security, many of Spectronic's customers and suppliers, agreed to the use of their names and information by Spectronic in connection with the hearing. (Gammelgaard Decl., ¶9). Specifically, 48 customers and seven suppliers of Plaintiffs agreed to be included in the proof at the hearing before the bailiff's court of Randers. Consequently, Plaintiffs submitted a list of 48 customers to the bailiff's court as "Bilag n.r. 1" and a list of seven suppliers as "Bilag n.r. 2" to the bailiff's court. (*Id.,* ¶10, Exhs. A, B). Plaintiffs requested that the bailiff's court issue a preliminary injunction enjoining Defendants from having any direct or indirect business contact with any of the 48 customers and any of the seven supplies identified by Plaintiffs. (*Id.,* ¶¶11-12, Exhs. A, B). Plaintiffs did not identify any other customers or suppliers to the bailiff's court and did not request an injunction against customers or suppliers not identified in the two exhibits submitted to the bailiff's court of Randers. (*Id.,* ¶13).

After a four day hearing in December, 2007, the bailiff's court granted Plaintiffs' request in its entirety and enjoined Plaintiffs from working with any of the entities identified in the only two lists provided to the bailiff's court by Plaintiffs. (*Id.,* ¶14). 15. Specifically, the court enjoined Defendants from doing any business, directly or indirectly with the following customers: Adaptive Digital Systems; Andyteh Concept Srl; ATEK Pty Ltd.; Audio and Acoustics; Avex B. V.; Baewoon Company Ltd.; Beling d.o.o., Elect Eng.; Brimfek Inc.; BSS PREKYBA, UAB ; Carinex Ltd.; Colvista Ltda.; Comercializadora White; DTC

Communications, Inc.; Dyplex Communications Ltd.; Excellence Tech; FGH Security; Findme Solutions; Fotovideo De Colombia S.A.; Frassini company BVBA; G&R Ltd.; Gamma TSE Ltd.; Gans & Pugh Associates Inc.; Gecomse s.a.; Griff Comm Ltd; GS VBS; C Technologie; Komcentra s.r.o; LongHope Anhua Police; Manifest Marketing Ltd.; Mass International Ltd ; Metco; Microtec Sicherheitstech. GmbH; MIS; Moseco; MOTEC Sdn. Bhd.; New Springs Co., LTD; Parinto cc; PAZ Logistics Ltd.; PT Satria Jaya Abadi; RA.SE.T s.r.l.; Raytheon; SAGA D.O.O.; Shanghai Unitech Ltd.; ST Electronics; VASTech; Viper (Thai) Co Ltd.; Wonda Group (Asia) Limited; Xlefeng Technology Co. Ltd.; and XTEK LTD.  (*Id.,* ¶15).

Seven of the 48 customers subject to the Danish preliminary injunction are American companies with actual brick-and-mortar physical presences in the United States, including:  Adaptive Digital Systems (20322 South West Acadia, New Port Beach, California 92660); Brimtek Inc. (43720 Trade Center Place, Suite 60, Dulles, Virginia 20166); Comercializadora White (172 Lynn Loop, Laredo, Texas 78045); DTC Communications, Inc. (486 Amherst Street, Nashua, New Hampshire 03063); Gans & Pugh Associates Inc. (690 Center Street, Suite 201, Herndon, Virginia 20170); and Raytheon (7700 Arlington Boulevard, Falls Church, Virginia 22042).  (*Id.* ¶16).

Additional customers and suppliers would have been added to these lists; however, since many of Plaintiffs' customers wished to remain anonymous during these proceedings, Plaintiffs did not submit their names to the bailiff's court for consideration in December, 2007.  The January 8, 2008 decision of the bailiff's court of Randers specifically recognizes this fact and states:  "[P]laintiffs have chosen not to name such customers to protect their privacy." (*Id.* Exh. C).  Since Plaintiffs did not subject the identities of relevant information

of these customers to the bailiff's court, these customers were not listed as part of Appendices 1 and 2 to that court's January 8 decision.

The Danish Action now proceeds to a civil court for a "confirmatory action" where Plaintiffs intend to seek even broader relief under Danish law on a more permanent basis following the conclusion of expedited discovery in this matter. In the meantime, the Danish police continue their investigation into Defendants' theft of Plaintiffs' proprietary and trade secret information. A true and accurate summary of the Danish proceedings prepared my law firm is appended hereto Exhibit D. (*Id.* ¶20-21, Exh. D).

### III.    DEFENDANTS' MISREPRESENTATIONS

#### A.    Misrepresentations to This Court

Contrary to the misstatements set forth in Defendant Hansen's sworn affidavit of April 21, 2008, seven of the above listed 48 customers are American companies with actual brick-and-mortar physical presences in the United States, including: Adaptive Digital Systems (20322 South West Acadia, New Port Beach, California 92660); Brimtek Inc. (43720 Trade Center Place, Suite 60, Dulles, Virginia 20166); Comercializadora White (172 Lynn Loop, Laredo, Texas 78045); DTC Communications, Inc. (486 Amherst Street, Nashua, New Hampshire 03063); Gans & Pugh Associates Inc. (690 Center Street, Suite 201, Herndon, Virginia 20170); and Raytheon (7700 Arlington Boulevard, Falls Church, Virginia 22042). (Moestrup Aff., ¶14).

Defendant Hansen deliberately misinformed this Court in his affidavit submitted on April 21, 2008 when he said that the Danish Court merely enjoined Defendants from "doing

business . . . with a specified list of customers, a list that includes just (2) companies located in the United States: Brimtek Inc. and Ganz & Pugh." (Dkt. No. 12-2, ¶14). He also deliberately misled this Court when he claimed that the only "United States companies covered by the Danish preliminary injunction, Brimtek Inc. and Ganz & Pugh, are not expected to attend the trade show in Washington, D.C." (*Id.,* ¶15).

At the time Mr. Hansen and his attorneys filed his affidavit in opposition to Spectronic's motion for a preliminary injunction, Defendant Hansen knew that the January 8, 2008 Order from the bailiff's court of Randers enjoined Defendants from "directly or indirectly" providing, selling, renting, supplying or even lending products to any of the 48 customers and seven suppliers identified by Spectronic in its Danish motion. Most of these 48 customers do business in the United States and seven of them are physically located here, including Raytheon, an American company located less than 10 miles away from this Courthouse that participated in the 2008 GovSec Exposition in Washington, D.C. between April 23-24, 2008 at Booth 2131. (*Id.,* ¶16, Exh. A).

Although Defendant Hansen advised this Court that "the United States companies covered by the Danish preliminary injunction [were] not expected to attend the trade show in Washington, D.C.," Defendant Hansen knew that Raytheon: (1) was an American company covered by the Danish injunction; (2) had purchased booth number 2131 at the Exposition prior to April 21, 2008; and (3) planned to attend the Exposition. (*Id.,* ¶17).

As page 14 of the "GovSec" brochure appended to the Moestrup Affidavit demonstrates, Raytheon registered for the subject Exposition prior to December 11, 2007. This brochure demonstrates further that Covidence had not registered for the Exposition as of

December, 2007. Consequently, Spectronic did not ask the bailiff's court to enjoin Defendants from participating in the Exposition. However, Spectronic *did* ask the bailiff's court to enjoin Defendants from doing business, either directly or indirectly, with Raytheon, and such relief was granted. (*Id.,* ¶18, Exh. B).

Defendant Hansen was present during the December, 2007 proceedings in Denmark and has actual knowledge that Raytheon was one of the seven American companies covered by the Danish injunction. (*Id.,* ¶19). Defendant Hansen was also present before this Court on Tuesday, April 22, 2008 when counsel for Spectronic advised this Court that, contrary to the misrepresentations contained in Defendant Hansen's affidavit, the Danish Court enjoined Defendants from "directly or indirectly" doing any business with Raytheon. So, too, was Defendant Hansen present when Spectronic's counsel advised this Court that, contrary to Defendant Hansen's sworn statement, Spectronic believed Raytheon would attend the Exposition the following day. Despite these statements by Spectronic's counsel, Defendant Hansen did nothing to correct the misstatements in Defendant Hansen's affidavit.

Instead, Defendants allowed this Court to proceed under the false assumption that only two American companies were subject to the Danish injunction and that neither American company would attend the Exposition. As recently as May 2, 2008, Defendants have continued to mislead this Court as to the breadth of the Danish court order and have yet to admit that Raytheon was one of the companies from which Defendants were enjoined from having any direct or indirect business contact.

**B.**    **Misrepresentations to the American Surveillance and Intelligence Community**

Plaintiffs have alleged that Defendants are misleading the American surveillance and intelligence community with respect to Plaintiffs' ability to provide a video recorder in the United States prior to 2009. This claim by Defendants is false. Over the past few years, Plaintiffs have developed a couple video recorders, including a recorder called the "Freja." Plaintiffs have alleged that, prior to resigning from Plaintiffs, Defendants misappropriated the technology of the Freja, as well as Plaintiffs' "Beowulf" recorder, for use in the development and marketing of their knock-off video recorder, the "Oculus." As the accompanying affidavit of Christian T. Moestrup sets forth, Defendants are deliberately misinforming the American surveillance and intelligence community that Plaintiffs will not be able to deliver the Freja to the U.S. market until months after the so-called Oculus has arrived for immediate sale and use. (*Id.* ¶26).

Specifically, Defendant Hansen has been telling customers that, as a result of his former high-level fiduciary status at Spectronic, he knows that Spectronic cannot produce a miniature video recorder prior to December, 2008. This claim is false; Defendant Hansen knows it to be false; and Defendant Hansen continues to make this claim in order to continue to deceive the American surveillance and intelligence community so as to unlawfully divert sales of video recorders away from Spectronic to Covidence. (*Id.*).

Paragraphs "33"-"39" of the Complaint, together with Exhibit "5"-"10" to the Complaint, establish that in 2006, the individual Defendants had access to all of Spectronic's strategic planning for the years 2007 - 2011 concerning Spectronic's planned positioning in the video surveillance market, including Spectronic's plans related to development of the Freja video

recorder. In early 2006, the United States Department of Homeland Security ("DHS") approached Spectronic with a request for a video recorder. (*Id.* ¶28). As paragraphs "50" - "57" of the Complaint set forth, prior to his resignation from Spectronic, Defendant Hansen functioned as development manager, reporting directly to the CEO of Spectronic, Kim Lehman. When DHS approached Spectronic with its specifications for a video recorder, Mr. Lehman and Mr. Moestrup tasked Defendant Hansen with interfacing directly with DHS to coordinate the development of such a video recorder. (*Id.*).

In this action, Plaintiffs have submitted sworn testimony to the effect that from early 2006 through Defendant Hansen's resignation, Defendant Hansen used Plaintiffs' financial resources, intellectual property and employees to develop a video recorder to the specifications of DHS. As paragraphs "95" - "100" of the Complaint explain, among the employees assigned to Defendant Hansen in connection with the development of the video recorder for DHS were Niels-Ole Pedersen, Ulrich Sorensen and Kim Torbjorn Schjodt. These individuals have left Spectronic and are now working with Defendant Hansen at Covidence.

The sworn allegations put forth at Exhibits "5" - "10" to the Complaint contradict Defendant Hansen's misstatement at paragraph "4" of his affidavit that "[a]t the time Defendants left Spectronic, none of the Plaintiffs had a video recorder in development." Spectronic clearly had several plans in development, including the development of the Beowulf and Freja recorders.

Particularly egregious, however, is Defendant Hansen's claim later in that paragraph that "it had been Spectronic's strategic business decision to limit its product range to audio products." This statement is completely untrue. (*Id.,* ¶32). In reality, Defendant Hansen was specifically tasked as an officer and fiduciary of the company with handling all plans for the

11

development and testing of a video recorder. It was defendant Hansen who consistently delayed Spectronic's proposed launch of a video recorder, as he constantly advised Spectronic's CEO and Mr. Moestrup that Spectronic was "too busy" working on "other projects" for DHS to turn its full attention to the implementation of a miniature video recorder for DHS. (*Id.*). Now it is clear that his attempts to delay this launch were part of an effort to usurp both Spectronic's technology and business opportunity by developing the Oculus video recorder for himself and Covidence.

Of particular relevance to this actions, however, is the fact that notwithstanding Defendant Hansen's actual knowledge of Spectronic's plan to release its video recorder to the American market this summer, in the course of advertising the Oculus video recorder, Defendant Hansen has made false statements to American customers of Spectronic - including Raytheon and DHS - claiming that Spectronic will not have a video recorder available to the American market until 2009. (*Id.*). These statements by Defendant Hansen are demonstrably false, and have been spread throughout the American intelligence and surveillance community for the commercial purpose of deceiving customers into purchasing the Oculus from Covidence instead of purchasing the Freja or the Beowulf from Spectronic. As discussed below, it is highly likely that these misrepresentations will actually confuse customers in the United States and in this District, causing harm to Plaintiffs as a result.

## III.    ANALYSIS

### A.    Legal Standard

In order for Defendants to prevail on their present motion for sanctions, Defendants must demonstrate, by clear and convincing evidence, that Plaintiffs acted in bad faith when they refused to withdraw their Complaint and dismiss the present action for allegedly

having misled the Court about the scope of the preliminary injunction issued by the bailiff's court of Randers in Denmark.. Defendants' motion fails to alert the Court of this District most recent decision on the topic of sanctions, *Alexander v. FBI*, _ _ F. Supp. 2d _ _, 2008 WL 903115 (D.D.C. April 3, 2008). In *Alexander*, the Court explained that with regard to "those inherent power sanctions that are fundamentally penal – dismissals and default judgments, as well as contempt orders, awards of attorneys fees, and the imposition of fines – a district court must find clear and convincing evidence of the predicate misconduct." *Alexander*, 2008 WL at * 25 (quoting *Shepherd v. Am. Broadcasting Co.*, 62 F.3d 1469, 1478).

As the court in *Alexander* explained:

> "Heightened certainty" is called for both to guard against
> the misguided imposition of sanctions that are
> "fundamentally punitive" and to reduce the risk of
> erroneously tarnishing a party's reputation with findings of
> bad faith ... ."

*Id.* (quoting *Shepherd*, 62 F.3d at 1476-78). Although the imposition of sanctions is left to the discretion of the district court judge, even where "[Rule 11] has been violated, a court *may* impose an appropriate sanction," but must first find "clear and convincing evidence" of misconduct worthy of such a fundamentally punitive result. *See Rafferty v. NYNEX Corp.*, 60 F.3d 844, 852 n. 12 (D.C. Cir. 1995) (noting that when the rule has been violated, a court *may* impose an appropriate sanction, but following the Amendment of Rule 11 in 2003, is not obligated to do so); see also *Alexander*, 2008 WL at * 25; *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 82 (D.D.C. 2007) (agreeing with the party moving for sanctions that the non-moving party's "amended complaint is meritless," but stating that that sanction should not issue unless it is "clear that the non-moving party acted in bad faith.").

In *McManus v. District of Columbia*, sixteen current and former employees of various District of Columbia government agencies filed a "rather opaque" Amended Complaint against fourteen defendants in federal court. *McManus*, 530 F. Supp. 2d at 53. The Amended Complaint alleged breaches of employment contracts and collective bargaining agreements, breaches of fiduciary duties of fair representation and various violations of due process of law. Twelve of the defendants moved to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(5), and 12(b)(6). *Id.* at 54. Two of the defendants filed separate motions for sanctions claiming that at the time the plaintiffs filed their Amended Complaint, they "knew that the claims therein [were] unwarranted under existing law" and that plaintiffs "fail[ed] to conduct a reasonable legal or factual inquiry into the claims" set forth in the Amended Complaint. *Id.* at 54 and 82.

The court agreed that "Plaintiffs' Amended Complaint [was meritless] adding that "it is true that the Amended Complaint's deficiencies were highlighted in the motions to dismiss the original Complaint." *Id.* In denying the request for sanctions, however, the court explained that "there is a difference between meritless and sanctionable filings, and it is not clear that the filing of Plaintiffs' Amended Complaint was entirely unwarranted under existing law."

Similarly, in *Cauderlier & Associates, Inc. v. Zambrana*, this District denied a motion for sanctions even though the court "found [the non-moving party's underlying] motion entirely unpersuasive," since the moving party failed to demonstrate "that the arguments in support of [the non-moving party's underlying] motion were so lacking in legal support as to warrant sanction." *Zambrana*, 463 F. Supp. 2d 63, 64 (D.D.C.).

In order to impose sanctions against Plaintiffs in this case, therefore, this Court must determine that Defendants have conclusively established, by clear and convincing

evidence, that Plaintiffs' failure to "dismiss the present action" based on Defendants' claim that "Plaintiffs' description of the Danish proceedings was misleading" amounts to a perpetuation of "fraud upon the court" or a "defiling of the temple of justice." *See Alexander,* 2008 WL at *25; *see also Chambers v. NASCO, Inc.,* 501 U.S. 32, 46 (1991) (decided prior to the 2003 amendment to Rule - a fact ignored in Defendants' motion papers - stating that a court "may access attorney's feed against the responsible party" if the court finds "that fraud has been practiced against it or that the very temple of justice has been defiled.")

For the reasons set forth in the Affidavit of Christian T. Moestrup, sworn to May 16, 2008, the Declaration of B. Kevin Burke, Jr., executed on May 16, 2008, together with the exhibits annexed to those papers, and as explained below, Defendants cannot meet their high burden of establishing, by clear and convincing evidence, that this Court should visit the "harsh punishment" of sanctions upon Plaintiffs in this action. *Sharp. V. Rosa Mexicano, D.C., LLC,* 496 F.Supp. 2d 93, 100 (D.D.C. 2007) (denying motion for sanctions, stating that a court must take into consideration that sanctions are a "harsh punishment"); *see also Zambrana,* 463 F.Supp. 2d at 64 ("Rule 11 sanctions are harsh punishment intended for those who frustrate judicial proceedings.").

## B.     Defendant Hansen, Not Plaintiffs, Misled This Court

Defendants have not and cannot show, by clear and convincing evidence, that Plaintiffs, rather than Defendants, have misled this Court regarding the Danish Action. The simple fact that Defendants Hansen denied that Raytheon was subject to the preliminary injunction and had obtained a booth at the GovSec Exposition in Washington from April 23-24, 2008 demonstrates: (1) bad faith on the part of Defendants; and (2) the drastic and inherently

penal sanction of attorney's fees should not be assessed to Plaintiffs based on Plaintiffs' failure to dismiss this action on Monday, April 21, 2008. *See Alexander*, 2008 WL at * 25.

It is well-settled that a district court should exercise restraint when deciding whether to impose sanctions under any circumstances, and should only due so after making "an explicit finding that the target of the sanctions acted in bad faith." *Alexander*, 2008 WL at *25. In the case at bar, the only "clear and convincing evidence" that one party or the other mislead this Court is found in the Affidavit of Defendant Jimmi M. Hansen, submitted on April 21, 2008 ("Hansen Aff."). As set forth above, Defendant Hansen advised this Court that the Danish court merely enjoined Defendants from doing business with "just two (2) companies located in the United States: Brimtek Inc. and Ganz & Pugh." (Hansen Aff. ¶14). Defendants continue to maintain the truth of that assertion. The Danish court, however, enjoined Defendants from working with, directly or indirectly, seven companies in the United States.

Defendants Hansen also told this Court that the "two United States companies covered by the preliminary injunction" would not "attend the trade show in Washington, D.C." (*Id.*). That, too, was a misstatement, as Raytheon, one the companies subject to the Danish injunction, had registered to participate in the trade show even prior to the issuance of the Danish injunction. As the Moestrup affidavit demonstrates, Defendant Hansen knew that Raytheon was covered by the injunction. As this Court will recall, Defendant was present in Court on April 22, 2008 when Plaintiffs' counsel brought this fact to the Court's attention. Not only did Defendant Hansen fail to correct the misstatement in his affidavit, he and his co-Defendants refuse to correct it even today.

Since Defendants are relying on the Court's "inherent power" to punish Plaintiffs in this action, Plaintiffs respectfully submit that Defendant Hansen's lack of candor with the

16

Court precludes the Court from imposing the "harsh penalty" of a punitive sanction against Plaintiff. At a minimum, Defendants' misrepresentations estop them from claiming that they have "clear and convincing evidence" that Plaintiffs' version of the Danish injunction amounts to a perpetuation of "fraud upon the court" or a "defiling of the temple of justice." *See Alexander*, 2008 WL at *25.

**C.      Plaintiffs Never Received Reasonable Notice of Defendants Motion for Sanctions**

      Assuming, *arguendo*, that Defendant had not misrepresented the scope of the Danish injunction to this Court, sanctions would be inappropriate due to the fact that Defendants afforded Plaintiffs no reasonable opportunity to investigate and rebut Defendants' spurious allegations that Plaintiffs have proceeded in bad faith. An analysis of the method by which Defendants' "notified" Plaintiffs of Defendants' intent to move for sanctions suggests strongly that Defendants intended to place Plaintiffs in an impossible position to avail themselves of *any* safe harbor contemplated under applicable sanctions jurisprudence.

      In determining to exercise its inherent power in this case on the facts presented in the record, the Court should consider the so-called "offer" Defendants claim to have extended Plaintiffs "to forgo or withdraw [Defendants'] request for sanctions." O'Connor Aff., ¶¶ 4-5. Although caselaw suggests Rule 11(c)(2)'s safe harbor provision does not necessarily preclude the imposition of sanctions pursuant to the Court's inherent power, under the facts of this case, this Court should not exercise this "fundamentally penal" and "harsh power." *Alexander*, 2008 WL at * 25.

      The individual Defendants in this action received copies of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and the Memorandum of Law in

Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("Plaintiffs' Papers") by electronic mail on April 11, 2008. (Burke Decl. ¶5). Defendants' Danish counsel received Plaintiffs' Papers a day earlier. (*Id.* ¶4). Both the individual Defendants and their Danish counsel, therefore, had notice of Plaintiffs' representations to this Court concerning the January 8, 2008 decision of bailiff's court of Randers 11 or 12 days prior to the April 22, 2008 argument date set by this Court.

Although Plaintiffs' Papers clearly identified that Plaintiffs sought injunctive relief effective April 23, 2008, Defendants and their Danish counsel apparently waited until Thursday, April 17 to retain local counsel in Washington, D.C.

On April 17, 2008, Plaintiffs' Buffalo, New York counsel received a voicemail message from counsel for Defendants' local counsel, John O'Connor. Mr. O'Connor's message indicated that his law firm had been retained by Defendants relative to this action. (*Id.* ¶6). Upon retrieving Mr. O'Connor's voicemail message of April 17, Plaintiffs' Buffalo counsel contacted Mr. O'Connor that afternoon and advised him that although Plaintiffs had filed several of their exhibits "under seal," Plaintiffs would forward all of the exhibits submitted to the Court directly to Mr. O'Connor. Plaintiffs' Buffalo counsel also gave Mr. O'Connor his e-mail address and his mobile telephone number and told him that he should feel free to use both methods of contacting Plaintiffs' counsel at any time, day or night, weekday or weekend. *Id.* ¶7.

On Monday, April 21, 2008, Plaintiff's Buffalo counsel traveled to Washington, D.C. in order to appear before this Court on Tuesday morning, April 22, 2008. As of attorney Burke's departure for Washington that Monday morning, neither attorney Michael McManus, Plaintiffs' local counsel, nor attorney Burke, Plaintiffs' Buffalo counsel, had heard from Mr. O'Connor since Friday morning, April 18, 2008, at which time Mr. O'Connor confirmed that he

18

had received all of the exhibits filed as part of Plaintiffs' Papers. Defendants and their Danish

counsel, in the meanwhile, had received Plaintiffs' Papers between 10 and 11 days prior to the

departure to Washington by attorney Burke. (*See* Burke Decl., ¶¶7-8; *see also* Plaintiff's

Amended Rule 65.1 Certification Regarding Notice to Defendants, filed April 11, 2008 (Dkt. No.

8)).

      Mr. Burke arrived in Washington, D.C. at approximately 7:00 p.m. Eastern

Daylight Time on Monday, April 21, 2008. At that time, he retrieved a voicemail message on

his Buffalo, New York law firm answering machine apparently left by Mr. O'Connor at 12:15

PM (Burke Decl. ¶10). It was then 1 AM in Denmark and Spectronic's company representative

was still in the air on his way from Denmark to Washington, D.C., not to arrive until 11:43 PM.

      In the message he left in Plaintiffs' counsel's Buffalo office voicemail system, Mr.

O'Connor claimed that: (1) he had received a translation of the copy of the Danish preliminary

injunction Plaintiffs had previously submitted to this Court; and Defendants believed (2)

Plaintiffs' description of the Danish proceeding to this Court was misleading; and that (3) unless

Plaintiffs agreed to withdraw their preliminary injunction motion and dismiss the present action;"

(4) Defendants would seek sanctions against my Plaintiffs. That was the entire voicemail

message. Although Mr. O'Connor had Burke's e-mail address, he did not e-mail Mr. Burke to

warn him of possible sanctions and/or discuss a possible resolution short of sanctions. There was

not a letter sent via e-mail, nor was there a fax sent to either the office of Plaintiffs' local counsel,

Michael McManus, or the Buffalo office of Mr. Burke. Nor did Mr. O'Connor telephone Mr.

McManus in Washington after having failed to reached Mr. Burke in Buffalo.

      Although Defendants' counsel knew several alternative methods of

communicating with Plaintiffs' counsel, including the mobile telephone number of attorney

Burke, the e-mail address of attorney Burke, the office telephone number of Michael F.

McManus, and the e-mail address of attorney McManus, Mr. O'Connor decided to leave a

message on Mr. Burke's Buffalo office voicemail system. This was so despite the fact that, as

Mr. O'Connor himself indicates, Mr. O'Connor had in his possession the prior day a certified

translation of the disputed decision from Denmark,

Approximately two and a half hours after leaving this voicemail message, and

more than four hours prior to attorney Burke's arrival in Washington, D.C. on April 21,

Defendants filed their opposition to Plaintiffs' motion for a preliminary injunction. (Burke Decl.,

¶12; O'Connor Decl. ¶ 5). Although Mr. O'Connor did not raise the sanctions issue by e-mail to

either attorneys Burke or McManus, on April 21, five minutes *after* Defendants filed their

opposition papers asking for an award of sanctions, Mr. O'Connor e-mailed copies of

Defendants' papers (including Defendants' request for sanctions) to both attorneys Burke and

McManus. *Id.*

Shortly after retrieving Mr. O'Connor's voicemail message, Mr. Burke logged

onto this Court's ECF/CM system and downloaded a copy of the Defendants' opposition papers

in this action. Mr. Burke also opened an e-mail attachment from Mr. O'Connor apparently sent

approximately five minutes after Mr. O'Connor filed Defendants' opposition papers. At the time

Mr. O'Connor filed Defendants' opposition papers, Mr. Burke was *en route* to Washington and it

was approximately 8:45 p.m. in Denmark. At the time Mr. Burke retrieved Mr. O'Connor's

voicemail message and was first able to open either Defendants' opposition papers or Mr.

O'Connor's e-mail attachment sent five minutes after the filing of the opposition papers, it was

approximately 1:00 a.m., Tuesday morning, April 22 in Denmark.

On Tuesday morning, April 22, Mr. McManus and Mr. Burke met in Mr. McManus' law office with a representative of Spectronic and discussed Defendants' threat of sanctions unless Plaintiffs dismissed the entire action. Plaintiffs then requested of this Court an opportunity to present a witness in Court Tuesday morning. This request was denied.

Since Defendants chose only to leave a voicemail in Buffalo warning of sanctions rather than utilizing any of the several more reasonable methods of communications (set forth above), and even had they felt it advisable to do so, Plaintiffs' counsel were *de facto* precluded from withdrawing and dismissing the case without consulting their clients prior to Defendants' filing of its opposition papers, a mere two and one-half hours after leaving the 12:15 PM voicemail on April 21.

Mr. O'Connor's decision to offer a "safe harbor" to Plaintiffs by leaving a voicemail message in Buffalo while Plaintiffs' Buffalo counsel was travelling is particularly curious given Mr. O'Connor's use of Mr. Burke's e-mail address and mobile telephone number during evenings and on weekends during this case. For example, on Sunday, April 27, 2008, Mr. O'Connor and Mr. Burke exchanged e-mail messages concerning a joint proposed briefing schedule in connection with the present motion. In fact, Mr. O'Connor e-mailed a draft of a letter to this Court as late as 8:44 PM that Sunday.[1] Mr. O'Connor did not, however, e-mail Mr. Burke on the Sunday he admits he received a certified copy of January 8, 2008 decision at issue on this motion. Instead, he waited until the afternoon of the following day to leave a voicemail message in Buffalo.

---

[1] Mr. O'Connor never did forward a copy of the final executed draft of this letter to Mr. Burke, either prior or subsequent to its supposed delivery to this Court.

The resulting inability of Defendants' counsel to fully investigate Mr. O'Connor's allegations of misrepresentations, and Defendants' related "offer" to cure such bad acts by withdrawing this action in its entirety, could not have come as a surprise to Defendants' counsel. Mr. O'Connor has demonstrated that he is specifically aware that in order for Plaintiffs' counsel to communicate a problem, the resolution of which much occur by a given Tuesday morning, Plaintiffs' counsel must seek to contact their clients in Denmark no later than early Monday morning of the same week. A specific example from this case illustrates the point.

Following the parties' appearance before this Court on Tuesday, April 22, 2008, Mr. Burke reached out Mr. O'Connor regarding a proposed briefing schedule in connection with this motion. Since Mr. Burke's primary client contacts at Spectronic were out of the country on Thursday, April 24 and Friday, April 25, Mr. Burke was unable to confirm when he would be able to obtain any documents that may or not be of relevance to this action (including the lists of 48 customers and seven suppliers subject to the Danish injunction). Mr. Burke further advised that once he was able to determine which, if any, documents he needed for this motion, he would have to obtain translations. Consequently, after acknowledging that time was of the essence, Mr. Burke advised that in light of these variables, and due to Mr. Burke's unusually busy business travel schedule that week, Mr. Burke would contact Mr. O'Connor as soon as possible. (Burke Decl. Exh. B).

In reply to Mr. Burke's e-mail, on Friday, April 25 at 7:59 PM, Mr. O'Connor replied by e-mail a mere 36 minutes later. In his reply, Mr. O'Connor told Mr. Burke that unless Mr. Burke heard from Plaintiffs "no later than Tuesday," Mr. O'Connor would "simply advise [this Court] that we've reached out and have not been able to get a response from Plaintiffs." Mr. O'Connor added: "Fortunately for you, you have a six-hour time difference with your clients, so

you have an opportunity to talk to your clients before your depositions start on Monday and Tuesday and it will be right in the middle of their work day." (*Id.*).

Mr. O'Connor, thus, clearly realized that in order for Plaintiffs' counsel to confer with their clients in Denmark, counsel needed to contact Denmark early Monday morning. Despite this awareness of "the six-hour time difference," he did not contact Plaintiffs' counsel regarding his threat of sanctions until Monday afternoon, April 21 (and by voicemail in Buffalo, at that). Mr. O'Connor waited to call even though (as his declaration states) he had possession of the certified translation of the subject January 8, 2008 decision on Sunday, April 20, 2008. Unfortunately for Plaintiffs, Mr. O'Connor declined to notify Plaintiffs of his concerns until after the conclusion of Spectronic Denmark's work day on April 21. This decision was made despite Mr. O'Connor's knowledge of the e-mail addresses of attorneys Burke and McManus; despite Mr. O'Connor's possession of the mobile telephone number for Mr. Burke; and despite Mr. O'Connor's demonstrated recognition that Mr. Burke would have had to contact his clients in Denmark early Monday in order to either clarify the record concerning Defendants' charges or, more seriously, withdraw the action that day.

Mr. O'Connor's decision to forego any of the above-referenced methods of communicating with either of Plaintiffs' attorneys thus left Plaintiffs in the untenable position of appearing in Court on Tuesday morning - hours after the filing deadline in connection with the motion that had passed - with the choice of either withdrawing the motion in Court or seeking leave to introduce a fact witness from Spectronic to rebut Defendants' charges. Had Plaintiffs chosen to withdraw the motion after Defendants had filed their papers and the Court had summoned all parties to the Courthouse, Defendants would undoubtedly have cried foul and demanded immediate sanctions. An otherwise potentially meritorious case would have appeared

frivolous to even to most loyal advocate of Spectronic. Instead, Plaintiffs' counsel sought leave
to introduce a live witness (subjecting him to cross-examination not available with an affidavit)
in order to address Defendants' charges, but the Court denied that request.

In most cases involving sanctions, the moving party is required to afford the non-
moving party 21 days to correct alleged deficiencies in the challenged paper, claim or contention.
*See* Fed. R. Civ. P. 11(c)(2). Although a district court has inherent power to impose sanctions
beyond the limitations set forth in Rule 11(c), under the circumstances of the present case,
Defendants should not be allowed to completely abrogate *any* notice requirement and seek
attorney's fees in this action. Since the individual Defendants and their Danish counsel has
actual possession of Plaintiffs' Papers at least 10 days prior to the hearing, and because
Defendants failed to offer any reasonable notice and/or opportunity to cure any alleged
deficiency in Plaintiffs' Papers (despite having several readily available means to do so), this
Court should refrain from imposing the "harsh" and "inherently penal" sanction of attorney's fees
in this action.

**D.    Plaintiffs' Lanham Act Claims Are Valid**

As set forth above, Defendants did not merely demand that Plaintiffs withdraw
their motion for a preliminary injunction; rather, in order to avoid a motion for sanctions,
Defendants demanded that Plaintiffs withdraw and dismiss their entire action based upon
Plaintiffs' alleged misrepresentation of the Danish preliminary injunction. Since it possible for
Plaintiffs to sustain a Section 43 Lanham Act claim with a showing of the facts set forth in the
accompanying affidavit of Christian Moestrup, Defendants' cannot demonstrate by clear and
convincing evidence that this action is so utterly frivolous as to constitute bad faith. Even if this
Court disagrees with Plaintiffs' good faith Lanham Act claims, as this District has noted, "there is

a difference between meritless and sanctionable filings" and unless it is "clear that the filing of

Plaintiffs' . . . Complaint was entirely unwarranted under existing law," sanctions should not

issue. *See McManus*, 530 F. Supp. 2d at 53, 82.

> Section 43(a) of the Lanham Act, 15 U.S.C. Section 1125(a) provides:

> Any person who, or in connection with any goods
> or services, or any container for goods, uses in
> commerce any word, term, name, symbol, or
> device, or any combination thereof, or any false
> designation of original, **false or misleading
> description of fact, or false or misleading
> misrepresentation of fact, which (A) is likely to
> cause confusion, or to cause mistake, or to
> deceive as to the** affiliation, connection, or
> association of such person with another person, or
> as to the origin, sponsorship, or approval of his or
> her goods, services, or **commercial activities by
> another person** ... shall be liable in a civil action
> by **any person who believes** that he or she is or **is
> likely to be** damaged by such act.

15 U.S.C. §1125(a) (emphasis supplied). Although the Supreme Court has explained that

Section 43(a) does not create a federal cause of action independent of state common law where a

distributor may have stolen the ideas of others in making a product as long as the distributor

accurately identifies itself as the distributor, rather than the creator, of the tangible product sold

(see *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 53 U.S. 23, 37 (2003)), Section 43

applies to the actions of Defendants in the case at bar.

> At issue in *Dastar* was whether a producer of a new video production violated

Section 43(a) by not acknowledging reliance on an original television production. *Id.*, 539 U.S.

at 25-28. Although the specific language of Section 43(a) at issue in *Dastar* was "origin of

goods," the Court explained that Section 43(a) is "one of the few provisions that goes beyond

trademark protection." *Id.*, 539 U.S. at 29. The Supreme Court in *Daystar* clarified that the

language of Section 43(a) is broader than much of the Lanham Act in that it prohibits actions "that deceive consumers and impair a producer's goodwill." *Id.*, 539 U.S. at 32. Although the Court eventually rejected the plaintiffs' claim in *Dastar*, concluding that claims to protect an author's interest were actionable under copyright law, not the Lanham Act, the Court did not hold that Section 43(a) does not include causes of action grounded in allegations of false or misleading description of fact and false or misleading representation of fact. *See Schlotzsky's, Ltd. v. Sterling Purchasing and National Distribution Co., Inc.*, 520 F.3d 393, 399 (5th Cir. March 2008) (explaining that after *Dastar*, federal courts have noted that Section 43(a) is "a remedial statute that should be broadly construed" and concerns not only false descriptions of origin but also "false representation by those engaged in commerce" and "causes of action grounded in allegations of false or misleading description of fact and false or misleading misrepresentation of fact"); *see also Zyla v. Wadsworth, Div. of Thompson Corp.*, 360 F.3d 243, 251 (1st Cir. 2004) (discussing the breadth of Section 43(a)); *Empresa Cubana Del Tabaco v. Culbro Corp.*, 399 F.3d 462, 478 (2d Cir. 2005) (stating that Section 43(a) includes causes of action grounded in allegations of false or misleading description of fact and false or misleading representation of fact); *Gnesys, Inc. v. Greene*, 437 F.3d 482, 488-89 (6th Cir. 2005) (stating that Section 43(a) concerns false representation by those engaged in commerce, and is clearly not limited to false designation of origin or trademark issues).

The United States District Court for the District of Columbia has clarified that in order to state a federal unfair competition claim alleging false and misleading statements of fact under Section 43(a) of the Lanham Act, a plaintiff must allege that the defendant has made statements of fact in furtherance of commerce that were (1) false or misleading, (2) actually or likely deceptive, (3) material in their effects on buying decisions, (4) connected with interstate

26

commerce, and (5) actually or likely injurious to plaintiff. *See e.g., Globalaw Ltd. v. Carmon and Carmon Law Office & Globalaw, Inc.*, 452 F. Supp. 2d 1, 58 (D.D.C. 2006) (ultimately rejecting plaintiff's Section 43 claim but reciting the standard for stating a facially valid claim, and citing *Alpo Pet Foods v. Ralston Purina Co.*, 913 F.2d 958, 964 (D.D.C. 1990) (affirming the trial court's finding of multiple violations of Section 43 of the Lanham Act for deceptive marketing and modifying the trial court's award of damages)).

In the case at bar, Plaintiffs have submitted sworn demonstrating that in early 2006, the United States Department of Homeland Security ("DHS") approached Spectronic with a request for a video recorder. (*Id.* ¶28). As paragraphs "50" - "57" of the Complaint set forth, prior to his resignation from Spectronic, Defendant Hansen functioned as development manager, reporting directly to the CEO of Spectronic, Kim Lehman. When DHS approached Spectronic with its specifications for a video recorder, Mr. Lehman and Mr. Moestrup tasked Defendant Hansen with interfacing directly with DHS to coordinate the development of such a video recorder. (*Id.*).

From early 2006 through Defendant Hansen's resignation from Plaintiffs, Defendant Hansen used Plaintiffs' financial resources, intellectual property and employees to develop a video recorder to the specifications of DHS. As paragraphs "95" - "100" of the Complaint explain, among the employees assigned to Defendant Hansen in connection with the development of the video recorder were Niels-Ole Pedersen, Ulrich Sorensen and Kim Torbjorn Schjodt. These individuals are now employed by Covidence and are engaged in the promotion of Covidence's video recorder, the "Oculus."

Plaintiffs have submitted sworn testimony that Defendant Hansen intentionally delayed the development of Spectronic's video recorder while he was at Spectronic so that he

could usurp the business opportunity provided by DHS for his own benefit and the benefit of

Covidence.  (*Id.*, ¶¶26-34).  Not only did Defendant Hansen delay the development of

Spectronic's "Freja" recorder while was he was employed as Spectronic's fiduciary, Spectronic

has learned that, notwithstanding the fact that Defendant Hansen has actual knowledge of

Spectronic's plan to release its video recorder to the American market this summer, in the course

of advertising the Oculus video recorder, Defendant Hansen has made false statements to

American customers of Spectronic (including Raytheon and DHS) claiming that Spectronic will

not have a video recorder available to the American market until 2009.  These statements by

Defendant Hansen are demonstrably false, and have been spread throughout the American

intelligence and surveillance community for the commercial purpose of deceiving customers into

purchasing the Oculus from Covidence instead of purchasing the Freja or the Beowulf from

Spectronic.  (*Id.*) [2]

       Moreover, since it is widely known in the industry that the Defendants are former

high-level employees and fiduciaries of Spectronic, and because Defendant Hansen played a key

role in the development of Spectronic's strategic development plan for 2007 - 2011, it is highly

likely that Defendant Hansen deceptive statements regarding the availability - or supposed lack

thereof - of the Freja and/or the Beowulf recorders will materially affect the buying decisions of

American customers within the intelligence and surveillance industry.  (*Id.*) 35.   Since the U.S.

market constitutes approximately 55 percent of all of Spectronic's world-wide sales, a disruption

to Spectronic's sales attempts in the U.S. caused by these deceptions will undoubtedly cause

serious injury to Spectronic and will otherwise adversely affect interstate commerce in the U.S.

---

[2] Interestingly, Defendant Hansen claims that he obtained this information during the proceedings in Denmark. If, in fact, Defendant Hansen is mischaracterizing testimony gathered during the December, 2007 proceedings in his representations to the general public, this only serves to underscore Plaintiffs' rationale in scaling back the relief they ultimately requested from the bailiff's court of Randers, as it is clear that any information obtained from that forum will be made public by Defendants.

confusing the purchasing decisions of such major interstate U.S. purchasers as Raytheon and DHS.

Since Plaintiffs have submitted sworn testimony in good faith averring that Defendant Hansen has made statements of fact in furtherance of commerce that were: (1) false or misleading (Spectronic will not have video recorder ready for the U.S. market until 2009); (2) actually or likely deceptive (based on Defendant Hansen's well-known former status with Spectronic); (3) material in their effects on buying decisions (DHS has or will choose the Oculus over the Freja if it believes the difference in timing is a matter of several months); (4) connected with interstate commerce (the U.S. interstate portion of this industry constitutes 55% of Spectronic's business); and (5) actually or likely injurious to plaintiff (this market is huge for Spectronic), it cannot be said that Plaintiffs' Lanham Act claims are sanctionable. *See Globalaw Ltd.,* 452 F. Supp. 2d at 58. As the above-cited caselaw, Section 43 is broad enough to include causes of action grounded in allegations of false or misleading description of fact and false or misleading representation of fact. Defendant Hansen's claims regarding the Freja fall into that category. Even the Court has determined that Plaintiffs did not meet their high burden of proof for a preliminary injunction, it cannot be said that it is impossible for Plaintiffs to prove the allegations with supplemental proof obtained from willing third-parties. Plaintiffs claims, although perhaps not fully developed to point of entitlement to a preliminary action, were put forth in good faith. Given this District's recognition of the difference between meritless and sanctionable filings, sanctions should not issue under this facts. *See McManus*, 530 F. Supp. 2d at 53, 82.

E.    **Plaintiffs' Computer Fraud and Abuse Act Claims Are Not Sanctionable**

The Computer Fraud and Abuse Act, 18 U.S.C. Section 1030 provides, in relevant

part:

> Section 1030.  Fraud and related activity in
> connection with computers  (a) Whoever (2)
> intentionally accesses a computer without
> authorization **or exceeds authorized access,** and
> thereby obtains (C) information from any protected
> computer if the conduct involved an interstate or
> foreign communication [or] (4) knowingly and with
> intent to defraud, accesses a protected computer
> without authorization, **or exceeds authorized
> access, and by means of such conduct furthers
> the intended fraud and obtains anything of value**
> … shall be punished as provided in subsection (c)
> of this section.

18 U.S.C. §1030(a)(2)(C) and §1030(a)(4).

The CFAA defines "protected computers" as follows:

> The term "protected computer" means a computer
> … which is used in interstate or foreign commerce
> or communication, including a computer located
> outside the United States that is used in a manner
> that affects interstate commerce or foreign
> commerce or communication in the United States.

18 U.S.C. §1030(e)(2)(B).

Although Plaintiffs' primary claim to subject matter jurisdiction arises from

Section 43 of the Lanham Act, paragraphs "112" - "115" of the Complaint set forth the basis

upon which Plaintiffs may develop their CFAA claims.

Following Defendant Hansen's departure, Plaintiffs learned that Defendant

Hansen diverted business opportunities related to the "Omega video" project.  (Complaint,

¶¶112-115).  In November, 2006, Defendant Hansen was tasked with developing a video recorder in collaboration with two of the suppliers now subject to the Danish court's preliminary injunction, "ELSY" and "Jiri Kremar."  Although defendant Hansen was tasked with obtaining exclusive distribution rights for the Omega project on behalf of Spectronic, defendant Hansen reported to Spectronic that he was unable to secure the project for Spectronic.  (Id. ¶113).

Following Hansen's resignation, Spectronic learned that defendant Hansen had, in fact, attempted to negotiate his own deal with Jiri Kremar, a senior product developer for Spectronic's supplier ELSY, related to the Omega project and that he used Spectronic's computers without Spectronic's authorization to attempt to negotiate a deal with Spectronic's supplier on behalf of himself, rather than Spectronic.  Appended to the Complaint as "Exhibit 25" is a "Working document between Jiri Kremar and Spectronic" dated May 2, 2007.  This document shows that defendant Hansen, on behalf of Covidence, inquired of Spectronic's supplier into the possibility of purchasing up to 30 systems prior his departure from Spectronic.  Exhibit 26 to the Complaint demonstrates that while Defendant Hansen was using Spectronic's computers without access to usurp the business opportunities associated with Spectronic's Omega video recorder project, he was telling Brimtek (another supplier now covered by the Danish injunction) that in dealing with customers in the United States, Brimtek should advise all U.S. customers interested in Spectronic's Omega project video recorder that "Jimmi was the guy to deal with selling Omega to U.S."  (Complaint, Exh. 26).

As Plaintiff further develops these facts, it is apparent that Defendant used Spectronic's computers without authorization in order to divert interstate and international sales of video recorders under the Omega project from Spectronic to Defendant Hansen.  Even the Court has determined that Plaintiffs did not meet their high burden of proof for a preliminary

injunction based on the CFAA, it cannot be said that it is impossible for Plaintiffs to prove the allegations with supplemental proof obtained in this action. As with Plaintiffs' Lanham Act claim, Plaintiffs' CFAA claim, although perhaps not fully developed to point of entitlement to a preliminary action, was put forth in good faith. Given this District's recognition of the difference between meritless and sanctionable filings, sanctions should not issue under this facts. *See McManus*, 530 F. Supp. 2d at 53, 82.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court to deny Defendants' motion.

DATED:   Buffalo, New York
         May 16, 2008

                              **JAECKLE FLEISCHMANN & MUGEL, LLP**

                                      /s/ B. Kevin Burke, Jr.
                              By: _____
                                      B. Kevin Burke, Jr., Esq.
                              12 Fountain Plaza
                              Buffalo, New York  14202-2292
                              Telephone:  716.856.0600
                              Facsimile:  716.856.0600

                              **McKOOL SMITH LLP**

                              Michael G. McManus (Bar No. 493422)
                              1700 K Street, NW
                              Suite 740
                              Washington, D.C. 20006
                              Telephone: 202.370.8301
                              Facsimile: 202.370.8344

                              *Attorneys for Plaintiffs Spectronic Denmark A/S,*
                                 *DTC COMMUNICATIONS, INC., and*
                                 *DOMO, LTD.*

861228v1